# AFFIDAVIT FOR SEARCH WARRANT

| 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝕮𝖔𝖚𝖗𝖙 | DISTRICT  Southern District of New York |
|---|---|
| UNITED STATES OF AMERICA  v.  PREMISES KNOWN AND DESCRIBED AS  **(1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK, AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK** | DOCKET NO **06 MAG** MAGISTRATE'S CASE NO. **1188**  To:  Honorable Gabriel W. Gorenstein  United States Magistrate Judge |

The undersigned being duly sworn deposes and says: That he/she has reason to believe that

| ☐ on the person of | ☒ on the premises known | DISTRICT Eastern District of New York |
|---|---|---|

### PREMISES KNOWN AND DESCRIBED AS

**(1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK, AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK**

The following property is concealed:

### SEE ATTACHMENT A

Affiant alleges the following grounds for search and seizure[2]

### SEE ATTACHED AFFIDAVIT

See attached affidavit which is incorporated as part of this affidavit for search warrant

Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

### SEE ATTACHED AFFIDAVIT

| SIGNATURE OF AFFIANT | OFFICIAL TITLE, IF ANY  **Charles Villani, Investigator  United States Attorney's Office, S.D.N.Y.** |
|---|---|

Sworn to before me, and subscribed in my presence:

| DATE  August ____, 2006       AUG 2 2 2006 | JUDGE[1] OR FEDERAL MAGISTRATE JUDGE  S/ Gabriel W Gorenstein |
|---|---|

[1] United States Judge or Judge of a State Court of Record.
[2] If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor

GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

**FILED UNDER SEAL**

IN THE MATTER OF THE APPLICATION   :
OF THE UNITED STATES FOR A SEARCH  :
WARRANT FOR THE PREMISES KNOWN  :
AS (1) 6805 & 6809 FORT HAMILTON    :
PARKWAY, BROOKLYN, NEW YORK, AND  :
(2) 272 VAN NAME AVENUE, STATEN     :
ISLAND, NEW YORK                  :

<u>AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT</u>

06 Mag. _____

-------------------------------------------------------x

STATE OF NEW YORK       )
COUNTY OF NEW YORK   )   SS.:

CHARLES VILLANI, being duly sworn, deposes and says that he is an investigator in the United States Attorney's Office, Southern District of New York.

Upon information and belief, there is probable cause to believe that there is evidence located inside THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES") of violations of Title 18, United States Code, Section 2339B, material support to a foreign terrorist organization; Title 50, United States Code, Section 1701, *et seq.*, violation of the International Emergency Economic Powers Act ("IEEPA"); conspiracy to commit these offenses in violation of 18 U.S.C. § 371; and other laws.

The sources of my information and the grounds for my belief are as follows:

## I.    Introduction

1.     I am an investigator with the United States Attorney's Office in this District and have been employed in this position for approximately 4 months. Prior to serving in this position, I worked for the New York City Police Department for approximately 20 years, and

served on the Federal Bureau of Investigation's Joint Terrorism Task Force for approximately the last 5 of those years. Over the past 5 years, I have participated in numerous terrorism-related investigations. I have also executed several search warrants and arrested individuals associated with crimes relating to terrorism. Based upon my training and experience, I am familiar with the means by which individuals engage in these offenses. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the BROOKLYN PREMISES and STATEN ISLAND PREMISES. In addition, the information contained in this Affidavit is based upon information provided by other law enforcement officers and others, as well as my personal observation and knowledge. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part only.

2.      Based on my training and experience, as well as on information provided by other law enforcement officers, I am familiar with the practices and methods of persons committing terrorism-related crimes. Based on those sources, and on the facts set forth below, I believe that there is probable cause to believe that the BROOKLYN PREMISES and STATEN ISLAND PREMISES contain evidence and instrumentalities of violations of 18 U.S.C. Section 2339B, material support to a foreign terrorist organization; Title 50, United States Code, Section 1701, *et seq.*, violation of the International Emergency Economic Powers Act ("IEEPA"); conspiracy to commit these offenses in violation of 18 U.S.C. § 371; and other laws, as well as other items described in Attachment A, appended hereto.

-2-

3.     Based on my experience, training, and investigation of this and other matters, I know that Hizballah (or Hezbollah), the "Party of God" in Arabic, is an organization based in Lebanon that has been designated a Foreign Terrorist Organization by the United States Department of State, pursuant to Section 219 of the Immigration and Nationality Act. Hizballah was first designated as a Foreign Terrorist Organization by the United States Department of State on or about October 8, 1997, and remains designated as a Foreign Terrorist Organization today. Founded in or about 1982 with support from Iran and Syria after the Israeli invasion of Lebanon, Hizballah's stated mission is the destruction of the State of Israel and the establishment of a fundamentalist Islamic state in Lebanon. Since its formation, Hizballah has been responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon that killed 241 Marines, the 1984 bombing of the United States Embassy in Beirut that killed 24, the 1992 bombing of the Israeli Embassy in Argentina that killed 29, and the 1994 bombing of a Jewish cultural center in Buenos Aires that killed 95.

4.     Based on my experience, training, and investigation of this and other matters, I know that, although Hizballah is designated a Foreign Terrorist Organization by the United States, it nevertheless operates openly in Lebanon. Among other things, in addition to its terrorist activities, Hizballah runs schools, hospitals, and even a television station in Lebanon, and makes little effort to hide its activities or membership. Indeed, members of Hizballah ran for office in the last Lebanese parliamentary election and won approximately 23 of the 128 seats.

5.     Within Lebanon, Hizballah owns and/or operates a media network, the Lebanese Media Group, which is the parent company to both (a) al Manar, a satellite television operation, and (b) al Nour, a radio operation. Al Manar and al Nour regularly broadcast messages

from Hizballah's leadership, and the television and radio station are designed to increase support for Hizballah's activities and mission. These media outlets promote the message and image of Hizballah throughout the world, wherever the radio and television signals can be transmitted and received. As discussed *infra*, the Treasury Department designated both al Manar and al Nour as terrorist entities in March 2006.

6.    In the course of conversations with attorneys for the Government, I have learned that the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001" amended Federal Rule of Criminal Procedure 41. Federal Rule of Criminal Procedure 41(b)(3) now provides that a search warrant may be issued "in an investigation of domestic terrorism or international terrorism (as defined by section 2331 of Title 18, United States Code), by a Federal magistrate judge in any district in which activities related to terrorism may have occurred, for a search of property or for a person within or outside the district." The instant investigation concerns both international and domestic terrorism due to the fact that it concerns activities, both inside the United States and abroad, done in concert with Hizballah, al-Manar, and the Lebanese Media Group, all of which have been designated by the United States government as terrorist entities. *See infra* at ¶ 11.

## II.    Relevant Statutes

7.    Title 18, United States Code, Section 2339B states in relevant part:

Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

8.    The term "material support or resources" in §2339B is defined in 18 U.S.C. § 2339A to include "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."

9.    Title 50, United States Code, Section 1701, et seq., known as the International Emergency Economic Powers Act ("IEEPA"), grants the President the authority to, among other things, "investigate, . . . prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). Section 1701 grants the President the power to exercise this authority upon declaration of a national emergency.

10.    Pursuant to this authority, the Office of Foreign Assets Control ("OFAC"), the office within the Department of Treasury charged with the responsibility of administering sanctions against foreign persons and entities, promulgated regulations to implement Executive Orders relating to national emergencies. Under Executive Order 13224, which is entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism" (attached hereto as "Attachment B"), the Treasury Department has the authority to block interests in property and U.S. transactions of persons or institutions associated with terrorists or terrorist organizations. Specifically, Section 1 of the Order states that

-5-

it applies to "all property and interests in property of the following persons that are in the United States *or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons* are blocked." [Emphasis added.] Pursuant to Section 1(c) of the Order, the Secretary of the Treasury has the authority to determine the "persons" who are subject to the Order. *See* Attachment B, Section 1(c).

11.     Executive Order 13224, Section 2(a) further states that "any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, *including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons ... determined to be subject to this order.*" [Emphasis added.] That Section goes on to prohibit:

> (b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and
> (c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

12.     The Treasury Department's regulations implementing Executive Order 13224 expressly preclude, among other things, "services performed in the United States or by U.S. persons . . . for the benefit of a person whose property or interests in property are blocked pursuant to § 594.201(a)." *See* 31 C.F.R. § 594.406(a)(1) (attached, together with related regulations, as "Attachment C").

13.     On or about March 24, 2006, the Department of Treasury named the following as Specially Designated Global Terrorist (SDGT) entities pursuant to Executive Order 13224: al Manar, a satellite television operation owned or controlled by the Hizballah terrorist

-6-

network; al Nour, a radio operation owned or controlled by Hizballah; and the Lebanese Media Group, the parent company to both al Manar and al Nour. Prior to that designation, on October 31, 2001, Hizballah itself was designated as a SDGT under Executive Order 13224. [According to 31 C.F.R. § 594.201, Note 2 to Paragraph (a), designation as an SDGT indicates that the property and interests in property of the SDGT are blocked. *See* Attachment C; *see also* Attachment D (title page and page listing "Al Manar" as "[SDGT]" in "Alphabetical Listing of Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers (as of June 26, 2006)," 31 C.F.R. Chapter V, appendix A).

14.    IEEPA sets forth criminal penalties for willful violations of its provisions: "Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both." 50 U.S.C. § 1705(b).[1]

### III.    Description of the BROOKLYN PREMISES and STATEN ISLAND PREMISES

15.    The BROOKLYN PREMISES are two adjoining store-front offices located at 6805 and 6809 Fort Hamilton Parkway in Brooklyn. The 6805 location is the office for Strong 1 Brothers, Ltd., and the 6809 location is the office for HDTV Corporation. The front of the two stores is red brick with two glass doors and two glass windows; one door has an HDTV sign at

---

[1]    This criminal prohibition applies to, among other things, "any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order[.]" Executive Order 13224, § 2. The Executive Order goes on to define "United States person" as "any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States." *Id.* § 3.

the top. The two offices share a single white awning. On that awning, "HDTV" is written in blue lettering with "HDTV Ltd.," a 718-area code telephone number, "www.hdtvsatellitereceiver.com," and "We are the leader of digital satellite technology" in black lettering. On that same awning, "Strong" and "Strong 1, Brothers Ltd." is written in black lettering, along with telephone (718-439-3050) and fax (718-439-7188) numbers. An aerial inspection of the BROOKLYN PREMISES in or about February 2006 revealed a large satellite dish on the roof of this building.

16.    The STATEN ISLAND PREMISES includes two structures and satellite equipment installed throughout what appeared to be a double lot, the entirety of which is enclosed by a fence. The first structure is a two-floor, beige brick house with a small stoop facing Van Name Avenue. This first structure is deeper than it is wide. The second structure, located behind the first structure, is approximately the same width as the first, but it is not nearly as deep, and it contains only one floor above ground; the second structure (white in color) is located in the rear of the lot and resembles a large storage shed or a similar building. Finally, the STATEN ISLAND PREMISES includes a significant number of satellite dishes (approximately 8) of various sizes in the space inside the fences that is not occupied by either the first or second structure. A sign on the fence encircling the STATEN ISLAND PREMISES states:

HDTV-LTD
TX/RX EARTHSTATION
VIDEO AUDIO DATA, IP SECURITY
www.hdtvuplink.com
www.fccfederal.com
Email-info@hdtvuplinlk.com [sic]
(718) 439-3050 FAX * (718) 439-7188
<=====================

-8-

## IV. The Investigation

17. In or about February 2006, a confidential source informed law enforcement officers that JAVED IQBAL, a/k/a "John Iqbal," operated a business called "HDTV" in Brooklyn from which he sold satellite television service, including access to al Manar television broadcasts. Subsequent investigation revealed an Internet website — www.hdtvuplink.com — registered on or about June 24, 2004, to "HDTV Corporation" at 6805 Fort Hamilton Parkway in Brooklyn (part of the BROOKLYN PREMISES). The "administrative contact, technical contact" for this website is listed as "John Iqbal" [believed to be JAVED IQBAL]; IQBAL's contact information is listed as "john@hdtvuplink.com." In addition, subsequent investigation revealed other Internet websites registered to HDTV Corporation:

   a. www.strongsatellite.com — registered on or about March 6, 2002, to "HDTV Corporation" at 6805 Fort Hamilton Parkway in Brooklyn. The administrative contact for this website is listed as "john@hdtvuplink.com," and Network Solutions is listed as the "technical contact."

   b. www.hdtvsatellitereceiver.com — registered on or about June 9, 2001, to "HDTV Corporation" at 6805 Fort Hamilton Parkway in Brooklyn. The "administrative contact, technical contact" for this website is listed as "john@hdtvuplink.com." [A review of this website on or about July 26, 2006, indicated that a user attempting to access the website would be automatically redirected to the website described *infra* in ¶17(c), another HDTV website.]

   c. www.americasatellitetv.com — registered on or about December 4, 2001, to "HDTV Corporation" at 6805 Fort Hamilton Parkway in Brooklyn. The "administrative contact, technical contact" for this website is listed as "john@hdtvuplink.com."

d. www.fccfederal.com — registered on or about May 2, 2002, to "HDTV Corporation" at 6805 Fort Hamilton Parkway in Brooklyn. The "administrative contact, technical contact" for this website is listed as "john@hdtvuplink.com." [On or about July 26, 2006, this website seemed to contain only a picture of satellite dishes with directions to call "1718-439-7188" for "HDTV Corporation Setallite [*sic*] Services. This number is listed as the fax number for Strong 1 Brothers Ltd. on the awning at the BROOKLYN PREMISES, *see supra* at ¶ 15.]

18.     A review of the Internet website for HDTV (www.hdtvuplink.com) in or about July 2006 demonstrates that customers are invited to contact the company directly at 6809 Fort Hamilton Parkway in Brooklyn (part of the BROOKLYN PREMISES). On this website, HDTV describes itself as using equipment designed by Strong 1 Brothers Ltd. to provide a "gateway" for satellite service for television and/or data transmission:

> HDTV is a provider of global video and Data transmission services over satellite and fiber. HDTV.SOLUTION provides the most advanced Internet Protocol technology. HDTV's proprietary custom control software gives unsurpassed control over bandwidth. HDTV offers guaranteed Quality of service. As mfg of our own MPEG2 set top box, our new MPEG4 set top box an IP modem. **Our network is fully protected with redundant equipment. Services is monitored 24/7 at our Network Operations Center in Brooklyn an [*sic*] Staten Island.** From a single gateway, our customers can access domestic an [*sic*] international satellites. HDTV network uses the highest MPEG2 compression equipment which allows the company to provide the highest quality signal transmission at any bit rate.

<http://www.hdtvuplink.com/about.htm> (emphasis supplied). The website goes on to say: "Our company HDTV uplink has teleports around the globe offering global satellite coverage through the Intel Sat, Eutel Sat, Pan am Sat, Arab Sat, Telstar, New skies, Amazonas and other satellites.

-10-

68

C/KU and K band teleport services are provided from our teleports in Pakistan (Islamabad), London, and New York." *Id.*

19.     In or about February 2006, I learned that "HDTV Ltd." was incorporated in the State of New York on or about January 31, 2002, and that its registered address is 272 Van Name Avenue in Staten Island (the STATEN ISLAND PREMISES).

20.     Also in or about February 2006, I and other law enforcement officials observed the STATEN ISLAND PREMISES and BROOKLYN PREMISES from a helicopter. At the STATEN ISLAND PREMISES, I observed approximately eight large satellite dishes on the lot.

21.     On or about May 17, 2006, JAVED IQBAL, a/k/a "John Iqbal," was interviewed by law enforcement officials at John F. Kennedy International Airport upon his return to the United States from a trip to Lebanon and other destinations. In that interview, IQBAL stated the following, among other things:

a.     IQBAL owns and operates HDTV Corporation. IQBAL provided a business card that listed www.hdtvuplink.com as the Internet website for his business and 6809 Fort Hamilton Parkway in Brooklyn [part of the BROOKLYN PREMISES] as the business address.

b.     IQBAL stated that he resides in the United States as a legal permanent resident. At the request of law enforcement officers, IQBAL presented a passport from Pakistan and a United States alien registration card.

c.     IQBAL stated that the purpose of his recent trip was to meet media companies in Lebanon and Qatar in order to solicit business to broadcast their transmissions to

-11-

Arab communities in the United States. IQBAL stated that he met with representatives of the Arabic Television Network in Beirut, Lebanon, but IQBAL said that he was unsuccessful in concluding any business deals in Beirut.

        d.    IQBAL stated that he lives at the STATEN ISLAND PREMISES with his wife and four children.

        22.    Also at that border stop on or about May 17, 2006, law enforcement officers copied various items in the possession of JAVED IQBAL, a/k/a "John Iqbal." Two of these items, among others, were:

        a.    A business credit card in the name of "Javed Iqbal, Stong [*sic*] 1 Brothers Ltd."; and

        b.    A card issued on or about January 19, 2005, by the Federal Communication Commission ("FCC") bearing IQBAL's photograph and FCC identification number. The card lists IQBAL's business as "International Teleport Government and Private Media Broadcaster," and lists his address as 6809 Fort Hamilton Parkway in Brooklyn (part of the BROOKLYN PREMISES).

        23.    On or about June 7, 2006, a confidential informant (the "CI") — who is being paid a stipend by the Federal Bureau of Investigation ("FBI") for his investigative activities — walked into the BROOKLYN PREMISES and spoke with JAVED IQBAL, a/k/a "John Iqbal," about the services offered by HDTV. Prior to this meeting, law enforcement officers fitted the CI with a device that recorded (both audio and video) the CI's conversation that day with IQBAL.

I have reviewed a copy of that recording.[2] In that conversation, among other things, the CI stated the following:

a.      The CI stated that he needed the "DISH network" [a satellite television service]. IQBAL asked why the CI needed the DISH Network, and the CI answered that he was Lebanese and needed "LBC" [Lebanon Broadcasting Corporation, which I believe to be a secular/Christian television network]. Before the CI could finish his statement about LBC, IQBAL asked if the CI was "Lebanese Christian." When the CI answered no, IQBAL asked, "Why you don't watch al Manar?" IQBAL soon repeated this question after the CI explained that he needed the television service for his parents.

b.      IQBAL went on to explain different service packages that would allow the CI to receive al Manar broadcasts, as well as broadcasts of other Arab television stations (such as al-Jazeera). At one point, IQBAL stated that most of his customers watched al Manar: "Myself I have 80 percent Lebanese watch al Manar."

c.      IQBAL again asked the CI why he wanted to watch LBC, and stated that al Manar would be one of the channels available if the CI purchased a certain satellite system.

24.     On or about July 11, 2006, the CI notified JAVED IQBAL, a/k/a "John Iqbal," that he (the CI) would like IQBAL to install a satellite system in an apartment in Manhattan. In the course of the CI's conversation with IQBAL, the CI clarified that al Manar would be included in the channels that the CI would be able to access after installing IQBAL's

---

[2]      A review of this video indicates that there are several computers being used at the BROOKLYN PREMISES, apparently as part of IQBAL's business.

satellite. IQBAL thereupon told the CI that al Manar could be found at "Channel 2" on the system that IQBAL would cause to be installed.

25. On or about July 14, 2006, an employee of JAVED IQBAL's came to the Manhattan apartment designated by the CI for the purpose of installing a satellite television system for the CI. This installation was recorded by a hidden video camera. At the end of the installation process, it appeared that "Channel 2" [al Manar] was scrambled — possibly as a result of bombing of Hizballah targets carried out by the State of Israel in Lebanon on or about that date — and the CI asked IQBAL and his employee to fix this problem. In a telephone conversation that day with the CI, according to the CI, IQBAL assured the CI that the recently installed satellite system would enable the CI to receive al Manar broadcasts.

26. On or about July 18, 2006, the CI and JAVED IQBAL, a/k/a "John Iqbal," spoke again over the telephone about the installation of IQBAL's satellite system in the CI's Manhattan apartment. Specifically, the CI told IQBAL that the satellite system was not receiving al Manar broadcasts, as IQBAL had promised. According to the CI, IQBAL stated [falsely] in the course of that conversation that al Manar broadcasts were "legal" in the United States.

27. On or about July 22, 2006, the CI again spoke with JAVED IQBAL, a/k/a "John Iqbal," over the telephone. In that conversation, IQBAL stated that he would have a Lebanese employee or contractor complete the installation of the CI's satellite system to enable the CI to receive al Manar broadcasts. IQBAL added, however, that the Lebanese individual wanted to "check out" the CI to make sure that the CI was not a spy.

28. On or about August 15, 2006, I spoke with Mark Dubowitz, the Chief Operating Officer of the Foundation for Defense of Democracies and a co-manager of the

-14-

Coalition Against Terrorist Media, an organization devoted to highlighting the problem of terrorist-sponsored media broadcasts. Approximately four days earlier, Dubowitz had notified an official of the Department of the Treasury that HDTV was providing al Manar television broadcasts in the United States. In my conversation with Dubowitz on or about August 15th, Dubowitz explained that he had spoken with an individual who had contacted JAVED IQBAL, a/k/a "John Iqbal," in or about March 2006 and informed IQBAL that the U.S. Government had recently designated al Manar as a terrorist entity. According to that individual's report to Dubowitz, IQBAL stated that he was aware of the recent designation and promised at that time (in or about March 2006) to stop broadcasting al Manar.

29.     Also on or about August 15, 2006, another law enforcement officer assigned to the JTTF visually observed JAVED IQBAL, a/k/a "John Iqbal," inside the BROOKLYN PREMISES while walking past the location. On that occasion, the law enforcement officer also observed what appeared to be the symbol and/or banner of al Manar on a television screen inside the offices of HDTV (which were open for business).

30.     On or about August 17, 2006, the CI again spoke with JAVED IQBAL, a/k/a "John Iqbal," over the telephone. With the CI's consent, that conversation was recorded, and I have reviewed a recording of the conversation. In that conversation, IQBAL stated that the CI would have to wait to have al Manar service installed because the recent war had damaged al Manar's ability to broadcast. IQBAL also indicated his knowledge that broadcasting al Manar in the United States was illegal by stating that it was his understanding that the United States government would soon make al Manar's broadcasts legal in the United States.

## REQUEST TO SEARCH THE PREMISES

31.     Based on the foregoing, I believe that there is probable cause that the THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES")   , contain evidence, instrumentalities and fruits of criminal activity.

32.     Therefore, based on the foregoing, I believe that the BROOKLYN PREMISES and STATEN ISLAND PREMISES will contain evidence and fruits and instrumentalities of the crimes described above, including:

(a)     Financial records, including but not limited to checks, wires, journals, ledgers, faxes and/or fax machines, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, correspondence relating thereto (including electronic mail);

(b)     Travel records, and correspondence relating thereto (including electronic mail), evidencing travel to/from the Middle East and payment for such travel;

(c)     Photographs relating to any of the subject matters described above;

(d)     Technical specifications and other materials relating to the provision of satellite signal service, and correspondence relating thereto (including electronic mail);

(e)     Promotional materials, brochures, rates, channel lists, licensing agreements, and other materials relating to the services provided by HDTV Corporation, Strong 1 Brothers, Ltd., JAVED IQBAL, a/k/a "John Iqbal," or any related entities or individuals, and any correspondence relating thereto (including electronic mail);

-16-

74

(f)     Any written materials, videos, audio recordings, MP3 files, correspondence (including electronic mail) and computer files relating to Hizballah, officials and/or representatives of Hizballah, al Manar, al Nour Radio, Lebanese Media Group, or other Special Designated Global Terrorist entities;

(g)     Satellite dishes, routers, switches, wiring, and any other equipment that might be associated with the transmission of data, television broadcasts, and/or radio broadcasts from al Manar, al Nour, and/or the Lebanese Media Group;

(h)     Computer records referring or relating to the information sought in sub-paragraphs (a) and (g) above, including, but not limited to, computers; central processing units; external and internal drives; external and internal storage equipment or media; terminals or video display units; optical and CD scanners; computer software; computerized data storage devices, including data stored on zip drives, handheld "flash" drives, palm pilots and/or other personal data assistants, and any such device's power supply hardware; account names; passwords; encryption codes; computer printouts or computer programs; computer or data processing software or data, including CD-ROMs, hard disks, floppy disks, together with peripheral equipment such as keyboards, printers, modems or acoustic couplers, and magnetic tapes which could contain or be used to transmit or store records, documents, and materials relating to criminal activity by JAVED IQBAL, a/k/a "John Iqbal," and others.  These records include, but are not limited to, materials relating to the establishment and operation of any Internet websites associated with HDTV Corporation, Strong 1 Brothers Ltd., JAVED IQBAL, a/k/a "John Iqbal," or any related entities or individuals.

<u>Search/Seizure of Computers and/or Satellite Equipment</u>

33.     Based on my observations in the course of this investigation, including video recorded of the BROOKLYN PREMISES by the CI and my review of Internet websites for HDTV and related companies, there is probable cause to believe that JAVED IQBAL, a/k/a "John Iqbal," and/or his business associates use computers in the course of criminal activity. Moreover, as described throughout this affidavit, there is probable cause to believe that IQBAL and/or his business associates use satellite equipment to violate IEEPA, to provide material support to a foreign terrorist organization, and to conspire to violate those laws. I therefore request permission to seize certain computer and satellite equipment, including (a) input/output peripheral devices, keyboards, magnetic storage devices, related instructions in the form of manuals and notes, as well as the software utilized to operate any computers, and (b) satellite dishes, routers, wiring, and any other equipment that might be associated with the transmission of data and/or broadcasts from foreign countries, so that these materials may be subsequently analyzed by a qualified specialist in a laboratory setting.

*Computers*

34.     Computer storage devices (such as hard disks, diskettes, compact disks, tapes, zip drives, handheld "flash" drives, etc.) can store the equivalent of thousands of pages of information. In addition, a user may seek to conceal evidence of criminal activity by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending upon the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

-18-

35.     Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficiently specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

36.     Due to the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. It may be the case, however, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises.

37.     Computers recognized in the computer trade as personal "laptop" or "notebook" computers are often substantially smaller devices capable of being stored in a portable carrying case. While the storage capabilities of such devices vary, they are more often designed to facilitate usage by a single individual. Because of these characteristics, physical removal of personal laptop or notebook computers is usually the more practical alternative, and is often less intrusive then requiring federal agents to remain at the premises for the amount of time reasonably

-19-

required to review, analyze and copy pertinent data. Thus, a presumption exists that such computers will be seized and subsequently processed by a qualified computer specialist in a laboratory setting for reasons set forth above.

*Satellite Equipment*

38.     Analyzing satellite equipment for criminal evidence likewise requires expert skill. It is difficult to know prior to the search whether the FBI's experts possess sufficient specialized skills to analyze the equipment and any of its data or features. Moreover, any analysis will need to follow data analysis protocols designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. For that reason, it may be necessary to seize certain equipment and transport it to a controlled environment pending analysis by a trained expert; leaving instrumentalities of criminal activity in the possession of JAVED IQBAL, a/k/a "John Iqbal," at either the BROOKLYN PREMISES or the STATEN ISLAND PREMISES presents too great a risk of loss or destruction of evidence.

*Procedures*

39.     If, after inspecting the input/output peripheral devices, system software, pertinent computer related documentation, and any satellite equipment, it becomes apparent that these items are no longer necessary to retrieve and preserve the evidence, such materials and/or equipment will be returned within a reasonable time.

40.     The analysis of electronically stored computer data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file

-20-

cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

41.     The Government therefore respectfully requests permission to, if necessary, remove any computer systems and satellite equipment from THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES").   The Government will endeavor to determine during the search whether the removal of some or all of the computer system or satellite equipment is necessary to retrieve relevant data.   If it is necessary to remove the computer system or satellite equipment, the data contained therein will be duplicated as quickly as possible and the seized system/equipment returned.

## CONCLUSION

42.     For the foregoing reasons, there is probable cause to believe that THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES")          , contain evidence, instrumentalities, and fruits of a crime, including violations of Title 18, United States Code, Section 2339B, material support to a foreign terrorist organization; Title 50, United States Code,

-21-

Section 1701, *et seq.*, violation of the International Emergency Economic Powers Act ("IEEPA"); conspiracy to commit these offenses in violation of 18 U.S.C. § 371; and other laws.

WHEREFORE, I respectfully request that a search warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure to search THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES"), and to open any closed containers or other closed items found therein (including any safes or computers found on either premises) and to seize said items set forth in the Rider attached to this affidavit. I also respectfully request that this affidavit and related documents be filed under seal. The information to be seized is relevant to an ongoing investigation. Premature disclosure of the contents of the affidavit and related documents may jeopardize this continuing investigation.

Charles Villani
Investigator
United States Attorney's Office, S.D.N.Y.

Sworn to before me this
_____th day of August, 2006

AUG 2 2 2006

S/ Gabriel W. Gorenstein
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-22-

# ATTACHMENT A

## THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES")

(a)     Financial records, including but not limited to checks, wires, journals, ledgers, faxes and/or fax machines, diaries, account applications, service agreements, contracts, loans, credit cards, bills, receipts, deposit and withdrawal slips, bank statements, correspondence relating thereto (including electronic mail);

(b)     Travel records, and correspondence relating thereto (including electronic mail), evidencing travel to/from the Middle East and payment for such travel;

(c)     Photographs relating to any of the subject matters described above;

(d)     Technical specifications and other materials relating to the provision of satellite signal service, and correspondence relating thereto (including electronic mail);

(e)     Promotional materials, brochures, rates, channel lists, licensing agreements, and other materials relating to the services provided by HDTV Corporation, Strong 1 Brothers, Ltd., JAVED IQBAL, a/k/a "John Iqbal," or any related entities or individuals, and any correspondence relating thereto (including electronic mail);

(f)     any written materials, videos, audio recordings, MP3 files, correspondence (including electronic mail) and computer files relating to Hizballah, officials and/or representatives of Hizballah, al Manar, al Nour Radio, Lebanese Media Group, or other Special Designated Global Terrorist entities;

(g)     Satellite dishes, routers, wiring, and any other equipment that might be associated with the transmission of data and/or broadcasts from foreign countries;

(h)     Computer records referring or relating to the information sought in sub-paragraphs (a) and (g) above, including, but not limited to, computers; central processing units; external and internal drives; external and internal storage equipment or media; terminals or video display units; optical and CD scanners; computer software; computerized data storage devices, including data stored on zip drives, handheld "flash" drives, palm pilots and/or other personal data assistants, and any such device's power supply hardware; account names; passwords; encryption codes; computer printouts or computer programs; computer or data processing software or data, including CD-ROMs, hard disks, floppy disks, together with peripheral equipment such as keyboards, printers, modems or acoustic couplers, and magnetic tapes which could contain or be used to transmit or store records, documents, and materials relating to criminal activity by JAVED IQBAL, a/k/a "John Iqbal," and others. These records include, but are not limited to, materials relating to the establishment and operation of any Internet websites associated with HDTV Corporation, Strong 1 Brothers Ltd., JAVED IQBAL, a/k/a "John Iqbal," or any related entities or individuals; and

## ATTACHMENT A (cont.)

**THE PREMISES KNOWN AS (1) 6805 & 6809 FORT HAMILTON PARKWAY, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), AND (2) 272 VAN NAME AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES")**

(i)     The search procedure for electronic data contained in computer operating software or memory devices, whether performed on site or in a laboratory, or other controlled environment, may include the following techniques:

1.  The seizure of any computer or computer-related equipment or data, including floppy diskettes, fixed hard drives, or removable hard disk cartridges, software or memory in any form — which was accessible to or under the control of HDTV Corporation, Strong 1 Brothers Ltd., JAVED IQBAL, a/k/a "John Iqbal," and/or any related entites — containing material described in sub-paragraphs (a)-(g), and the removal thereof from the PREMISES for analysis by authorized personnel;

2. Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

3. "Opening" or cursorily reading the first few pages of such files in order to determine their precise contents;

4. "Scanning" storage areas to discover and possibly recover recently-deleted data;

5. Scanning storage areas for deliberately hidden files; or

6. Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.



Tuesday,
September 25, 2001

Part IV

# The President

Executive Order 13224—Blocking
Property and Prohibiting Transactions
With Persons Who Commit, Threaten To
Commit, or Support Terrorism

Notice of September 24, 2001—
Continuation of Emergency With Respect
to UNITA

ATTACHMENT B
83

Federal Register

Vol. 66, No. 186

Tuesday, September 25, 2001

# Presidential Documents

Title 3—

The President

Executive Order 13224 of September 23, 2001

## Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code, and in view of United Nations Security Council Resolution (UNSCR) 1214 of December 8, 1998, UNSCR 1267 of October 15, 1999, UNSCR 1333 of December 19, 2000, and the multilateral sanctions contained therein, and UNSCR 1363 of July 30, 2001, establishing a mechanism to monitor the implementation of UNSCR 1333,

I, GEORGE W. BUSH, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, acts recognized and condemned in UNSCR 1368 of September 12, 2001, and UNSCR 1269 of October 19, 1999, and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and in furtherance of my proclamation of September 14, 2001, Declaration of National Emergency by Reason of Certain Terrorist Attacks, hereby declare a national emergency to deal with that threat. I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists. I also find that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism.

I hereby order:

**Section 1.** Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

(a) foreign persons listed in the Annex to this order;

(b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

(d) except as provided in section 5 of this order and after such consultation. if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

Sec. 2. Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:

(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order;

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

(c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term "terrorism" means an activity that—

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(ii) appears to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

Sec. 4. I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order. Furthermore, I hereby determine that the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, Public Law 106– 387) shall not affect the imposition or the continuation of the imposition of any unilateral agricultural sanction or unilateral medical sanction on

any person determined to be subject to this order because imminent involvement of the Armed Forces of the United States in hostilities is clearly indicated by the circumstances.

**Sec. 5.** With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

**Sec. 6.** The Secretary of State, the Secretary of the Treasury, and other appropriate agencies shall make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism.

**Sec. 7.** The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Sec. 8.** Nothing in this order is intended to affect the continued effectiveness of any rules, regulations, orders, licenses, or other forms of administrative action issued, taken, or continued in effect heretofore or hereafter under 31 C.F.R. chapter V, except as expressly terminated, modified, or suspended by or pursuant to this order.

**Sec. 9.** Nothing contained in this order is intended to create, nor does it create, any right, benefit, or privilege, substantive or procedural, enforceable at law by a party against the United States, its agencies, officers, employees or any other person.

**Sec. 10.** For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 11.** (a) This order is effective at 12:01 a.m. eastern daylight time on September 24, 2001.

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.

THE WHITE HOUSE,
*September 23, 2001.*

Billing code 3195–01–P

ANNEX

Al Qaida/Islamic Army

Abu Sayyaf Group

Armed Islamic Group (GIA)

Harakat ul-Mujahidin (HUM)

Al-Jihad (Egyptian Islamic Jihad)

Islamic Movement of Uzbekistan (IMU)

Asbat al-Ansar

Salafist Group for Call and Combat (GSPC)

Libyan Islamic Fighting Group

Al-Itihaad al-Islamiya (AIAI)

Islamic Army of Aden

Usama bin Laden

Muhammad Atif (aka, Subhi Abu Sitta,
    Abu Hafs Al Masri)

Sayf al-Adl

Shaykh Sai'id (aka, Mustafa Muhammad Ahmad)

Abu Hafs the Mauritanian (aka, Mahfouz Ould al-Walid, Khalid Al-
    Shanqiti)

Ibn Al-Shaykh al-Libi

Abu Zubaydah (aka, Zayn al-Abidin Muhammad Husayn, Tariq)

Abd al-Hadi al-Iraqi (aka, Abu Abdallah)

Ayman al-Zawahiri

Thirwat Salah Shihata

Tariq Anwar al-Sayyid Ahmad (aka, Fathi, Amr al-Fatih)

Muhammad Salah (aka, Nasr Fahmi Nasr Hasanayn)

Makhtab Al-Khidamat/Al Kifah

Wafa Humanitarian Organization

Al Rashid Trust

Mamoun Darkazanli Import-Export Company

[FR Doc. 01-24205
Filed 9-24-01; 1:05 pm]
Billing code 4810-25-C

## Subpart I—Paperwork Reduction Act

594.901  Paperwork Reduction Act notice.

AUTHORITY: 3 U.S.C. 301; 22 U.S.C. 287c; 31 U.S.C. 321(b); 50 U.S.C. 1601–1651, 1701–1706; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); E.O. 13224, 66 FR 49079, September 25, 2001; E.O. 13268, 67 FR 44751, July 3, 2002; 3 CFR, 2002 Comp., p. 240; E.O. 13284, 64 FR 4075, January 28, 2003.

SOURCE: 68 FR 34197, June 6, 2003, unless otherwise noted.

## Subpart A—Relation of This Part to Other Laws and Regulations

### § 594.101  Relation of this part to other laws and regulations.

This part is separate from, and independent of, the other parts of this chapter, with the exception of part 501 of this chapter, the recordkeeping and reporting requirements and license application and other procedures of which apply to this part. Actions taken pursuant to part 501 of this chapter with respect to the prohibitions contained in this part are considered actions taken pursuant to this part. Differing foreign policy and national security circumstances may result in differing interpretations of similar language among the parts of this chapter. No license or authorization contained in or issued pursuant to those other parts authorizes any transaction prohibited by this part. No license or authorization contained in or issued pursuant to any other provision of law or regulation authorizes any transaction prohibited by this part. No license or authorization contained in or issued pursuant to this part relieves the involved parties from complying with any other applicable laws or regulations.

## Subpart B—Prohibitions

### § 594.201  Prohibited transactions involving blocked property.

(a) Except as authorized by statutes, regulations, orders, directives, rulings, instructions, licenses or otherwise, and notwithstanding any contracts entered into or any license or permit granted prior to the effective date, property and interests in property of the following persons that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in:

(1) Foreign persons listed in the Annex to Executive Order 13224 of September 23, 2001, as may be amended;

(2) Foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury, the Secretary of Homeland Security and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(3) Persons determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security and the Attorney General, to be owned or controlled by, or to act for or on behalf of, any person whose property or interests in property are blocked pursuant to paragraphs (a)(1), (a)(2), (a)(3), or (a)(4)(i) of this section; or

(4) Except as provided in section 5 of Executive Order 13224, any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security and the Attorney General:

(i) To assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of:

(A) Acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States, or

(B) Any person whose property or interests in property are blocked pursuant to paragraph (a) of this section; or

(ii) To be otherwise associated with any person whose property or interests in property are blocked pursuant to paragraphs (a)(1), (a)(2), (a)(3), or (a)(4)(i) of this section.

NOTE 1 TO PARAGRAPH (a). Section 5 of Executive Order 13224, as amended, provides that, with respect to those persons designated pursuant to paragraph (a)(4) of this section, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State, the

ATTACHMENT C

89

Secretary of Homeland Security and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under the International Emergency Economic Powers Act and the United Nations Participation Act if the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

NOTE 2 TO PARAGRAPH (a). The names of persons whose property or interests in property are blocked pursuant to §594.201(a) are published on OFAC's website, announced in the FEDERAL REGISTER and incorporated on an ongoing basis with the identifier [SDGT] in appendix A to 31 CFR chapter V.

NOTE 3 TO PARAGRAPH (a). Section 501.807 of this chapter V sets forth the procedures to be followed by persons seeking administrative reconsideration of their designation pursuant to §594.201(a)(2), (a)(3), or (a)(4) or who wish to assert that the circumstances resulting in designation no longer apply. Similarly, when a transaction results in the blocking of funds at a financial institution pursuant to this section and a party to the transaction believes the funds to have been blocked due to mistaken identity, that party may seek to have such funds unblocked pursuant to the administrative procedures set forth in §501.806 of this chapter.

(b) Unless otherwise authorized by this part or by a specific license expressly referring to this section, any dealing in any security (or evidence thereof) held within the possession or control of a U.S. person and either registered or inscribed in the name of or known to be held for the benefit of any person whose property or interests in property are blocked pursuant to §594.201(a) is prohibited. This prohibition includes but is not limited to the transfer (including the transfer on the books of any issuer or agent thereof), disposition, transportation, importation, exportation, or withdrawal of any such security or the endorsement or guaranty of signatures on any such security. This prohibition applies irrespective of the fact that at any time (whether prior to, on, or subsequent to the effective date) the registered or inscribed owner of any such security may have or might appear to have assigned, transferred, or otherwise disposed of the security.

NOTE 1 TO §594.201. Section 106 of the USA PATRIOT Act of 2001 (Pub. L. 107–56, Oct. 26, 2001) amended section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702) to authorize explicitly the blocking of property and interests in property of a person or entity during the pendency of an investigation. The name of any person or entity whose property or interests in property are blocked pursuant to this authority appears on the Office of Foreign Assets Control's (OFAC) blocked persons list with the descriptor "[BPI-PA]." The scope of the property or interests in property blocked during the pendency of an investigation may be more limited than the scope of the blocking set forth in §594.201(a). Inquiries regarding the scope of any such blocking should be directed to OFAC's Compliance Division at 202/622–2490.

NOTE 2 TO §594.201. The prohibitions set forth in this part are separate from and in addition to other parts of 31 CFR chapter V, including but not limited to the Terrorism Sanctions Regulations (part 595), the Terrorism List Government Sanctions Regulations (part 596), and the Foreign Terrorist Organizations Sanctions Regulations (part 597). The prohibitions set forth in this part also are separate and apart from the criminal prohibition, set forth at 18 U.S.C. 2339B, against providing material support or resources to foreign terrorist organizations designated pursuant to section 219 of the Immigration and Nationality Act, as amended.

§594.202 Effect of transfers violating the provisions of this part.

(a) Any transfer after the effective date that is in violation of any provision of this part or of any regulation, order, directive, ruling, instruction, or license issued pursuant to this part, and that involves any property or interest in property blocked pursuant to §594.201(a), is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests.

(b) No transfer before the effective date shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or any interest in, any property or interest in property blocked pursuant to §594.201(a), unless the person with whom such property is held or maintained, prior to that date, had written notice of the transfer or by any written evidence had recognized such transfer.

§ 594.315 United States person; U.S. person.

The term *United States person* or *U.S. person* means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States.

## Subpart D—Interpretations

§ 594.401 Reference to amended sections.

Except as otherwise specified, reference to any provision in or appendix to this part or chapter or to any regulation, ruling, order, instruction, direction, or license issued pursuant to this part refers to the same as currently amended.

§ 594.402 Effect of amendment.

Unless otherwise specifically provided, any amendment, modification, or revocation of any provision in or appendix to this part or chapter or of any order, regulation, ruling, instruction, or license issued by or under the direction of the Director of the Office of Foreign Assets Control does not affect any act done or omitted, or any civil or criminal suit or proceeding commenced or pending prior to such amendment, modification, or revocation. All penalties, forfeitures, and liabilities under any such order, regulation, ruling, instruction, or license continue and may be enforced as if such amendment, modification, or revocation had not been made.

§ 594.403 Setoffs prohibited.

A setoff against blocked property (including a blocked account), whether by a U.S. bank or other U.S. person, is a prohibited transfer under §§ 594.201 and 594.204 if effected after the effective date.

§ 594.404 Termination and acquisition of an interest in blocked property.

(a) Whenever a transaction licensed or authorized by or pursuant to this part results in the transfer of property (including any property interest) away from a person, such property shall no longer be deemed to be property blocked pursuant to § 594.201(a), unless

there exists in the property another interest that is blocked pursuant to § 594.201(a) or any other part of this chapter, the transfer of which has not been effected pursuant to license or other authorization.

(b) Unless otherwise specifically provided in a license or authorization issued pursuant to this part, if property (including any property interest) is transferred or attempted to be transferred to a person whose property or interests in property are blocked pursuant to § 594.201(a), such property shall be deemed to be property in which that person has an interest and therefore blocked.

§ 594.405 Transactions incidental to a licensed transaction.

Any transaction ordinarily incident to a licensed transaction and necessary to give effect thereto is also authorized, except:

(a) An incidental transaction, not explicitly authorized within the terms of the license, by or with a person whose property or interests in property are blocked pursuant to § 594.201(a); or

(b) An incidental transaction, not explicitly authorized within the terms of the license, involving a debit to a blocked account or a transfer of blocked property.

§ 594.406 Provision of services.

(a) Except as provided in § 594.207, the prohibitions on transactions or dealings involving blocked property contained in §§ 594.201 and 594.204 apply to services performed in the United States or by U.S. persons, wherever located, including by an overseas branch of an entity located in the United States:

(1) On behalf of or for the benefit of a person whose property or interests in property are blocked pursuant to § 594.201(a); or

(2) With respect to property interests subject to §§ 594.201 and 594.204.

(b) Example: U.S. persons may not, except as authorized by or pursuant to this part, provide legal, accounting, financial, brokering, freight forwarding, transportation, public relations, educational, or other services to a person whose property or interests in property are blocked pursuant to § 594.201(a).

NOTE TO §594.406. *See* §§594.506 and 594.507, respectively, on licensing policy with regard to the provision of certain legal or medical services.

### §594.407 Offshore transactions.

The prohibitions in §§594.201 and 594.204 on transactions or dealings involving blocked property apply to transactions or dealings by any U.S. person in a location outside the United States with respect to property that the U.S. person knows, or has reason to know, is held in the name of a person whose property or interests in property are blocked pursuant to §594.201(a) or in which the U.S. person knows, or has reason to know, a person whose property or interests in property are blocked pursuant to §594.201(a) has or has had an interest since the effective date.

### §594.408 Payments from blocked accounts to satisfy obligations prohibited.

Pursuant to §§594.201 and 594.204, no debits may be made to a blocked account to pay obligations to U.S. persons or other persons, except as authorized pursuant to this part.

### §594.409 Charitable contributions.

Unless otherwise specifically authorized by the Office of Foreign Assets Control by or pursuant to this part, no charitable contribution or donation of funds, goods, services, or technology, including those to relieve human suffering, such as food, clothing, or medicine, may be made to or for the benefit of a person whose property or interests in property are blocked pursuant to §594.201(a). For purposes of this part, a contribution or donation is made to or for the benefit of a person whose property or interests in property are blocked pursuant to §594.201(a) if made to or in the name of such a person; if made to or in the name of an entity or individual acting for or on behalf of, or owned or controlled by, such a person; or if made in an attempt to violate, to evade or to avoid the bar on the provision of contributions or donations to such a person.

### §594.410 Credit extended and cards issued by U.S. financial institutions.

The prohibitions in §§594.201 and 594.204 on engaging in transactions or dealings in property subject to those sections prohibits U.S. financial institutions from performing under any existing credit agreements, including, but not limited to, charge cards, debit cards, or other credit facilities issued by a U.S. financial institution to a person whose property or interests in property are blocked pursuant to §594.201(a).

## Subpart E—Licenses, Authorizations and Statements of Licensing Policy

### §594.501 General and specific licensing procedures.

For provisions relating to licensing procedures, see part 501, subpart E, of this chapter. Licensing actions taken pursuant to part 501 of this chapter with respect to the prohibitions contained in this part are considered actions taken pursuant to this part.

[68 FR 53660, Sept. 11, 2003]

### §594.502 Effect of license or authorization.

(a) No license or other authorization contained in this part, or otherwise issued by or under the direction of the Director of the Office of Foreign Assets Control, authorizes or validates any transaction effected prior to the issuance of the license, unless specifically provided in such license or authorization.

(b) No regulation, ruling, instruction, or license authorizes any transaction prohibited under this part unless the regulation, ruling, instruction or license is issued by the Office of Foreign Assets Control and specifically refers to this part. No regulation, ruling, instruction, or license referring to this part shall be deemed to authorize any transaction prohibited by any provision of this chapter unless the regulation, ruling, instruction, or license specifically refers to such provision.

(c) Any regulation, ruling, instruction, or license authorizing any transaction otherwise prohibited under this

459

TEXT

31 C.F.R. Ch. V, App. A

►CODE OF FEDERAL REGULATIONS
►TITLE 31--MONEY AND FINANCE: TREASURY
►SUBTITLE B--REGULATIONS RELATING TO MONEY AND FINANCE
►CHAPTER V--OFFICE OF FOREIGN ASSETS CONTROL, DEPARTMENT OF THE TREASURY
►APPENDICES TO CHAPTER V--NOTE
►Appendix A to Chapter V--Alphabetical Listing of Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers (as of June 26, 2006)

<Text of appendix amended by ►71 FR 39708, retroactively effective June 27, 2006.>

TEXT

17 NOVEMBER (a.k.a. EPANASTATIKI ORGANOSI 17 NOEMVRI; a.k.a. REVOLUTIONARY ORGANIZATION 17 NOVEMBER) [FTO] [SDGT]

TEXT

32 COUNTY SOVEREIGNTY COMMITTEE (a.k.a. 32 COUNTY SOVEREIGNTY MOVEMENT; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; a.k.a. REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. REAL OGLAIGH NA HEIREANN; a.k.a. RIRA) [FTO] [SDGT]

TEXT

32 COUNTY SOVEREIGNTY MOVEMENT (a.k.a. 32 COUNTY SOVEREIGNTY COMMITTEE; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; a.k.a. REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. REAL OGLAIGH NA HEIREANN; a.k.a. RIRA) [FTO] [SDGT]

TEXT

2000 DOSE E.U. (a.k.a. DOMA E M), Calle 31 No. 1-34, Cali, Colombia; NIT # 805015749-3 (Colombia) [SDNT]

TEXT

2000-DODGE S.L., Calle Gran Via 80, Madrid, Madrid, Spain; C.I.F. B83149955 (Spain) [SDNT]

TEXT

2904977 CANADA, INC. (a.k.a. CARIBE SOL; a.k.a. HAVANTUR CANADA INC.), 818 rue Sherbrooke East, Montreal, Quebec H2L 1K3, Canada [CUBA]

TEXT

A G REPRESENTACIONES LTDA., Calle 22 Norte No. 9-43, Cali, Colombia; Calle 20N No. 5N-26 Of. 102, Cali, Colombia; NIT # 800132578-3 (Colombia) [SDNT]

TEXT

A RAHMAN, Mohamad Iqbal (a.k.a. ABDURRAHMAN, Abu Jibril; a.k.a. ABDURRAHMAN, Mohamad Iqbal; a.k.a. ABU JIBRIL; a.k.a. MUQTI, Fihiruddin; a.k.a. MUQTI, Fikiruddin; a.k.a. RAHMAN, Mohamad Iqbal); DOB 17 Aug 1958; POB Tirpas-Selong Village, East Lombok, Indonesia; nationality Indonesia (individual) [SDGT]

TEXT

A.I.C. COMPREHENSIVE RESEARCH INSTITUTE (a.k.a. A.I.C. SOGO KENKYUSHO; a.k.a. ALEPH; a.k.a. AUM SHINRIKYO; a.k.a. AUM SUPREME TRUTH) [FTO] [SDGT]

TEXT

A.I.C. SOGO KENKYUSHO (a.k.a. A.I.C. COMPREHENSIVE RESEARCH INSTITUTE; a.k.a. ALEPH; a.k.a. AUM SHINRIKYO; a.k.a. AUM SUPREME TRUTH) [FTO] [SDGT]

TEXT

A.T.E. INTERNATIONAL LTD. (a.k.a. RWR INTERNATIONAL COMMODITIES), 3 Mandeville Place, London, United Kingdom [IRAQ2]

TEXT

A.W.A. ENGINEERING LIMITED, 3 Mandeville Place, London, United Kingdom [IRAQ2]

TEXT

ABAS, Mohamad Nasir (a.k.a. ABAS, Nasir; a.k.a. BIN ABAS, Mohammed Nasir; a.k.a. BIN ABAS, Sulaiman; a.k.a. "KHAIRUDDIN"; a.k.a. "SOLIMAN"); DOB 6 May 1969; nationality Malaysia (individual) [SDGT]

TEXT

ABAS, Nasir (a.k.a. ABAS, Mohamad Nasir; a.k.a. BIN ABAS, Mohammed Nasir; a.k.a. BIN ABAS, Sulaiman; a.k.a. "KHAIRUDDIN"; a.k.a. "SOLIMAN"); DOB 6 May 1969; nationality Malaysia (individual) [SDGT]

TEXT

ABASTECEDORA NAVAL Y INDUSTRIAL, S.A. (a.k.a. ANAINSA), Panama [CUBA]

TEXT

ABAUNZA MARTINEZ, Javier; DOB 1 Jan 1965; POB Guernica, Vizcaya Province, Spain; D.N.I. 78.865.882 (Spain); Member ETA (individual) [SDGT]

TEXT

ABBAKAR MUHAMAD, Abdul Aziz; DOB 1961; POB Sudan; Passport 562605 (Sudan) issued 28 Oct 1998; IARA Peshwar, Pakistan Director (individual) [SDGT]

TEXT

ABBAS, Abdul Hussein, Italy (individual) [IRAQ2]

TEXT

ABBAS, Abu (a.k.a. ZAYDAN, Muhammad); DOB 10 Dec 1948; Director of PALESTINE LIBERATION FRONT--ABU ABBAS FACTION (individual) [SDT]

ATTACHMENT D
93

TEXT

ABBAS, Kassim, Lerchesbergring 23A, D-60598, Frankfurt, Germany; DOB 7 Aug 1956; POB Baghdad, Iraq (individual) [IRAQ2]

TEXT

ABBES, Moustafa, Via Padova, 82, Milan, Italy; DOB 5 Feb 1962; POB Osniers,

TEXT

Algeria (individual) [SDGT]

TEXT

ABBES, Youcef (a.k.a. "GIUSEPPE"), Via Padova 82, Milan, Italy; Via Manzoni, 33, Cinisello Balsamo, Milan, Italy; DOB 5 Jan 1965; POB Bab El Aoued, Algeria (individual) [SDGT]

TEXT

ABD AL HADI (a.k.a. BENDEBKA, L'Hadi; a.k.a. HADI), Via Garibaldi, 70, San Zenone al Po, Pavia, Italy; Via Manzoni, 33, Cinisello Balsamo, Milan, Italy; DOB 17 Nov 1963; POB Algiers Algeria (individual) [SDGT]

TEXT

ABD AL HAFIZ, Abd Al Wahab (a.k.a. FERDJANI, Mouloud; a.k.a. "MOURAD"; a.k.a. "RABAH DI ROMA"), Via Lungotevere Dante, Rome, Italy; DOB 7 Sep 1967; POB Algiers, Algeria (individual) [SDGT]

TEXT

ABD AL-GHAFAR, Sundus, Iraq; DOB c. 1967; POB Kirkuk, Iraq; nationality Iraq; wife of Izzat Ibrahim Al-Duri (individual) [IRAQ2]

TEXT

ABD AL-GHAFUR, Humam Abd al-Khaliq (a.k.a. 'ABD AL-RAHMAN, Humam 'abd al-Khaliq; a.k.a. ABD-AL-GHAFUR, Humam abd-al-Khaliq; a.k.a. GHAFUR, Humam Abdel Khaleq Abdel; a.k.a. RASHID, Humam 'abd al-Khaliq); DOB 1945; POB ar-Ramadi, Iraq; nationality Iraq; Former Minister of Higher Education and Research; M0018061/104,issued 12 September 1993 (individual) [IRAQ2]

TEXT

'ABD AL-KARIM (a.k.a. ABU AL-MU'TAZ; a.k.a. AL-HABIB; a.k.a. AL-KHALAYLAH, Ahmad Fadil Nazzal; a.k.a. AL-MUHAJIR; a.k.a. AL-ZARQAWI, Abu Mus'Ab; a.k.a. GHARIB; a.k.a. KHALAILAH, Ahmed Fadeel; a.k.a. KHALAYLEH, Fedel Nazzel; a.k.a.

TEXT

AL HARAKAT AL ISLAMIYYA (a.k.a. ABU SAYYAF GROUP) [FTO] [SDGT]

TEXT

AL HARAMAIN (a.k.a. AL-HARAMAIN; INDONESIA BRANCH; a.k.a. AL-HARAMAIN FOUNDATION; a.k.a. YAYASAN AL HARAMAIN; a.k.a. YAYASAN AL HARAMAINI; a.k.a. YAYASAN AL-MANAHIL-INDONESIA), Jalan Laut Sulawesi Blok DII/4, Kavling Angkatan Laut Duren Sawit, Jakarta Timur 13440, Indonesia [SDGT]

TEXT

AL HARAMAIN AL MASJED AL AQSA (a.k.a. AL HARAMAYN AL MASJID AL AQSA; a.k.a. AL-HARAMAIN & AL MASJED AL-AQSA CHARITY FOUNDATION : BOSNIA BRANCH; a.k.a. AL-HARAMAYN AND AL MASJID AL AQSA CHARITABLE FOUNDATION), Hasiba Brankovica No. 2A, Sarajevo, Bosnia and Herzegovina [SDGT]

TEXT

AL HARAMAIN FOUNDATION, INC. (a.k.a. ALHARAMAIN; a.k.a. AL-HARAMAIN; UNITED STATES BRANCH; a.k.a. ALHARAMAIN FOUNDATION; a.k.a. AL-HARAMAIN FOUNDATION; a.k.a. ALHARAMAIN HUMANITARIAN FOUNDATION; a.k.a. AL-HARAMAIN HUMANITARIAN FOUNDATION; a.k.a. ALHARAMAIN ISLAMIC FOUNDATION; a.k.a. AL-HARAMAIN ISLAMIC FOUNDATION; a.k.a. ALHARAMAYN; a.k.a. AL-HARAMAYN; a.k.a. ALHARAMAYN FOUNDATION; a.k.a. AL-HARAMAYN FOUNDATION; a.k.a. ALHARAMAYN HUMANITARIAN FOUNDATION; a.k.a. AL-HARAMAYN HUMANITARIAN FOUNDATION; a.k.a. ALHARAMAYN ISLAMIC FOUNDATION; a.k.a. AL-HARAMAYN ISLAMIC FOUNDATION; a.k.a. ALHARAMEIN; a.k.a. AL-HARAMEIN; a.k.a. ALHARAMEIN FOUNDATION; a.k.a. AL-HARAMEIN FOUNDATION; a.k.a. ALHARAMEIN HUMANITARIAN FOUNDATION; a.k.a. AL-HARAMEIN HUMANITARIAN FOUNDATION; a.k.a. ALHARAMEIN ISLAMIC FOUNDATION; a.k.a. AL-

TEXT

HARAMEIN ISLAMIC FOUNDATION; a.k.a. MU'ASSASAT AL-HARAMAIN AL-KHAYRIYYA; a.k.a. MU'ASSASAT AL-HARAMAYN AL-KHAYRIYYA; a.k.a. MU'ASSASAT AL-HARAMEIN AL-KHAYRIYYA; a.k.a. VAZIR; a.k.a. VEZIR), 3800 Highway 99 S., Ashland, OR 97520- 8718; 1257 Siskiyou BLVD, Ashland, OR 97520; 2151 E. Division St., Springfield, MO 65803 [SDGT]

TEXT

AL HARAMAYN AL MASJID AL AQSA (a.k.a. AL HARAMAIN AL MASJED AL AQSA; a.k.a. AL-HARAMAIN & AL MASJED AL-AQSA CHARITY FOUNDATION; BOSNIA BRANCH; a.k.a. AL-HARAMAYN AND AL MASJID AL AQSA CHARITABLE FOUNDATION), Hasiba Brankovica No. 2A, Sarajevo, Bosnia and Herzegovina [SDGT]

TEXT

AL MANAR TV, Al Manar TV, Abed al Nour Street, Haret Hriek, Beirut, Lebanon; PO Box 354/25, Beirut, Lebanon; info@manartv.com; www.manartv.com; www.almanar.com.lb [SDGT]

TEXT

AL MANSOOREEN (a.k.a. AL MANSOORIAN; a.k.a. ARMY OF THE PURE; a.k.a. ARMY OF THE PURE AND RIGHTEOUS; a.k.a. ARMY OF THE RIGHTEOUS; a.k.a. IDARA KHIDMAT-E-KHALQ; a.k.a. JAMA'AT AL-DAWA; a.k.a. JAMAAT UD-DAAWA; a.k.a. JAMAAT UL-DAWAH; a.k.a. JAMA'AT-I-DAWAT; a.k.a. JAMAATI-UD-DAWA; a.k.a. JAMA'AT-UD-DA'AWA; a.k.a. JAMA'AT-UD-DA'AWAH; a.k.a. JAMAAT-UD-DAWA; a.k.a. JAMAAT-UL-DAWA; a.k.a. JAMAIAT-UD-DAWA; a.k.a. LASHKAR E-TAYYIBA; a.k.a. LASHKAR E-TOIBA; a.k.a. LASHKAR-I-TAIBA; a.k.a. PAASBAN-E-AHLE-HADIS; a.k.a. PAASBAN-E-KASHMIR; a.k.a. PAASBAN-I-AHLE-HADITH; a.k.a. PASBAN-E-AHLE-HADITH; a.k.a. PASBAN-E-KASHMIR;

TEXT

a.k.a. "JUD"), Pakistan [SDGT] [FTO]

TEXT

AL MANSOORIAN (a.k.a. AL MANSOOREEN; a.k.a. ARMY OF THE PURE; a.k.a. ARMY OF THE PURE AND RIGHTEOUS; a.k.a. ARMY OF THE RIGHTEOUS; a.k.a. IDARA KHIDMAT-E-KHALQ; a.k.a. JAMA'AT AL-DAWA; a.k.a. JAMAAT UD-DAAWA; a.k.a. JAMAAT UL-DAWAH; a.k.a. JAMA'AT-I-DAWAT; a.k.a. JAMAATI-UD-DAWA; a.k.a. JAMA'AT-UD-DA'AWA; a.k.a. JAMA'AT-UD-DA'AWAH; a.k.a. JAMAAT-UD-DAWA; a.k.a. JAMAAT-UL-DAWA; a.k.a. JAMAIAT-UD-DAWA; a.k.a. LASHKAR E-TAYYIBA; a.k.a. LASHKAR E-TOIBA; a.k.a. LASHKAR-I-TAIBA; a.k.a. PAASBAN-E-AHLE-HADIS; a.k.a. PAASBAN-E-KASHMIR; a.k.a. PAASBAN-I-AHLE-HADITH; a.k.a. PASBAN-E-AHLE-HADITH; a.k.a. PASBAN-E-KASHMIR; a.k.a. "JUD"), Pakistan [SDGT] [FTO]

TEXT

AL MASRI, Abd Al Wakil (a.k.a. ALI, Hassan; a.k.a. AL-NUBI, Abu; a.k.a. ANIS, Abu; a.k.a. ELBISHY, Moustafa Ali; a.k.a. FADHIL, Mustafa Mohamed; a.k.a. FADIL, Mustafa Muhamad; a.k.a. FAZUL, Mustafa; a.k.a. HUSSEIN; a.k.a. JIHAD, Abu; a.k.a. KHALID; a.k.a. MAN, Nu; a.k.a. MOHAMMED, Mustafa; a.k.a. YUSSRR, Abu); DOB 23 Jun 1976; POB Cairo, Egypt; citizen Egypt alt. Kenya; Kenyan ID No. 12773667; Serial No. 201735161 (individual) [SDGT]

TEXT

AL MUKHLAS, Ali Gufron (a.k.a. GHUFRON, Ali; a.k.a. GUFRON, Ali; a.k.a. HAQ, Huda bin Abdul; a.k.a. MUCHLAS; a.k.a. MUKHLAS; a.k.a. MUKLAS; a.k.a. "SOFWAN"); DOB 9 Feb 1960; alt. DOB 2 Feb 1960; POB Solokuro subdistrict, Lamongan district, East Java province, Indonesian; nationality Indonesia

TEXT

(individual) [SDGT]

TEXT

AL NOUR BROADCASTING STATION (a.k.a. AL NOUR RADIO; a.k.a. AL NUR RADIO; a.k.a. RADIO ANNOUR), Abed Al Nour Street, PO Box 197/25, Alghobeiri, Haret Hriek, Beirut, Lebanon; info@al-nour.net; www.al-nour.net [SDGT]

TEXT

AL NOUR RADIO (a.k.a. AL NOUR BROADCASTING STATION; a.k.a. AL NUR RADIO; a.k.a. RADIO ANNOUR), Abed Al Nour Street, PO Box 197/25, Alghobeiri, Haret Hriek, Beirut, Lebanon; info@al-nour.net; www.al-nour.net [SDGT]

TEXT

AL NUR RADIO (a.k.a. AL NOUR BROADCASTING STATION; a.k.a. AL NOUR RADIO; a.k.a. RADIO ANNOUR), Abed Al Nour Street, PO Box 197/25, Alghobeiri, Haret Hriek, Beirut, Lebanon; info@al-nour.net; www.al-nour.net [SDGT]

TEXT

AL OBAIDI, Tarik Nasser S. (a.k.a. AL-'UBAYDI, Tarik; a.k.a. AL-'UBAYDI, Tariq), Baghdad, Iraq; DOB 1945; POB Baghdad, Iraq; nationality Iraq; Passport 212331 (Iraq) (individual) [IRAQ2]

TEXT

AL PETRA COMPANY FOR GOODS TRANSPORT LTD (a.k.a. PETRA NAVIGATION & INTERNATIONAL TRADING CO. LTD.), Hai Al Wahda Mahalat 906, 906 Zulak 50, House 14, Baghdad, Iraq [IRAQ2]

TEXT

AL QAEDA (a.k.a. AL QA'IDA; a.k.a. AL QAIDA; a.k.a. AL-JIHAD; a.k.a. EGYPTIAN AL-JIHAD; a.k.a. EGYPTIAN ISLAMIC JIHAD; a.k.a. INTERNATIONAL FRONT FOR FIGHTING JEWS AND CRUSADES; a.k.a. ISLAMIC ARMY; a.k.a. ISLAMIC ARMY FOR THE LIBERATION OF HOLY SITES; a.k.a. ISLAMIC SALVATION FOUNDATION; a.k.a. NEW

# 06 MAG 1081

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF THE )
UNITED STATES OF AMERICA )
FOR AN ORDER PURSUANT TO )
18 U.S.C. § 2705(b) )
_____ )

**06 Mag. _____**
**To Be Filed Under Seal**

## ORDER

WHEREAS, on July 27, 2006, the Court issued a warrant (the "Warrant") pursuant to

Federal Rule of Criminal Procedure 41 directing Network Solutions, LLC, an Internet Service Provider,

to disclose certain data and information to law enforcement officials in connection with an ongoing

investigation; and

WHEREAS notifying the affected customers of Network Solutions, LLC may seriously

jeopardize an ongoing investigation by revealing its existence;

IT IS ORDERED that the Warrant and this Order be sealed — and that any notification

required under 18 U.S.C. § 2703(b) with respect to electronic communications requested by the Warrant

be delayed — until either the arrest of JAVED IQBAL, a/k/a "John Iqbal, or 90 days from today (October

25, 2006), whichever occurs first; and

IT IS FURTHER ORDERED that Network Solutions, LLC shall not disclose the existence

of the Warrant and/or this Order of the Court, or the existence of the investigation, to the affected customers

or to any other person (except as necessary to carry out the Warrant and/or this Order) unless and until

authorized to do so by the Court.

SO ORDERED:

New York, New York
July 27th, 2006

s/ Frank Maas
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**FRANK MAAS**
United States Magistrate Judge
Southern District of New York