UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA              :

              – *against* –              :              06 Cr. 1054 (RMB)

JAVED IQBAL and              :              FILED ELECTRONICALLY

SALEH ELAHWAL,              :

            Defendants.
------------------------------------------------------------x


## JOINT MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' PRE-TRIAL MOTIONS


Joshua L. Dratel, Esq.
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street,   3rd floor
New York, NY 10005
(212) 732-0707
*Attorneys for Defendant Javed Iqbal*


Edward V. Sapone, Esq.
Law Office of Edward V. Sapone
1 Penn Plaza, Suite 5315
New York, NY 10119
(212) 974-0600
*Attorney for Defendant Saleh Elahwal*

– Of Counsel –
Joshua L. Dratel
Edward V. Sapone
Renita K. Thukral

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    *The Indictment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    *Mr. Iqbal's Arrest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT I

THE "MATERIAL SUPPORT" COUNTS (1,2, 7 & 8)
SHOULD BE DISMISSED BECAUSE (A)  THEY FAIL
TO STATE AN OFFENSE UNDER THE STATUTE,
18 U.S.C. §2339B;  (B) THE CONDUCT ALLEGED IS
EXEMPTED FROM §2339B;  AND/OR (C)  §2339B IS
UNCONSTITUTIONALLY VAGUE ON ITS FACE OR
AS APPLIED, AND IS UNCONSTITUTIONALLY OVERBROAD . . . . . . . . . . . . . . . . . . . . . 9

A.    *The "Material Support" Allegations In the Indictment* . . . . . . . . . . . . . . . . . . . . . . . . .10

B.    *The "Material Support" Statute – 18 U.S.C. §2339B* . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C.    *Counts 1, 2, 7 & 8 Do Not State An Offense Under §2339B*
      *Because They Fail Allege An Essential Element of the Offense* . . . . . . . . . . . . . . . . . . . 11

      1.    *The Applicable Law Regarding Challenges to An Indictment* . . . . . . . . . . . . . . . 11

      2.    *Counts 1, 2, 7 & 8 Fail to Allege An Essential Element of §2339B* . . . . . . . . . . 12

D.    *Counts 1,2, 7 & 8 Do Not State An Offense Under §2339B Because*
      *They Fail to Identify the "Material Support" Mr. Iqbal and*
      *Dr. Elahwal Allegedly Provided* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

E.    *Count 1, 2, 7 & 8 Are Deficient Because They Includes As*
      *"Material Support" Protected First Amendment Activity*
      *Expressly Excluded From the Ambit of §2339B* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      1.    *Congress, the Courts, and the Department of Justice*
            *All Agree That Protected First Amendment Activity*

*Does Not Constitute "Material Support"* ............................ 17

    a.    *The Rule of Construction Set Forth In §2339B(i)*
        *Explicitly Prohibits Abridgment of First Amendment Rights* ........ 17

    b.    *The Courts' Interpretation Is Uniform and Unambiguous* .......... 19

    c.    *The Department of Justice's Position In Other Cases*
        *Is Consistent With That of Congress and the Courts* ............... 20

  2.    *Analysis of First Amendment Doctrine Demonstrates That*
       *the Allegations In This Case Consist of Protected First*
       *Amendment Activity* ................................................ 23

  3.    *Other Canons of Statutory Construction Similarly Compel Dismissal* ........ 28

F.    *If Mr. Iqbal and Dr. Elahwal's Alleged Conduct Falls Within the*
    *Definition of "Material Support," §2339B Is Unconstitutionally*
    *Vague On Its Face and/or As Applied, and/or Is Unconstitutionally*
    *Overbroad In Violation of the First Amendment* ............................. 30

  1.    *Facial Vagueness When Fundamental Rights Are Implicated* ............. 31

  2.    *The Overbreadth Doctrine* ........................................... 34

  3.    *§2339B Is Unconstitutionally Vague On Its Face*
       *and As Applied, and Is Unconstitutionally Overbroad* ................... 36

  4.    *§2339B's Vagueness Is Aggravated By Its Failure to Contain*
       *Any* De Minimis *Standard of Conduct Necessary for a Violation* ........... 42

POINT II

COUNT FOUR SHOULD BE DISMISSED BECAUSE (A)
THE INDICTMENT FAILS TO ALLEGE ANY
SUBSTANTIVE OFFENSE;  (B)  THE CONDUCT ALLEGED
IS EXEMPTED FROM 22 U.S.C. §287c, AND/OR BECAUSE
THE STATUTE IS UNCONSTITUTIONALLY VAGUE AS
APPLIED, AND/OR IS UNCONSTITUTIONALLY OVERBROAD ................... 48

A.    *The UNPA Charges In the Indictment* ....................................... 49

B.    *The UNPA Counts Fail to Allege An Essential Element* ......................... 50

1.      *The Relevant UNPA Provisions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

2.      *The UNPA Allegations In the Indictment*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

C.      *UNPA By Its Terms Does Not Apply to Hizballah* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

D.      *Protected First Amendment Activity Is Exempt From UNPA*  . . . . . . . . . . . . . . . . . . . . 52

E.      *If UNPA Applied to the Activity Alleged In the Indictment,*
        *the Statute Would Be Unconstitutionally Vague on Its*
        *Face and As Applied, and Unconstitutionally Overbroad* . . . . . . . . . . . . . . . . . . . . . . . 55

POINT III

THE COURT SHOULD DISMISS THE SEVERAL
MULTIPLICITOUS COUNTS IN THE INDICTMENT
BECAUSE THEY VIOLATE THE FIFTH AMENDMENT'S
PROHIBITION AGAINST DOUBLE JEOPARDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A.      *The Legal Principles of Multiciplicity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.      *The Multiplicitous Counts of the Indictment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

        1.      *Count Seven* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

        2.      *Count Eight* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

        3.      *Counts Five, Nine, and Eleven* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

        4.      *Counts Six and Ten* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

C.      *Multiplicitous Counts In An Indictment Create Inherent Jeopardy*
        *to a Defendant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

POINT IV

STATEMENTS MADE BY MR. IQBAL ON AUGUST 23, 2006,
AND ANY AND ALL FRUITS THEREOF, SHOULD BE
SUPPRESSED, AND/OR A HEARING CONDUCTED TO
DETERMINE WHETHER THEY WERE VOLUNTARY . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

A.      *Mr. Iqbal's Statements Were Elicited Unlawfully Without a*
        *Valid* Miranda *Waiver* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

iii

       1.     *Mr. Iqbal Was Under Arrest When Agents Entered His Home* . . . . . . . . . . . . . 63

       2.     *Mr. Iqbal's* Miranda *Waiver Was Not Voluntary* . . . . . . . . . . . . . . . . . . . . . . . 66

            a.     *Voluntariness of a* Miranda *Waiver Must Be
                   Evaluated Under the "Totality of the Circumstances"* . . . . . . . . . . . . . 66

            b.     *Mr. Iqbal's Subsequent* Miranda *Waiver Was Not
                   Voluntary Under the Totality of the Circumstances* . . . . . . . . . . . . . . . 68

B.     *Mr. Iqbal's Statements Were Elicited Unlawfully Without A
      Valid Waiver of Speedy Presentment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

POINT V

ALL PROPERTY SEIZED DURING THE SEARCHES OF
MR. IQBAL'S RESIDENCE, BUSINESS, AND CAR SHOULD BE
SUPPRESSED, AND/OR A HEARING CONDUCTED TO DETERMINE
WHETHER THEY WERE VOLUNTARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

A.     *The August 23, 2006, Search of Mr. Iqbal's Vehicle
      Was Conducted in Violation of the Fourth Amendment* . . . . . . . . . . . . . . . . . . . . . . . 73

B.     *The August 23, 2006, Searches of Mr. Iqbal's Residence and
      Business Were Conducted In Violation of the Fourth Amendment* . . . . . . . . . . . . . . . 75

       1.     *General Warrants Are Not Permissible Under the Fourth Amendment* . . . . . . 76

       2.     *A Search Warrant Issued Based on the Possession and Use of
            Satellite Communication Equipment Violates the First Amendment* . . . . . . . . . 77

POINT VI

THE INDICTMENT SHOULD BE DISMISSED BECAUSE
MR. IQBAL AND DR. ELAHWAL HAVE BEEN SUBJECT
TO SELECTIVE PROSECUTION, OR, IN THE ALTERNATIVE,
THE COURT SHOULD CONDUCT A HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

A.     *Other Entities Have Either Provided Al Manar In the United
      States, or Engaged In Business Transactions With Al Manar* . . . . . . . . . . . . . . . . . . . . 80

B.     *The Applicable Legal Standard for Selective Prosecution Motions* . . . . . . . . . . . . . . . 81

C.     *The Indictment In This Case Is the Product of a Selective Prosecution* . . . . . . . . . . . . 82

iv

POINT VII

THE COURT SHOULD GRANT MR. ELAHWAL A SEVERANCE
BECAUSE OTHERWISE HE WILL SUFFER UNDUE PREJUDICE
IF TRIED JOINTLY WITH MR. IQBAL, AGAINST WHOM ALMOST ALL
OF THE GOVERNMENT'S EVIDENCE, IS DIRECTED,
AND WHOSE STATEMENTS CREATE A *BRUTON* ISSUE ........................ 85

A.    *Mr. Elahwal Will Suffer Undue Prejudice If Tried Jointly With Mr. Iqbal* ........... 85

       1.    *The Applicable Legal Standard* ...................................... 85

       2.    *Mr. ElAhwal Will Be UnFairly Prejudiced If Not Granted a Severance* ...... 87

B.    Bruton v. United States *Requires a Severance In This Case* ...................... 87

POINT VIII

THE COURT SHOULD COMPEL THE GOVERNMENT
TO PRODUCE THE DEMANDED DISCOVERY,
BRADY MATERIAL, AND BILL OF PARTICULARS ............................. 89

Conclusion ............................................................... 93

## Introduction

This Memorandum of Law is submitted on behalf of defendants Javed Iqbal and Dr. Saleh Elahwal in support of their pretrial motions to dismiss the Indictment and for other relief. As detailed below, this case, and these motions, present First Amendment issues of overwhelming importance.

As Mark Neely, Jr. writes in *The Fate of Liberty: Abraham Lincoln and Civil Liberties*, (1991), "if truth is the first casualty of wartime, then civil liberties is surely the second."  Here, that caution has manifested itself in full relief.  The Indictment seeks to punish Mr. Iqbal and Dr. Elahwal for exercise of their First Amendment rights:  facilitating the broadcast of Al Manar, which the government alleges is the television station for Hizballah, a designated Foreign Terrorist Organization (hereinafter "FTO") under U.S. law.

As set forth in POINT I, the Indictment fails in many respects to state an offense under 18 U.S.C. §2339B, which prohibits the provision of "material support" to an FTO.  The Indictment fails to allege an essential element – that defendants knew that Hizballah was an FTO, or of the terrorist conduct underlying the FTO designation.  It also fails to identify the specific statutory type of "material support" allegedly provided.  In fact, the only item identified, television broadcasting services, or equipment related thereto, is so clearly First Amendment activity that it cannot – under the express terms of §2339B, as well as its legislative history and the case law interpreting the statute – constitute "material support."

Even assuming *arguendo* the conduct alleged in the §2339B counts qualify as "material support," the statute is unconstitutionally vague, either on its face or as applied, because it unduly and impermissibly infringes on protected First Amendment activity, and is

1

unconstitutionally overbroad for the same reasons.

Nor do the other charges in the Indictment, instituted under the United Nations Participation Act (hereinafter "UNPA"), 22 U.S.C. §287c, fare any better.  Indeed, as discussed in POINT II, they suffer from similar defects.  For example, the UNPA counts fail to enumerate the United Nations resolutions and regulations or Executive Order that Mr. Iqbal and Dr. Elahwal allegedly violated, which is a predicate to any application of §287c.

Also, UNPA does not reach Mr. Iqbal and Dr. Elahwal's conduct charged herein.  As with §2339B, specific statutory exemptions apply to the First Amendment activities undertaken by Mr. Iqbal and Dr. Elahwal, and place those activities outside the reach of UNPA.  In the event the exemptions do not apply, then §287c would be unconstitutional on its face or as applied, and/or would be unconstitutionally overbroad.

In addition, as set forth in POINT III, there are several counts that should be dismissed because they are multiplicitous, as they charge the same offense, with the only difference being the recipient of the alleged material support:  Hizballah rather than Al Manar.  Yet the government asserts that both are alter-egos, and charges "material support" to Hizbollah based on the provision of the very same "material support" to Al Manar.  The same is true with the paired UNPA counts, which should suffer the same fate.

In POINT IV, Mr. Iqbal challenges the voluntariness of his post-arrest statements.  In POINT V, he does the same with respect to the propriety and validity of the searches of his home, office, and vehicle.  If these motion papers are not sufficient to warrant suppression, Mr. Iqbal respectfully requests evidentiary hearings in the alternative.

POINT VI moves for dismissal of the Indictment because Mr. Iqbal and Dr. Elahwal are subject to selective prosecution based on their ethnicity, the religious heritage, and which is designed to curtail their exercise of their First Amendment rights.  As detailed below, numerous other entities have either transmitted Al Manar's signal to U.S. audiences, or engaged in contractual and/or business relations with Al Manar, without being prosecuted.  Only Mr. Iqbal and Dr. Elahwal, because of their distinct status, have been so targeted.

POINT VII seeks a severance for Dr. Elahwal based on the relative quantum of evidence against he and Mr. Iqbal, and because of issues that arise under *Bruton v. United States*, 391 U.S. 123 (1968), in relation to any admission of Mr. Iqbal's post-arrest statements.  POINT VIII seeks a Bill of Particulars as to two discrete elements that are absent from the Indictment, and without which defendants cannot adequately determine the specific charges against them, prepare their defense or guard against Double Jeopardy.

Accordingly, for all the reasons set forth below, it is respectfully submitted that Mr. Iqbal and Dr. Elahwal's pretrial motions should be granted in their entirety.

### Statement of Facts

Javed Iqbal is a 43-year old Pakistani immigrant who moved to this country with his family when he was a teenager.  *See* Declaration of Javed Iqbal, dated April 4, 2007, (hereinafter, "Iqbal Declaration"), at ¶ 1, attached to the April 6, 2007 Declaration of Joshua L. Dratel (hereinafter, "Dratel Declaration") as Exhibit 1.  He has never practiced the Muslim faith and does not identify with, or believe in, any religion.  *Id*.  Currently, he resides with his wife and their three children.  *Id*.

Although Mr. Iqbal never received any formal education in this country, he has opened

and operated several satellite companies. *Id*., at ¶¶ 1-2.  In 1997, he started Strong Brothers, a company which manufactured satellite receivers, and, in 2000, he started HDTV Corporation (hereinafter, "HDTV"), which introduced inexpensive, hi-definition television programming to the local market. *Id*., at ¶ 2.  In 2005, Mr. Iqbal received a teleport broadcasting license from the Federal Communications Commission, which enabled him to provide bandwith to television companies (such as Al-Manar) that sought to lease space on satellite dishes to which Mr. Iqbal had access. *Id*.

## A.    *The Indictment*

Since early 2005, Mr. Iqbal and his sole co-defendant, Dr. Saleh Elawal,[1] jointly have operated HDTV, a corporation registered in the State of New York that provided, among other things, satellite television services to customers in the New York City area.  At all times relevant to the charged conspiracy, and alleged substantive acts thereunder, HDTV maintained its main office in Brooklyn, New York, and maintained certain satellite equipment at Mr. Iqbal's residence on Staten Island, New York.

Mr. Iqbal is charged in 11 counts arising from his HDTV business venture.  All of the charged criminal conduct relates to business dealings between HDTV and Al-Manar, a news broadcasting agency headquartered in Beruit, Lebenon.[2]

---

[1]  The proper spelling of this defendant's last name is "ElAhwal."  However, he is referenced as "Dr. Saleh Elahwal" in the Indictment, and consequently will be referred to as such herein.

[2]  Notably, the Sealed Complaint signed by the Honorable Frank Maas on July 27, 2006, charged only one count – an alleged conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. §1705(b), in which the charged "overt acts" exclusively revolved around Mr. Iqbal's alleged offer to provide access to Al-Manar television broadcasts, conduct that falls squarely within the province of First Amendment protected speech.  Realizing

Specifically, the Indictment alleges six conspiracies:

- to provide material support, to wit, the provision of satellite television broadcasting services to Al Manar, a television station operated by Hizballah, a Foreign Terrorist Organization (hereinafter, "FTO"), in exchange for payment to HDTV, and the provision of electronic equipment related to satellite television broadcasting to Al Manar, in violation of 18 U.S.C. §2339B (Counts One and Seven);

- to engage in prohibited business transactions with Hizballah, to wit, the provision of satellite television services to Al Manar and electronic equipment, specifically, a power supply cord, in exchange for payment to HDTV, in violation of 22 U.S.C. §287c (Counts Three and Nine); and,

- to engage in prohibited business transactions with Al Manar, to wit, the provision of satellite television services and electronic equipment, specifically, a power supply cord, in exchange for payment to HDTV, in violation of 22 U.S.C. §287c (Counts Five and Eleven).

The Indictment further charges:  (a) two counts of provision of material support or resources to Hizballah, to wit, the provision of satellite television broadcasting services to Al Manar and the provision of electronic equipment related to satellite television broadcasting to Al Manar, in violation of 18 U.S.C. §§2339B and 2 (Counts Two and Eight); and (b) three counts of engaging in prohibited business transactions with Hizballah and Al Manar by providing satellite

---

as much, the government amended the statutory basis for its case and filed the current Indictment under different statutes altogether.

television services and electronic equipment related to satellite television broadcasting to Al Manar, in violation of 22 U.S.C. §287c, 18 U.S.C. §2, Executive Order 13224, C.F.R. Part 594 (Counts Four, Six, and Ten).

Mr. Iqbal was arraigned on November 20, 2006, before this Court, and entered a plea of not guilty on all counts.  These pre-trial motions follow.

**B.**     *Mr. Iqbal's Arrest*

Mr. Iqbal was arrested at his home in Staten Island, New York, pursuant to an arrest warrant, between 5 and 6 o'clock in the morning on August 23, 2006.  *See* Exhibit 1, at ¶ 3; FBI 302 Form, dated August 25, 2006, attached to Dratel Declaration, as Exhibit 2.  At least five agents from New York's Joint Terrorism Task Force (hereinafter, the "JTTF") arrived at Mr. Iqbal's residence, where they awoke Mr. Iqbal and his wife by repeatedly knocking on the front door.  *See* Exhibit 1, at ¶¶ 3-4.

Jarred from sleep, Mr. and Mrs. Iqbal went downstairs and opened the door.  The JTTF agents, all of whom were visibly armed, entered the premises, while Mr. Iqbal's three young children remained asleep in their bedrooms upstairs.  *See id.*, at ¶¶ 5-6.  Mrs. Iqbal was removed from the area by an agent, and escorted upstairs, where she was monitored by other agents for the duration of Mr. Iqbal's interrogation and the ensuing search of their home.  *See id.*, at ¶¶ 6, 9, 10. Over these four hours, Mrs. Iqbal was kept in a separate room from her children – and neither she nor her children were afforded any freedom of movement in their own home.  *See id.*, at ¶ 9.

Upon being isolated from his family, Mr. Iqbal suffered a severe anxiety attack and attempted to obtain his medication.  *See id.*, at ¶ 7.  However, the agents forced him to remain seated, denying him access to his medicine.  *See id.*  Mr. Iqbal, afraid of the consequences of

6

being deprived of his medication, immediately informed the JTTF agents of his multiple medical afflictions, including, but not limited to, acute panic attacks, a chronic cardiac condition, and a history of psychiatric problems, such as prolonged periods of depression and a severe anxiety disorder, all of which required daily medication. *See id*.; Exhibit 2, at p.1.  Furthermore, Mr. Iqbal informed the agents that he had been treated at a hospital emergency room – for the same medical conditions – just *two* days prior, and showed the agents paperwork to confirm it. *See id*., at ¶ 7.

Mr. Iqbal eventually was provided with his medication, and, in spite of his strained health, subsequently was interrogated for the next four hours, while his wife and children remained sequestered upstairs. *See id*., at ¶¶ 8-9.  Additional agents arrived on the scene and began searching Mr. Iqbal's home and surrounding areas, to wit, the "rear building/shed, garage and satellite transmission areas." *See* Exhibit 2, at p.1; Exhibit 1, at ¶ 10.  Forcing Mr. Iqbal to accompany them and watch as they rifled through his belongings, agents seized, *inter alia*, computer equipment (both personal and business-related), satellite equipment used by HDTV, as well as personal and business documents, such as business cards, bank records, telephone records, and bills. *See* Inventory of Search Conducted at 272 Van Name Avenue, dated August 23, 2006, attached to the Dratel Declaration, as Exhibit 6; Exhibit 1, at ¶ 10.

Once the agents had completed searching his home and seizing his property, the agents informed him that they would be transporting him to his business office in Brooklyn, where an additional search would occur.  The agents *then* read Mr. Iqbal his *Miranda* rights, *see* Exhibit 1, at ¶ 11, and asked him to sign:  (1) a *Miranda* waiver, *see* Advice of Rights Form, dated August 23, 2006, attached to the Dratel Declaration as Exhibit 3; (2) a waiver of speedy presentment, *see*

Waiver of Speedy Presentment, dated August 23, 2006, attached to the Dratel Declaration as Exhibit 4; and, (3) a consent to search form. *See* Consent to Search Form, dated August 23, 2006, attached to the Dratel Declaration as Exhibit 5.

Although Mr. Iqbal informed the agents that he did not understand the documents, he was told that "this was standard procedure" and should sign the papers. As Mr. Iqbal stated in his declaration, "[f]eeling that I had no alternative, I relented and signed." Exhibit 1, at ¶ 11.

Overwhelmed by the circumstances, Mr. Iqbal felt the onset of another panic attack and took additional medication. *See id.*, at ¶ 12. Nonetheless, the agents persisted, placing Mr. Iqbal in handcuffs, escorting him to their vehicle, and transporting him to HDTV offices in Brooklyn, where another search was executed in Mr. Iqbal's presence, and additional financial documents, business records, and computer equipment seized. *See* Inventory of Search Conducted at 6805-6809 Fort Hamilton Parkway, dated August 23, 2006, attached to the Dratel Declaration, as Exhibit 7; Exhibit 1, at ¶ 13.

Next, agents transported Mr. Iqbal to FBI offices at 26 Federal Plaza, where, according to the FBI's own account, he was subjected to approximately *eight* more hours of uninterrupted interrogation. *See* Exhibit 2, at p.5. Mr. Iqbal did not receive any food over this time and was held in handcuffs despite his protestations about his worsening health. *See* Exhibit 1, at ¶ 14; *see also* Exhibit 2, at pp. 3-4 (at 1:40 p.m. agents took Mr. Iqbal to a nursing office on the premises where he was examined by Nurse Michael Boyle). At 7:20 p.m., after weathering thirteen straight hours of custodial interrogation while his health progressively deteriorated, Mr. Iqbal was taken to New York Downtown Hospital, where he was treated in the emergency room for his ongoing medical problems. *See* Exhibit 2, at p.5; Exhibit 1, at ¶ 15.

Several hours later, Mr. Iqbal was released from the hospital and taken back into FBI custody.  He spent the night of August 23, 2006, at FBI offices, where he was denied food again. *See* Exhibit 1, at ¶ 15.

**POINT I**

**THE "MATERIAL SUPPORT" COUNTS (1, 2, 7 & 8)
SHOULD BE DISMISSED BECAUSE (A)  THEY FAIL
TO STATE AN OFFENSE UNDER THE STATUTE,
18 U.S.C. §2339B;  (B) THE CONDUCT ALLEGED IS
EXEMPTED FROM §2339B;  AND/OR (C)  §2339B IS
UNCONSTITUTIONALLY VAGUE ON ITS FACE OR
AS APPLIED, AND IS UNCONSTITUTIONALLY OVERBROAD**

The four Counts (1, 2, 7 & 8) that charge a violation of 18 U.S.C. §2339B – providing "material support" to a designated Foreign Terrorist Organization (hereinafter "FTO") – must be dismissed because they fail to state an offense, and/or the statute is unconstitutionally vague on its face or as applied, and/or §2339B is unconstitutionally overbroad.

As detailed below, the material support counts suffer from a variety of fatal infirmities. As a matter of pleading, the counts fail to allege an essential element of the offense altogether, and also fail to identify the statutory form of  "material support" that Mr. Iqbal and Dr. Elahwal allegedly provided.  As a matter of scope, all four material support counts attempt to reach conduct explicitly exempted from §2339B's reach:  specifically, protected First Amendment activity in the form of news and other broadcast programming.

Moreover, if §2339B somehow criminalizes such activity, it is unconstitutionally vague on its face and/or as applied.  In the event the material support counts allege the provision of the specific electronic equipment enumerated in Counts 9 and 10 (which charge a different offense), that vagueness also includes §2339B's failure to include any threshold standard of materiality for

9

determining what constitutes "material support."  In addition, if §2339B reaches the activities of

Mr. Iqbal and Dr. Elahwal, it would be unconstitutionally overbroad as well.

**A.**     ***The "Material Support" Allegations In the Indictment***

The Indictment alleges that Mr. Iqbal and Dr. Elahwal provided the following "material

support":

| Count 1: | "including satellite television broadcasting services" to Hizballah. *See* Indictment, at ¶6. |
|---|---|
| Count 2: | "by providing satellite television services to Hizballah's television station, Al Manar." Id., at ¶9. |
| Count 7: | "agreed with others to provide electronic equipment relating to satellite television broadcasting" to Hizballah (in exchange for money).  *Id*., at ¶23. |
| Count 8: | "provided electronic equipment relating to satellite television broadcasting" to Al Manar (in exchange for money).  *Id*., at ¶26. |

Thus, *all* of the "material support" allegedly provided by Mr. Iqbal and Dr. Elahwal

consists of television broadcasting or equipment relating to such broadcasts.

**B.**     ***The "Material Support" Statute – 18 U.S.C. §2339B***

The "material support" statute under which Mr. Iqbal and Dr. Elahwal are charged,

§2339B, requires that the "material support" be destined for an FTO.  A violation of §2339B is

defined as follows:

> [w]hoever, knowingly provides material support or resources to a
> foreign terrorist organization, or attempts or conspires to do so . . .
> [violates §2339B].  To violate this paragraph, a person must have
> knowledge that the organization is a designated terrorist
> organization . . . or that the organization has engaged in or engages
> in terrorist activity . . . or . . . terrorism[.]

10

18 U.S.C. §2339B(a)(1).

The term "material support or resources" in §2339B is defined in §2339A(b), and presently includes:

> (1) any property, tangible or intangible, or services, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, and other physical assets, except medicine or religious materials[.]

Also, subsection (3) defines "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

**C.     *Counts 1, 2, 7 & 8 Do Not State An Offense Under §2339B Because They Fail To Allege An Essential Element of the Offense***

**1.     *The Applicable Law Regarding Challenges to An Indictment***

As the Second Circuit stated in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), "[a]n indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments." *Id.* at 92, *citing Russell v. United States*, 369 U.S. 749, 760-61 (1962).

The Sixth Amendment "guaranty of the defendant's right 'to be informed of the nature and cause of the accusation' against him is also offended by an indictment that does not state the essential elements of the crime." 212 F.3d at 93, *quoting Russell*, 369 U.S. at 761, *and citing United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). Accordingly, the Indictment must be scrutinized to determine whether it meets these constitutional and statutory standards, and such scrutiny reveals that the Indictment is fatally deficient.

11

2.      *Counts 1, 2, 7 & 8 Fail to Allege An Essential Element of §2339B*

While Counts 1, 2, 7 & 8 allege violations of §2339B, not one count alleges an essential

element of the offense:  that a defendant "must have knowledge that the organization is a

designated terrorist organization . . . or that the organization has engaged in or engages in terrorist

activity . . . or . . . terrorism[.]"

Consequently, Counts 1, 2, 7 & 8 patently fail to state an offense under §2339B and must

be dismissed.  Section 2339B includes *two* knowledge requirements.  The first knowledge

requirement, as pleaded in the Indictment, refers to the knowing provision of material support.

The knowledge requirement at issue here, however, is the *second* knowledge element: that the

recipient of the material support was an FTO, or has engaged in terrorism.  The Indictment simply

does not plead that second knowledge requirement, an essential element added by amendment to

the statute in December 2004.  The first "knowingly" in the statute does not serve double duty in

that regard.  Thus, the single "knowingly" in the "material support" counts does not suffice to

allege the requisite knowledge of the FTO's designation or underlying terrorist activities.

Indeed, prior to the 2004 amendment, the government invariably argued that the first

"knowingly" referred only to the provision of material support, *i.e.*, that the defendant knew that

he or she was providing some form of material support as defined in §2339A(b), and did *not*

require knowledge that the recipient of that material support was an FTO.  *See, e.g.,*

*Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1138 & n. 5 (9th Cir.2000) (hereinafter "*HLP*

*I*");[3]  *United States v. Sattar*, 314 F. Supp.2d 279, 296 (S.D.N.Y. 2004) (hereinafter "*Sattar II*");

---

[3]  In *Humanitarian Law Project v. Ashcroft*, 352 F.3d 382, 400 (9th Cir. 2003) (hereinafter
"*HLP II*"), the Ninth Circuit revisited its prior ruling in *HLP I* that "knowingly" did not apply to
the FTO element of §2339B.  In *HLP II*, the Ninth Circuit read a second scienter element into the

*United States v. Al-Arian*, 308 F. Supp.2d 1322, 1336-37 (M.D. Fla. 2004).  *See also United States v. Sattar*, 272 F. Supp.2d 348, 355-59 (S.D.N.Y. 2003) (hereinafter "*Sattar I*").

In fact, it was the courts' negative reaction to the statute's failure to include that second scienter requirement that precipitated the amendment adding the clause, and the second knowledge element.  *See cases cited* **ante**.  *See also* "Material Support of Terrorists and Foreign Terrorist Organizations: Sunset Amendments," Updated March 17, 2007, at 2 (RL33035) (Charles Doyle, Senior Specialist, American Law Division) (hereinafter "CRS Paper") (2004 amendments were "in response to judicial decisions that either found them unconstitutionally vague or suggested a demanding mens rea (knowledge) requirement");  Andrew Peterson, *Addressing Tomorrow's Terrorists*, 2 J. Nat'l Security & Pol'y ___ (forthcoming) (hereinafter "Peterson"), advance copy at 51 n. 152 (addition of second knowledge element was "in response to court decisions which require specific intent to further the organization[']s illegal activities, not simply to aid the organization") (citation omitted).[4]

Conversely, the single "knowingly" in Counts 1,2, 7 & 8 cannot cover both elements. The 2004 amendment would be entirely superfluous if the first "knowingly" applied as well to FTO status and activity.  Again, the 2004 amendment was added because that first "knowingly" did *not* cover that aspect of the statute.  Accordingly, Counts 1, 2, 7 & 8 fail to include an essential element of §2339B, and must be dismissed as a result.

---

statute in order to preserve its constitutionality.

[4]  Due to its length, a separate copy of the advance version of Mr. Peterson's article is being provided separately with the instant motions.

**D.**   ***Counts 1, 2, 7 & 8 Do Not State An Offense Under §2339B Because They Fail to Identify the "Material Support" Mr. Iqbal and Dr. Elahwal Allegedly Provided***

Counts 1, 2, 7 & 8 suffer from an additional material infirmity:  they fail to allege adequately the "material support or resources" element of §2339B.  As the Court in *Pirro* explained, "'[t]he Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'" 212 F.3d at 93, *quoting Walsh*, 194 F.3d at 44.  As a result, "the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." 212 F.3d at 93.[5]

Also, Rule 12(b), Fed.R.Crim.P., provides, in relevant part, that "[a]ny defense, objection, or request that the court can determine without a trial of the general issue" may be raised before trial by motion.  Courts have held that "[f]or purposes of Rule 12(b)(2), a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 227 F.3d 678, 685 (3d. Cir. 2000). *See also United States v. Alsugair*, 2003 WL 1799003 (D.N.J. April 3, 2003).  Thus, if the facts alleged in the charging document do not establish the crime charged, the charge must be dismissed. *Panarella*, 227 F.3d at 685.[6]

Here, Counts 1, 2, 7 & 8 fail to satisfy that standard with respect to the enumeration of the "material support or resources" Mr. Iqbal and Dr. Elahwal are alleged to have provided.  For

---

[5]   In *Pirro*, a prosecution alleging fraud via a defendant's purported material misrepresentation, the indictment failed to allege the essential element of a material falsehood communicated by the defendant.  212 F.3d at 93.

[6]   Of course, "it is a settled rule that a bill of particulars cannot save an invalid indictment." *Russell,* 369 U.S. at 770. *See also Pirro*, 212 F.3d at 95 n. 10 (same).

14

example, as set forth **ante**, at 10, Counts 1 and 2 list "satellite television broadcasting services" as the "material support."  Yet that is not listed in the definition of "material support," and an essential element of the offense is not to be left to the vernacular, or to guesswork.  The same is true with respect to the "material support" alleged in Counts 7 and 8:  "electronic equipment relating to satellite television broadcasting."  *See* **ante**, at 10.  Thus, the "specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute."  *Panarella*, 227 F.3d at 685.[7]

Also, by including the phrase "to assist" in the conspiracy charged in Count 1, that Count impermissibly blurs the line between *conspiracy* (which is the nominal charge) and *aiding and abetting*, which, as the Second Circuit pointed out in *United States v. Tyler*, 758 F.2d 66 (2d Cir. 1985), are two offenses that are

> separate and distinct. . . .  The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal.   While a community of unlawful intent is similar to an agreement, it is not the same.   Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor ... but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act.

758 F.2d at 70-71, *quoting United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980) (other citations omitted).

Consequently, all four "material support" counts charging Mr. Iqbal and Dr. Elahwal suffer from fatal defects that require dismissal.

Nor does *receiving* material support constitute a violation of §2339B, even though Count

---

[7]  *See also* **post**, at POINT VIII (seeking a Bill of Particulars).  *But see* **ante**, at n. 6.

15

2 includes the allegation that the "satellite television broadcasting services" were provided by Mr. Iqbal and Dr. Elahwal "in exchange for payments of thousands of dollars to HDTV" (their company).  *See* Indictment, at ¶9.  While the Indictment is carefully crafted not to allege that receipt of money by Mr. Iqbal and Dr. Elahwal as the violation of §2339B, in fact that is the gravamen of the conduct charged in those counts.  Yet that cannot sustain a §2339B charge.[8] Consequently, Counts 1, 2, 7 & 8 must be dismissed for failing to state an offense.

**E.**     ***Count 1, 2, 7 & 8 Are Deficient Because They Include As "Material Support" Protected First Amendment Activity Expressly Excluded From the Ambit of §2339B***

Moreover, even if Counts 1, 2, 7 & 8 adequately alleged an offense under §2339B, and even if the conduct alleged constituted "material support" under the statutory definition, those four counts would still be deficient because the "material support" they allege encompasses protected First Amendment conduct that is expressly exempted from §2339B by explicit statutory language, by its legislative history, and the case law interpreting the statute.  Indeed, even the Department of Justice (hereinafter "DoJ") itself shares that point of view.

As discussed below, Congress and the courts have struggled to rein §2339B in so that it does not penalize the exercise of First Amendment rights.  *See* Peterson, at 14 ("[a] balancing of associational and free speech rights with the government's interest in preventing terrorist activity

---

[8]  It is clear from the Congressional Findings to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, that the focus of the material support provision was to proscribe fundraising *for* FTO's, not payments *by* FTO's. Principal among Congress's finding were that "some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations[.]" *Id.* §301(a)(6).

was present from the conception of 'material support'").[9]  Only rigorous adherence to the

restrictions that Congress and the courts have placed on §2339B in that context can save the

statute from unconstitutional application.  Here, fidelity to those principles requires dismissal of

the four material support counts.

>  **1.**  ***Congress, the Courts, and the Department of Justice All Agree That
>        Protected First Amendment Activity Does Not Constitute "Material Support"***

>  **a.**  ***The Rule of Construction Set Forth In §2339B(i)
>        Explicitly Prohibits Abridgment of First Amendment Rights***

In December 2004, §2339B was amended to include, *inter alia*, the following provision in

§2339B(i):

> [n]othing in this section shall be construed or applied so as to
> abridge the exercise of rights guaranteed under the First
> Amendment to the Constitution of the United States.

18 U.S.C. §2339B(I).  *See also* CRS Paper, at 4 (2004 amendments  "may rely on [their] section

2339B First Amendment disclaimer clause to answer the concern that the uncertain term might

lead to prosecution of mere advocacy or other First Amendment protected activities – at least with

regard to prosecutions under 2339B").  *But see* Peterson, at 49 ("even after [the 2004

amendments], the lines between what prohibited material support and constitutionally protected

association was still anything but clear").

That plain language merely codified and reinforced in unambiguous terms what Congress

---

[9]  *See also* Peterson, at 11 ("[t]he development of the 'material support' statutes shows
that Congress has struggled with exactly what level of involvement with terrorists or terrorist
organizations was sufficient to implicate a third party.  Initially, 'material' support was more
akin to participating in or aiding a violent act.  Congress was trying to create a term that would
differentiate between 'mere membership' in a terrorist organization and those who actually
supported and carried out a group's violent activities").

intended all along with respect to the scope of §2339B.  In the legislative history, Congress was careful to point out that the statute was not designed to cover protected speech:

> the ban does not restrict an organization's or an individual's ability to freely express a particular ideology or political philosophy. Those inside the United States will continue to be free to advocate, think and profess the attitudes and philosophies of the foreign organizations.  They are simply not allowed to send material support or resources to those groups, or their subsidiary groups, overseas.

*United States v. Sattar*, 272 F. Supp.2d 348, 357-58 (S.D.N.Y. 2003) (hereinafter "*Sattar I*"), *quoting* H.R. Rep. 104-383 at 45.  *See also* H.R. Rep. No. 104-383, at 44 ("[t]here is no proscription on one's right to think, speak, or opine in concert with, or on behalf of, [a foreign terrorist] organization.").

That same House Report discussed how §2339B should interact with the First Amendment:  citing *Elfbrandt v. Russell*, 384 U.S. 11 (1966), the Report stated that "the Court held "that an individual cannot be restricted from joining such a group.  The Court noted that, '[a] blanket prohibition of association with a group having both legal and illegal aims would pose a real danger that legitimate political expression or association would be impaired."  *Id*. at 15, *citing Scales v. United States*, 367 U.S. 203, 229 (1961).  *See also* Peterson, at 52 ("[t]he fundamental policy problem for Congress in creating the 'material support' prohibitions has not changed:  how to create an acceptable legal line between criminal support for terrorism and the legitimate exercise of protected First Amendment speech and association rights").[10]

---

[10]  The inevitable tension between the scope of the "material support" definition and First Amendment freedoms was present from the former's inception as part of immigration legislation (which was later transformed into the criminal provisions).  As House Committee on the Judiciary Report on H.R. 4427 stated, changes in the definition of "terrorist activity" (in the immigration context) were important, primarily to "make it clear that mere membership in an

Consequently, it is Congress' indisputable and continuing intention to exclude protected First Amendment activity from the scope of the definition of "material support."

### b. *The Courts' Interpretation Is Uniform and Unambiguous*

The Courts, too, have been clear in distinguishing "material support" from constitutionally protected First Amendment activity, including speech. For instance, in *United States v. Sattar*, 314 F. Supp.2d 279, 296 (S.D.N.Y. 2004) (hereinafter "*Sattar II*"), the Court recapitulated its analysis of the initial Indictment in *Sattar I* by stating that "by prohibiting the provision of personnel, including oneself, to a foreign terrorist organization, §2339B could conceivably apply to someone engaging in advocacy on behalf of such an organization, conduct protected by the First Amendment." *Sattar II*, 314 F. Supp.2d at 296, *citing Sattar I*, 272 F. Supp.2d at 358-59 (internal quotations omitted).[11]

Other courts, too, have recognized the critical and dispositive distinction between "material support" and constitutionally protected activity and speech. In *Humanitarian Law Project v. Ashcroft*, 352 F.3d 382 (9th Cir. 2003) (hereinafter "*HLP II*"), the Ninth Circuit explained that §2339B,

> does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group. Plaintiffs are even free to praise the groups for using terrorism as a means of achieving their ends. What AEDPA prohibits is the act of giving material support, and there is no constitutional right to facilitate terrorism by giving terrorists the

_____

organization, some members of which have engaged in terrorist activity, does not constitute an appropriate ground for exclusion." H.R. Rep. No. 100-882, at 19 (1988). Yet, as Peterson states, "the [House] report showed just how difficult and confusing drawing a line between protected associational activity and terrorism really is." Peterson, at 25.

[11] The Second Circuit has yet to address §2339B in this or any other context.

19

> weapons and explosives with which to carry out their grisly
> missions.   Nor, of course, is there a right to provide resources with
> which terrorists can buy weapons and explosives.

205 F.3d at 1133.  *See also HLP II*, 205 F.3d at 1134 ("[a]dvocacy is always protected under the

First Amendment"); *Id.* at 1137 ("advocacy is pure speech protected by the First Amendment");

*Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000, 1026-27 (7th Cir. 2002).

   In *Boim*, the Seventh Circuit stated that §2339B did *not* impose liability "on the basis of

membership alone or because a person espouses the views of an organization that engages in

illegal activities[,]" adding that the defendants could "with impunity, become members of Hamas,

praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of

Hamas."  291 F.3d at 1026.

   In *HLP II*, the Ninth Circuit also recognized that "personnel" in particular, in the context

of §2339B, "blurs the line between protected expression and unprotected conduct[.]"  205 F.3d at

1137.  The Fourth Circuit, too, in *United Sates v. Hammoud*, 381 F.3d 316, 329 (4th Cir. 2004),

*remanded for resentencing on other grounds*, 405 F.3d 1034 (4th Cir. 2005), a case involving

material support to Hizballah, stated that §2339B "does not prohibit mere association;  it prohibits

the *conduct* of providing material support to a designated FTO."  *See also Hammoud*, 381 F.3d at

330 ("Hammoud is free to advocate in favor of Hizballah or its political objectives – § 2339B

does not target such advocacy").

   **c.**  ***The Department of Justice's Position In Other Cases
Is Consistent With That of Congress and the Courts***

   The interpretation set forth above – that protected First Amendment activity cannot

constitute "material support" – is precisely the interpretation of "material support" DoJ has

adopted in other cases.  For instance, in the *Humanitarian Law Project* cases, DoJ repeatedly

urged a construction that would leave First Amendment activity unaffected, or conceded that such activity was not within the law's ambit. *See, e.g., HLP II*, 205 F.3d at 1137-38; *Humanitarian Law Project v. U.S. Dept. Of Justice*, 352 F.3d 382 (9th Cir. 2003) (hereinafter "*HLP III*"), *vacated on other grounds by* 393 F.2d 902 (9th Cir. 2004) (*en banc*); *Humanitarian Law Project v. U.S. Dept. Of Justice,* 2004 WL 547534, at *15 (C.D. Cal. March 17, 2004) (hereinafter "*HLP IV*").

Indeed, in *HLP III*, DoJ even pointed to additions to the United States Attorney's Manual (at §9-91.100)[12] with respect to the definition of "personnel" for the purpose of removing any threat to First Amendment activity. *See HLP III*, 352 F.3d at 403. *See also United States v. Khan*, 309 F. Supp.2d 789, 822 (E.D. Va. 2004).

Similarly, in *United States v. Al-Hussayen*, Cr. No. 03-48-C-EJL (D. Idaho), a prosecution involving *both* §2339A and §2339B, and allegations that dissemination of information over the

---

[12]  The revision to the United States Attorneys' Manual establishes a DoJ policy that:

> a person may be prosecuted under § 2339B for providing "personnel" to a designated foreign terrorist organization if and only if that person has knowingly provided the organization with one or more individuals to work under the foreign entity's direction or control.  Individuals who act independently of the designated foreign terrorist organization to advance its goals and objectives are not working under its direction or control and may not be prosecuted for providing "personnel" to a designated foreign terrorist organization.  Only individuals who have subordinated themselves to the foreign terrorist organization, *i.e.*, those acting as full-time or part-time employees or otherwise taking orders from the entity, are under its direction or control.

United States Attorneys' Manual, at §9-91-100;  *see also Khan*, 309 F. Supp.2d at 822.  That narrowing construction of §2339B was effectively codified in the 2004 amendments at §2339A(b)(2) (further defining "personnel").

internet constituted "material support," DoJ was adamant that it was *not* considering protected

speech (on web sites and in electronic mail messages) as serving as the "material support"

charged in the indictment.  In its Memorandum In Opposition to Defendant's Motion to Dismiss

Count One of the Superseding Indictment (Docket No. 482), at 6, the prosecutors there repeated

that "Section 2339A prohibits conduct, not speech.  The prosecutors, aware of the importance of

this distinction, have charged Mr. Al-Hussayen in the Superseding Indictment with criminal

conduct, not protected speech."  *See also id*. at 3 ("Count One therefore charges Mr. Al-Hussayen

not with *advocating* unlawful conduct but rather with *engaging in* unlawful conduct.  The charges

in Count One are predicated upon provision of these things of value, and not upon Mr. Al-

Hussayen's speech or the speech of others") (emphasis in original).[13]

In a separate filing in *Al-Hussayen*, its Opposition to Defendant's Motion to Dismiss

Count 1 on Vagueness and Over Breadth Grounds (Docket No. 484), at p. 9,[14] the government

insisted that "the Superseding Indictment [does not] lend itself to a reading of Count 1 that would

suggest that the defendant is being prosecuted for 'mere advocacy' that others should commit (or

contribute to the commission of) violent acts, as the result of his efforts to facilitate expression

and dissemination of such views."

As a result, it is clear that Congress, the Courts, and even DoJ all agree that "material

support" does not include protected First Amendment activity.  Here, examination of the

---

[13]  *See also id*. at 3 ("[t]he government is well aware of this distinction and has specifically charged Mr. Al-Hussayen with the criminal act of giving material support and not with the protected practice of abstract advocacy").

[14]  The documents are accessible, via PACER, on the District of Idaho's web site at www.id.uscourts.gov

parameters of protected First Amendment activity compels the conclusion that the allegations

underlying Counts 1, 2, 7 & 8 fail to constitute anything more than protected speech.

> **2.** *Analysis of First Amendment Doctrine Demonstrates That the*
> *Allegations In This Case Consist of Protected First Amendment Activity*

A brief examination of the main cases, and the boundaries of permissible expression as

explicated by the Supreme Court and the lower courts, demonstrates that the conduct alleged in

Counts 1, 2, 7 & 8 plainly falls within the limits of protected First Amendment activity.  The First

Amendment right to free speech includes the freedom to advocate the use of force or violation of

the law, *see Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969), to advocate for illegal action at

some indefinite time in the future, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (*per curiam*), to

advocate the political goals of a terrorist organization, including praising such groups for using

terrorism to achieve its objectives, *HLP II*, 205 F.3d at 1133, and even to advocate for action that

makes it more likely that someone will be harmed at some unknown time in the future by an

unrelated third party.  *Planned Parenthood of the Columbia/Willamette Inc. v. American*

*Coalition of Life Activists*, 244 F.3d 1007, 1015 (9th Cir. 2001) (hereinafter "*PPCW I*"), *vacated*

*on other grounds by* 290 F.3d 1058 (9th Cir. 2002) (*en banc*) (hereinafter "*PPCW II*").

The Complaint in this case, as well as the allegations throughout the Indictment, make

clear, as detailed **ante**, that the "material support" counts include within their allegations conduct

protected under the First Amendment:  speech in the form of political expression, news, and

artistic and entertainment programming.  Consequently, this application of §2339B abridges those

rights if the statute is construed to proscribe such First Amendment activities, and runs afoul of

§2339B(i).  Conversely, as detailed **post**, at section F, if §2339B(i) does not so limit the reach of

§2339B, and permits its application to the circumstances herein, the statute would be

unconstitutional as applied.

*Brandenburg*, the Supreme Court's definitive advocacy case, established that mere advocacy for the use of force or violation of the law is constitutionally protected.  395 U.S. at 449 (stating that a statute which "purports to punish for mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action . . . falls within the condemnation of the [First Amendment]").

In *Brandenburg*, a leader of an Ohio Ku Klux Klan group had been filmed (by a news reporter) making a speech.  395 U.S. at 444-45.  One portion of the film showed Brandenburg and several individuals, some of whom were armed, wearing hoods and gathering around a large burning cross.  395 U.S. at 445-46.  Other portions of the film showed Brandenburg making a speech warning of "revengeance" if the suppression of the white race continued, and making several derogatory comments regarding African-Americans and Jews, including exhortations to "[b]ury" the former, and send the latter "back to Israel."  395 U.S. at 446-47;  446 n.1.

In striking down the Ohio statute under which Brandenburg had been convicted, the Court reasoned that its prior decision in *Noto v. United States*, 367 U.S. 290, 297-98 (1961), distinguished between the mere abstract teaching of the moral propriety or moral necessity to resort to force and violence and actually preparing a group for violence and setting it into action. 395 U.S. at 447-48.

In doing so, the Court established a new (and by now enduring) standard for the constitutional guarantee of free speech by holding that the First Amendment provides protection for the advocacy of force or the violation of the law "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  395

24

U.S. at 448.

Applying this test to the Ohio statute, the Court found that it:

> punishes persons who advocate or teach the duty, necessity, or
> propriety of violence as a means of accomplishing . . . political
> reform;  or who publish or circulate or display any book or paper
> containing such advocacy;  or who justify the commission of
> violent acts with intent to exemplify, spread or advocate the
> propriety of the doctrines of criminal syndicalism;  or who
> voluntarily assemble with a group formed to teach or advocate the
> doctrines of criminal syndicalism.

*Id.*

Accordingly, the Court found that the Ohio statute violated the First Amendment because it failed to distinguish between mere advocacy and the incitement of imminent lawless action. 395 U.S. at 448-49.

The Court's next treatment of the issue occurred in *Hess v. Indiana*, 414 U.S. 105 (1973), in which the Court held that advocating illegal action at some indefinite time in the future was protected by the First Amendment.  Again, the facts are instructive.  Hess had been a participant in an antiwar demonstration at Indiana University during which several individuals had entered a public street disrupting the flow of traffic.  414 U.S. at 106.  When the demonstrators failed to obey verbal orders of the sheriff to clear the street, the sheriff and his deputies began walking up the street, causing the demonstrators to retreat to the sidewalks.  *Id.*  As the sheriff walked up the street he heard Hess yell an expletive, and arrested him for disorderly conduct.  414 U.S. at 107. It was later determined that Hess had actually stated "We'll take the []ing street later," or "We'll take the []ing street again."  *Id.*

The Supreme Court rejected the Indiana court's determination that Hess's statement was designed to "incite further lawless action" and "was likely to produce such action," declaring:

25

[a]t best, however, the statement could be taken as counsel for present moderation; at worst, *it amounted to nothing more than advocacy of illegal action at some indefinite future time.*  This is not sufficient to permit the State to punish Hess' speech.  Under our decisions, *the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.*  Since the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action.  And since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder, *those words could not be punished by the State on the ground that they had a tendency to lead to violence.*

414 U.S. at 108-09 (internal citations and quotations omitted) (emphasis added).  Accordingly, the Court reversed Hess's conviction. 414 U.S. at 109.[15]

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), provided the Court with its next opportunity to identify the limits of protected First Amendment activity.  In *Claiborne*, a boycott included watching the targeted stores, recording the names of African-Americans who violated the boycott, and publishing their names in a local paper entitled "Black Times."  458 U.S. at 903-04.  These persons were branded as traitors, called demeaning names, and socially ostracized.  458 U.S. at 904.  In addition, some violators were victims of retaliation – gunshots were fired into the houses of two violators, and a brick was thrown through a windshield of

---

[15]  *See also Ashcroft v. Free Speech Coaltion*, 535 U.S. 234, 253 (2002) (ban on virtual child pornography violates First Amendment notwithstanding government's argument that such pornography "whets the appetite of pedophiles and encourages them to engage in illegal conduct";  there are "vital distinctions between words and deeds, between ideas and conduct," and the "government may not prohibit speech because it increases the chance an unlawful act will committed 'at some indefinite future time'"), *quoting Hess* (other citations omitted).  The Court in *Ashcroft* added that "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  535 U.S. at 253.

another, among other acts.  458 U.S. at 904-05.

In the course of its analysis, the Court first rejected liability based upon the defendants' participation in the boycott itself, noting that all such acts consisted of various forms of protected conduct and speech.  458 U.S. at 907.  The Court emphasized the importance of group advocacy, *id.* [*quoting Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981)] (stating "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process"), the constitutional protections afforded such activities, 458 U.S. at 908 (*quoting Citizens Against Rent Control*, 454 U.S. at 296) ("[t]here are, of course, some activities, legal if engaged by one, yet illegal if performed in concert with others, but political expression is not one of them"), as well as the fact that such protections are not foregone by members of the group merely because other members may have participated in unprotected conduct.  458 U.S. at 908-09, *citing De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) ("[t]he question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bound of the freedom of speech which the Constitution protects").  *See also Scales v. United States*, 367 U.S. 203, 224-25 (1961).

The First Amendment right to disseminate news and information is as important and fundamental as any in the Bill of Rights.[16]   Courts have recognized that *political* speech or First

---

[16]  The First Amendment states in full as follows:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof;  or abridging the freedom of speech, or the press;  or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

Amendment activity merits maximum protection.  Indeed, political speech is at the core of the

First Amendment's protection.  *Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1079 (9th Cir.

1990) ("[p]olitical speech lies at the core of the First Amendment's protections").  *See also Mills*

*v. Alabama,* 384 U.S. 214, 218 (1966) ( "there is practically universal agreement that a major

purpose of [the First] Amendment was to protect the free discussion of governmental affairs");

*Boim*, 291 F.3d at 1026 ("[a]dvocacy is always subject to the highest levels of scrutiny under the

First Amendment");  *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960) (holding that statute

requiring disclosure of organizations to which teachers made contributions implicated the "right

of free association, a right closely allied to freedom of speech and a right which, like free speech,

lies at the foundation of a free society").

Here, Mr. Iqbal and Dr. Elahwal's conduct as alleged in this case – broadcasting the signal

of Al Manar's television programming – falls squarely within First Amendment parameters.  As a

result, the conduct alleged against Mr. Iqbal and Dr. Elahwal herein cannot be prosecuted under

§2339B, because to do so would clearly abridge First Amendment rights in violation of

§2339B(i), and contrary to the statute's legislative history and interpretation by the courts.

### 3.    *Other Canons of Statutory Construction Similarly Compel Dismissal*

Holding otherwise would also contravene the doctrine of constitutional avoidance, which

applies when "a statute is susceptible of two constructions, by one of which grave and doubtful

constitutional questions arise and by the other of which such questions are avoided, [a court's]

duty is to adopt the latter."  *United States ex rel. Attorney General, v. Delaware & Hudson Co.*,

213 U.S. 366, 408 (1909).  *See also Jones v. United States*, 526 U.S. 227, 239-40 (1999).  *Accord*

*Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997);  *United States v. Al-Arian*, 329 F.

Supp.2d 1294, 1298 & n. 11 (M.D. Fla. 2004) (relative to §2339B);  *United States v. Khan*, 309 F.

Supp.2d at 822 (applying the same principle to "personnel" in the context of §2339A).

Moreover, other canons of statutory construction further support that conclusion.  For

instance, in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005), the Court cautioned

that,

> "[w]e have traditionally exercised restraint in assessing the reach of
> a federal criminal statute, both out of deference to the prerogatives
> of Congress, *Dowling v. United States*, 473 U.S. 207 (1985), and
> our of concern that 'a fair warning should be given to the world in
> language that the common world will understand, of what the law
> intends to do if a certain line is passed.'  *McBoyle v. United States*,
> 283 U.S. 25, 27 (1931)."

*Id.*, *quoting United States v. Aguilar*, 515 U.S. 593, 600 (1995).

The Court in *Andersen* added that "[s]uch restraint is particularly appropriate here, where

the act underlying the conviction . . . is itself innocuous."  *Id.*[17]  Such restraint is equally, if not

more, necessary here, since the government, in alchemizing protected First Amendment activity

into "material support," seeks to punish conduct which, as the Ninth Circuit found in the specific

context of "personnel" under §2339B, "blurs the line between protected expression and

unprotected conduct[.]"  *See HLP II,* 205 F.3d at 1137.

As the Supreme Court explained in *NAACP v. Button*, 371 U.S. 415, 433 (1963) (citations

omitted), "[t]hese [First Amendment] freedoms are delicate and vulnerable, as well as supremely

precious in our society.  The threat of sanctions may deter their exercise almost as potently as the

actual application of sanctions. [ ]  Because First Amendment freedoms need breathing space to

---

[17]  In *Andersen*, that otherwise innocuous act was "persuasion" (in the context of alleged
obstruction of justice).

29

survive, government may regulate in the area only with narrow specificity. [ ]"  *See also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997);  *HLP III*, 352 F.3d at 403-04.

Also, to the extent there is any ambiguity whether the conduct at issue here constitutes "material support" under §2339A(b)(1) or is exempted under §2339B(i), the rule of lenity should be applied at this stage because the §2339B charge, which relies on protected First Amendment activity to satisfy the "material support" element, in contravention of statutory language, Congressional intent, and caselaw, will at the very least create the "grievous ambiguity or uncertainty" necessary for invocation of the rule of lenity.  *See Chapman v. United States,* 500 U.S. 453, 463 (1991)*.*

Accordingly, Counts 1, 2, 7 & 8, which charge "material support" under §2339B, must be dismissed.

**F.**     ***If Mr. Iqbal and Dr. Elahwal's Alleged Conduct Falls Within the Definition of "Material Support," §2339B Is Unconstitutionally Vague On Its Face and/or As Applied, and/or Is Unconstitutionally Overbroad In Violation of the First Amendment***

As the foregoing analysis demonstrates, the conduct alleged against Mr. Iqbal and Dr. Elahwal in Counts 1, 2, 7 & 8 is not encompassed by §2339B.  However, if, notwithstanding the plain meaning of §2339B and §2339B(i), the legislative history, the case law, and the DoJ's acknowledged limitations of the statute, somehow that conduct is deemed within the definition of "material support," §2339B would be unconstitutional on its face and/or as applied.  In addition, it would be unconstitutionally overbroad in violation of the First Amendment.

The First Amendment implications of the allegations in this case – pure information dissemination via television broadcasting – are self-evident, and the facts have been set forth in sufficient detail **ante**, at POINT I (A).  Likewise, the general First Amendment principles

regarding speech and political advocacy will not be reiterated herein.  *See* **ante**, at POINT E (2).

Instead, this section will present the principles of vagueness and overbreadth analysis, and how

they apply to this case.

### 1.   *Facial Vagueness When Fundamental Rights Are Implicated*

Vague laws offend two aspects of the Fifth Amendment's Due Process guarantee:  they

fail to provide adequate notice of what conduct is proscribed, and the lack of definable standards

makes them susceptible to arbitrary and discriminatory enforcement.  *Grayned v. City of*

*Rockford,* 408 U.S. 104, 108-09 (1972).

There has been much debate whether a challenge to a statute's facial vagueness requires

that such an enactment be vague in *all* its applications.  *See Farrell v. Burke*, 449 F.3d 470, 495-

96 & ns. 11-12 (2d Cir. 2006).  Regardless, the Second Circuit has determined that "[w]hen a

regulation does not threaten the exercise of fundamental rights, one whose conduct is clearly

proscribed by the [regulation] cannot successfully challenge it for vagueness."  *United States v.*

*Rybicki,* 354 F.3d 124, 129 (2d Cir. 2003) (*en banc*) (citations and internal quotation marks

omitted).

However, as the Court in *Farrell v. Burke* explained, "[w]hen fundamental rights are

implicated, however, the rules are different."  449 F.3d at 496.  Thus, as the Court elaborated,

quoting the Supreme Court,

> [o]ur cases . . . recognize a different approach where the statute at
> issue purports to regulate or proscribe rights of speech or press
> protected by the First Amendment.  Although a statute may be
> neither vague, overbroad, nor otherwise invalid as applied to the
> conduct charged against a particular defendant, he is permitted to
> raise its vagueness or unconstitutional overbreadth as applied to
> others.   And if the law is found deficient in one of these respects, it
> may not be applied to him either, until and unless a satisfactory

31

limiting construction is placed on the statute.

*Id.*, *quoting Coates v. City of Cincinnati,* 402 U.S. 611, 619-20 (1971) (internal citations omitted).

As a result, "[t]he general rule disfavoring facial vagueness challenges does not apply in the First Amendment context." *Farrell v. Burke*, 449 F.3d at 496, *citing Advance Pharm., Inc. v. United States,* 391 F.3d 377, 396 (2d Cir. 2004) [characterizing *City of Chicago v. Morales,* 527 U.S. 41, 55 (1999) (Stevens, J., plurality opinion) as "noting [the] propriety of facial vagueness review when [the] statute infringes on constitutionally protected rights" and *Parker v. Levy,* 417 U.S. 733, 759 (1974), as "noting [the] exception in [the] First Amendment context to [the] traditional rule against facial attacks"].

Nevertheless, "'[f]acial vagueness challenges may go forward only if the challenged regulation "reaches a substantial amount of constitutionally protected conduct.'" 449 F.3d at 496-97, *quoting Kolender v. Lawson,* 461 U.S. 352, 358 n. 8 (1983) (internal citation and quotation marks omitted), and *citing Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 60 (1976) (noting that a facial challenge for vagueness may go forward where "the statute's deterrent effect on legitimate expression" is "both real and substantial").

In *NAACP v. Button*, the Supreme Court further explained the different presumptions that apply when First Amendment activities are at issue:

> [i]f the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression.

371 U.S. at 432.

Another potential intermediate standard of review exists pursuant to the Supreme Court's

32

decision in *United States v. O'Brien*, 391 U.S. 367 (1968).  Under *O'Brien*, the government

action must be content-neutral and within the government's constitutional authority;  it must serve

substantial or important interests;  and it must "not 'burden substantially more speech than is

necessary to further the government's legitimate interests.'" *Turner Broadcast System v. FCC*,

512 U.S. 622, 662 (1994), *quoting Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

A content-neutral provision has only incidental impact on First Amendment activity.

Regarding §2339B, courts have held the statute to be content-neutral with respect to the First

Amendment, thus implicating the *O'Brien* standard.  *See Sattar I*, 272 F. Supp.2d 348, 361-62

(S.D.N.Y. 2003).  *See also HLP II*, 205 F.3d at 1134-35 (§2339B's funding ban is content-

neutral).

Consequently, in determining whether a defendant may challenge a statute on its face, the

Court "must first determine whether the [statute] will have a substantial chilling effect on

protected conduct."  449 F.3d at 497, *citing United States v. Loy,* 237 F.3d 251, 259 2d Cir. 2001)

("[a] defendant whose conduct is at the 'core' of the activities clearly covered by the statute's

terms may only raise a vagueness defense if the statute is one that is likely to chill the exercise of

constitutionally protected conduct.").

Here, as set forth **ante**, it is beyond dispute that "core" First Amendment values – speech

and the right to publish news and information – are at stake.[18]  Thus, a facial vagueness challenge

---

[18] In *Farrell*, the Court held that the Special Condition of parole imposed on the
petitioner, a convicted sex offender, was not facially vague because he "failed to show that the
Special Condition reached a substantial amount of protected conduct because (1) [his] First
Amendment rights as a paroled sex offender were circumscribed, (2) [he] was the only person
affected by the Special Condition, and (3) [he] offered no evidence that the Special Condition
chilled any protected conduct while it was in effect."  449 F.3d at 498.  All three factors
distinguish *Farrell* from the situation here.

33

to §2339B is appropriate.  *See HLP II*, 205 F.3d at 1137-38 (holding certain portions of the definition of "material support" vague on their face).

2.    *The Overbreadth Doctrine*

As the Second Circuit explained in *Farrell v. Burke*, "[o]verbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing." 449 F.3d at 498, *citing Broadrick v. Okla.,* 413 U.S. 601-12 (1973).  As a result, "[a] party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them."  *Id.*, *citing Broadrick*, 413 U.S. at 612.  *See also American Booksellers Foundation v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) ("[i]n the context of the First Amendment, a party whose speech could be constitutionally regulated is permitted to challenge a statute based on its overbreadth, the fact that the statute regulates not only their unprotected speech but also a substantial amount of protected speech") (citation omitted).

As the Second Circuit has stated, "[a] law is overbroad, and hence void, if it 'does not aim specifically at evils within the allowable area of State control, but, on the contrary, sweeps within its ambit other activities that . . . constitute an exercise of freedom of speech or of the press.'" *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999), *quoting Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).[19]  Ultimately, "[w]hen a court finds that a statute suffers from such substantial overbreadth, all enforcement of the statute is generally precluded."  *American Booksellers*, 342 F.3d at 104.  Also, "[a]ll overbreadth challenges are facial challenges, because an overbreadth

_____

[19]  In *Rahman*, which involved charges of seditious conspiracy, the Court noted that while speech can be regulated by such statutes, "political speech and religious exercise are among the activities most jealously guarded by the First Amendment."  189 F.3d at 117.

challenge by its nature assumes that the measure is constitutional as applied to the party before the court."  449 F.3d at 498.

However, as the Second Circuit noted in *Farrell*, "[o]verbreadth and vagueness are different doctrines."  449 F.3d at 498.  In fact, "'[a] clear and precise enactment [for vagueness purposes] may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct.'"  *Grayned v. City of Rockford,* 408 U.S. at 114.  Thus, as in *Farrell*, even an unsuccessful vagueness challenge will

> not be a barrier to [an] overbreadth challenge[], because overbreadth challenges are based upon the hypothetical application of the statute to third parties.  A plaintiff claiming overbreadth need not show that the challenged regulation injured his or her First Amendment interests in any way in order to bring the overbreadth challenge.

449 F.3d at 498-99.

In *Farrell*, the Court instructed that "[i]n order to prevail on an overbreadth challenge, 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'"  *Id*., at 499, *quoting Broadrick,* 413 U.S. at 615.  In performing overbreadth analysis, a court,

> [a]s with facial vagueness challenges, [] must consider not only conduct clearly prohibited by the regulation but also conduct that arguably falls within its ambiguous sweep.  The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition, even if they are not entirely sure whether it does.

*Id*., at 499 (emphasis in original).[20]

---

[20]  As with the vagueness challenge in *Farrell*, the overbreadth challenge failed for reasons entirely distinguishable from the circumstances here:  "First Amendment rights as a

35

**3.**     *§2339B Is Unconstitutionally Vague On Its Face*
*and As Applied, and Is Unconstitutionally Overbroad*

The canons of statutory construction dictate that Mr. Iqbal and Dr. Elahwal's "as applied"

challenge be considered first.  In *American Booksellers Foundation*, 342 F.3d at 105, the Court

stated, "[a]s the Supreme Court held in *Board of Trustees v. Fox*, it is 'generally [not] desirable [ ]

to proceed to an overbreadth issue unnecessarily.'  492 U.S. 469, 484-85 (1989).  Thus, 'the

lawfulness of the particular application of the law should ordinarily be decided first.'  *Id.* at 485;

*see also Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504 (1985)."  *See also Broadrick*, 413

U.S. at 613 (if the statute is overbroad, it may not be enforced "until and unless a limiting

construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to

constitutionally protected expression").[21]

Here, §2339B is unconstitutional as applied to Mr. Iqbal and Dr. Elahwal.  The protected

nature of their conduct in the First Amendment context is patent.  The dissemination of

information and news is central to the First Amendment.  The use of equipment to facilitate that

dissemination is essential to and inextricably intertwined with the exercise of those First

Amendment rights.

As the Court in *United States v. Rosen*, 445 F. Supp.2d 602 (E.D. Va. 2006), recounted,

"[a]s James Madison put it in 1822:  'A popular Government, without popular information, or a

---

paroled sex offender were circumscribed, and because [he] was the only person affected by the
Special Condition, we cannot say that the Special Condition's overbreadth was both real and
substantial in relation to its plainly legitimate sweep."  449 F.3d at 499.

[21]  Accordingly, in *American Booksellers*, the Court followed "'the normal rule that
partial, rather than facial, invalidation is the required course," and leave for another day an
overbreadth challenge to the statute.  342 F.3d at 105, *quoting Brockett,* 472 U.S. at 504.

means of acquiring it, is but a Prologue to a Farce or a Tragedy;  or, perhaps both.'" 445 F.

Supp.2d at 633, *citing United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson,

J., *concurring*) [*quoting* 9 Writings of James Madison 103 (G. Hunt ed.1910)].

The Court in *Rosen* also noted that such values are particularly important "in the context

of foreign policy because, as Justice Stewart observed in the Pentagon Papers case:"

> [i]n the absence of the government checks and balances present in
> other areas of our national life, the only effective restraint upon
> executive policy and power in the areas of national defense and
> international affairs may lie in an enlightened citizenry-in an
> informed and critical public opinion which alone can here protect
> the values of democratic government.

*Id*., *quoting New York Times v. United States,* 403 U.S. 713, 728 (1971) (Stewart J., concurring).

*See also New York Times v. Sullivan,* 376 U.S. 254, 269 (1964) (libel cannot claim "talismanic

immunity from constitutional limitations").

Under the *O'Brien* standard, as well, §2339B is unconstitutional as applied herein.  Even

if §2339B's ban on the conduct alleged in the Indictment can be deemed content-neutral,

application herein unquestionably "burden[s] more speech than is necessary to further the

government's legitimate interests" – indeed, it suppresses Mr. Iqbal's and Dr. Elahwal's free

speech rights categorically.  Thus, as applied herein, §2339B is not sufficiently tailored to achieve

the government's ostensible purpose.

In addition, several items within the "material support" definition, including

"communications equipment," have been found unconstitutionally vague as applied.  *See HLP IV*,

309 F. Supp. 2d 1185, 1198-99 (C.D. Cal. 2004);  *Sattar I*, 272 F. Supp.2d 348, 360-61 (S.D.N.Y.

2003).[22]  *See also HLP III.*

Regarding facial vagueness, for the same reasons §2339B "infringes on constitutionally protected rights."  417 U.S. at 759.[23]  By in effect proscribing *any* relationship with an FTO, §2339B collides directly with the doctrine the Supreme Court enunciated in *Scales*, and has reaffirmed repeatedly since:  a "blanket prohibition of association with a group having both legal and illegal aims" would pose "a real danger that legitimate political expression or association would be impaired."  *Scales*, 367 U.S. at 229.

In *Scales*, Justice Harlon distinguished between ordinary criminal conspiracies and "hybrid groups" – those with legal and illegal functions (just like Hizballah, which has members serving as members of the Lebanese parliament and government).  367 U.S. at 229.  Justice Harlan concluded that if the government could punish mere membership in or association with a "hybrid group," there existed "a real danger that legitimate political expression or association would be impaired[.]"  *Id.*  Thus, the Court required that the government may not punish membership in a hybrid group without "clear proof that a defendant 'specifically intended to accomplish [the organization's aims] by resort to violence.'"  367 U.S. at 229, *quoting Noto v. United States*, 367 U.S. 290, 299 (1961) (decided the same day as *Scales*).

---

[22]  Two District Courts have found that the amended version of §2339B is not unconstitutionally vague.  *See United States v. Assi*, 414 F.Supp.2d 707 (E.D. Mi. 2006);  *United States v. Marzook*, 383 F.Supp.2d 1056 (N.D. Ill. 2005).

[23]  The 2004 amendments' addition of the second knowledge requirement, *see* **ante**, at POINT I (C) (2), does not ameliorate the vagueness that arises from the impact of the "material support"definition upon First Amendment activities.  *See* CRS Paper, at 6 (noting that the additional element for §2339B (knowledge of FTO status or terrorist activities) "seems to foreclose [ ] problems [relating to inadvertent support], but it does little for any vagueness problems").

Here, §2339B manifests that "real danger to legitimate political expression" without the requisite corresponding allegation of the defendants' *specific intent* to accomplish Hizballah's goals "by resort to violence." As a result, §2339B is unconstitutionally vague on its face, and the "material support" counts must be dismissed.

Regarding overbreadth, there cannot be any question that §2339B chills First Amendment rights – even *abridges* them in violation of §2339B(i). *Anyone* who would seek to provide news or information, much less *advocacy*, with respect to sensitive political subjects relating to an FTO would not just hesitate, but would be intimidated altogether for fear that the simple act of dissemination would generate criminal charges. Thus, in the context in which First Amendment freedoms, including political speech, is most important – at the margins, and with respect to controversial subjects and situations – conduct would be most chilled.

The answer is no different with respect to the "power supply module" (mentioned in Counts 9 & 11), to the extent it is included within the "material support" charged in Counts 1, 2, 7 & 8. Certainly the purchase of paper and ink is a necessary incident to the exercise of First Amendment rights, and could not be punished under the statute. Any "power supply module" that was part and parcel of the broadcasting of Al Manar's signal is certainly "preparatory" and "incidental" to the protected activity of news and information dissemination, and therefore protected activity as well. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988) (recognizing that the antitrust immunity for [First Amendment] petitioning activities recognized in *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), extends to acts "'incidental' to a valid effort to influence governmental action"), *quoting Allied Tube,* 486 U.S. at 499 (*citing Noerr,* 365 U.S. at 143). *See also Sosa v. DIRECTV, Inc.,* 437 F.3d

923, 934-35 (9th Cir. 2006).

Nor is this the only conceivable circumstance in which §2339B could be used to stifle the most critical First Amendment rights.  Any forms of advocacy, of education, of providing information and news – including by means of radio, newspapers, magazines, books, theatre, and films – would be vulnerable to prosecution under §2339B.[24]

Also, the fact that Hizballah commits violent acts does not justify abridging the exercise of First Amendment rights.  In *Planned Parenthood* ("*PPCW I*"), the Ninth Circuit concluded that if such were allowed to occur, "it could have a highly chilling effect on public debate on any cause where somebody, somewhere has committed a violent act in connection with that cause . . . [because a] party who does not intend to threaten harm, nor say anything at all suggesting violence, would risk liability by speaking out in the midst of a highly charged environment."  244 F.3d at 1018.  *See also Claiborne Hardware*, 458 U.S. at 908-09, *citing De Jonge v. Oregon*, 299 U.S. at 365 (quoted **ante**, at 27).

Moreover, the content of Hizballah's message cannot serve as a justification for repressing it, and/or for prosecuting Mr. Iqbal and Dr. Elahwal for communicating it.  As the Supreme Court made clear in *Texas v. Johnson*, 491 U.S. 397, 414 (1989), in invalidating a flag-burning statute because such conduct was protected when constituting a means of political expression, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea because society finds the idea itself offensive or disagreeable."  *See also*

---

[24]  In fact, as discussed **post**, in POINT II, the government's efforts to stifle entirely all news, art, and other First Amendment content from nations such as Cuba was responsible for the amendments to the Trading With the Enemy Act and the International Emergency Economic Powers Act that explicitly exempted such materials from those statutes, and maintained their constitutionality.  *See, e.g., Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989).

*New York Times v. Sullivan*, 376 U.S. at 279 n. 19 [quoting from John Stuart Mill, *On Liberty* (1st ed. 1859): "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error"].[25]

Consequently, §2339B "brings within its scope – and thus threatens to chill – conduct protected by the First Amendment." *Sattar II*, 314 F. Supp.2d at 304, *citing Virginia v. Hicks*, 539 U.S. 113, 123 (2003). Moreover, as required for overbreadth, the statute's overbreadth is not only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. at 615.

The Ninth Circuit envisioned such a chill on the First Amendment in *PPCW I* when it described the potential results of a similar set of circumstances:

> [i]f this were a permissible inference, *it could have a highly chilling effect on public debate on any cause where somebody, somewhere has committed a violent act in connection with that cause.* A party who does not intend to threaten harm, nor say anything at all suggesting violence, would risk liability by speaking out in the midst of a highly charged environment.[26]

244 F.3d 1007, 1018 (9th Cir. 2001) (emphasis added), *vacated on other grounds by* 290 F.3d 1058 (9th Cir. 2002) (*en banc*).

_____

[25] There is no numerical threshold of persons affected for vagueness or overbreadth to exist. As the Court in *Farrell* explained, "[o]f course, the First Amendment is implicated if even one person's constitutionally protected conduct is chilled; any injury to First Amendment rights is a matter of profound concern to the courts." 449 F.3d at 497.

[26] Although the government may wish to argue that the statute provides a *mens rea* element that would impose criminal liability only upon those who advocated for illegal action at some indefinite time in the future, such activity is protected under the First Amendment. *See Hess v. Indiana*, 414 U.S. 105, 108 (1973).

**4.      §2339B's Vagueness Is Aggravated By Its Failure to Contain Any De Minimis Standard of Conduct Necessary for a Violation**

The breadth of §2339B is stunning.  The government has taken the position that providing an FTO even a "glass of water" constitutes a violation of the statute.  *See Singh-Kaur v. United States*, 385 F.3d 293, 312-13 (3d Cir. 2004) (Fisher, J., *dissenting*) (noting government's suggestion at oral argument that "the provision of a cup of water to a terrorist could constitute 'material support').

Indeed, in *Singh-Kaur*, the provision of food and setting up of tents for a meeting of members of an FTO was found sufficient to constitute "material support" warranting exclusion in the immigration context.  *Id.*, at 294.[27]  *See also* Testimony of Attorney General John Ashcroft before the House Judiciary Committee in June 2003, *The Justice Department and the USA PATRIOT Act: Hearing Before the House Comm. On the Judiciary*, 107th Cong. (2003), available at 2003 WL 21291138 ("we need for the law to make it clear that it's just as much a conspiracy to aid and assist the terrorist to go and fight – to join them for fighting purposes, as it is to carry them a lunch or to provide them a weapon");  Margaret D. Stock, *Providing Material Support to a Foreign Terrorist Organization: The Pentagon, The Department of State, the People's* Mujahedin *of Iran, & the Global War On Terrorism*, Bender's Immigration Bulletin (2006) (hereinafter "Stock"), at 21 ("[a]ccording to any attorney for the Department of Homeland Security, there is no *de minimis* exception to the concept of material support;  a person falls within the ambit of the

---

[27]  Complicating matters further in the First Amendment context (but ignored by the majority), the meetings at issue in *Singh-Kaur* were, according to the petitioner, for *religious* purposes, a fact not controverted by any other evidence.  385 F.3d at 301-02 (Fisher, J., *dissenting*).

"material support" statutes by giving even a dime to a terrorist") (footnote omitted).[28]

Yet in order to avoid vagueness and overbreadth, §2339B must contain *some* threshold *de minimis* level of "material support" before criminal liability attaches.  Otherwise, purely innocent and immaterial conduct will fall within the statute's parameters.  That not only implicates the lack of notice, but the other equally important prong of vagueness analysis: arbitrary and discriminatory enforcement.  Regarding the former, this case presents the paradigmatic facts:  that provision of a "power supply module" – an ordinary device available in any hardware store – could subject Mr. Iqbal and Dr. Elahwal to fifteen years' imprisonment.  The latter has manifested itself here most powerfully, too, and is addressed **post**, in POINT VI.[29]

Commentators, as well as the dissenting judge in *Singh-Kaur*, have condemned the government's position because of the constitutional implications, and also because it defies the plain statutory language and the rules of statutory construction.  In effect, it "reads 'material' out of 'material support' and treats half of the statutory term as surplusage."  385 F.3d at 303 (Fisher, J., *dissenting*).  *See also* Peterson, at 13, 54 ("[a]s Congress increasingly read the 'material' out of 'material support,' it had to find ways to limit the incredible scope of the statute[;]" "[t]he 'material' in material support has been read out of the statute").

Certainly the definition of the terms requires that the support be of some consequence to

---

[28]  Due to its length, the article by Ms. Stock, an Associate Professor at the U.S. Military Academy, West Point, New York, and Lieutenant Colonel, Military Police Corps, U.S. Army Reserve, is provided separately with this motion (rather than as an Exhibit).

[29]  If there is no *de minimis* standard for §2339B, then the selective prosecution of Mr. Iqbal and Dr. Elahwal is even more stark, since the other organizations that have provided Al Manar support via television broadcasts and the internet are equally ripe for prosecution, regardless how long any transmission might be, or the contents thereof.  *See* **post**, at 80-84.

terrorist activity before it can be deemed "material."  According to the majority in *Singh-Kaur*, Black's Law Dictionary defines "material" in this context as either "[h]aving some logical connection with the consequential facts," or "significant" or "essential."  385 F.3d at 298, *citing Black's Law Dictionary*, at 991 (7th ed. 1999).  Similarly, *Webster's* defines "material" in part as "being of real importance or great consequence."  *Webster's Third New Int'l Dictionary*, at 1392 (1981).  *See also* 385 F.3d at 304 (Fisher, J., *dissenting*).

The companion term, "support," is defined as "[s]ustenance or maintenance; esp., articles such as food and clothing that allow one to live in the degree of comfort to which one is accustomed."  *Black's Law Dictionary*, at 1453.  385 F.3d at 298.

When applying a statute, as the majority in *Singh-Kaur* noted, "[w]e start with 'the language employed by Congress, ... and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.'"  *Id.*, *quoting INS v. Phinpathya,* 464 U.S. 183, 189 (1984) (internal quotations and citations omitted).

In addition, as the dissent in *Singh-Kaur* pointed out, "[a]n indisputable axiom of statutory construction is that 'whenever possible each word in a statutory provision is to be given meaning and not to be treated as surplusage.'" 385 F.3d at 305, *quoting Acceptance Ins. Co. v. Sloan,* 263 F.3d 278, 283 (3d Cir.2001) (quotation marks omitted).  Moreover, avoiding "'unintended or absurd results'" is a "'deeply rooted rule of statutory construction.'"  385 F.3d at 299, *quoting United States v. Hodge,* 321 F.3d 429, 434 (3d Cir.2003) (internal quotations and citation omitted);  *see also* 385 F.3d at 306 (Fisher, J., *dissenting*).

Here, all three canons abhor applying "material support" to *any* support, regardless of its lack of impact on the anti-terrorism objectives of §2339B:  (a)  the "ordinary meaning of the

44

words used," as reflected in their legal and lay definitions, requires that the "support" be essential

or of some importance, or connected logically to the "consequential facts," *i.e.*, *material*;  (b)

unless the "support" provided must also be "material," the latter term is indeed mere surplusage;

and (c)  it would be a supremely absurd result if Mr. Iqbal and Dr. Elahwal were convicted of a

15-year felony for provision of a "power supply module" – an ordinary power strip.[30]

While the majority in *Singh-Kaur* – an immigration, *not* a criminal, case – found

otherwise, it is respectfully submitted that this Court should adopt the reasoning of the dissent in

*Singh-Kaur*.  As Judge Fisher explained,

> even under the broadest possible reading, "material" in this context
> must mean both "important" and "relevant" to terrorism.  "Material
> support," by its plain language, means that *the act affording support
> must be of a kind and degree that has relevance and importance to
> terrorist activity, terrorists, or terrorist organizations.*

385 F.3d at 304 (Fisher, J., *dissenting*) (emphasis in original).

Elaborating, Judge Fisher reasoned that "an act 'affording material support' must move

the ball down the field for terrorism."  *Id*.  Judge Fisher acknowledged that "[t]his is not to say

that under certain circumstances, food and shelter could not be 'material support[,]'" but he

emphasized that "as these are normal types of 'support,'" the facts must show that they are more

than *mere* support – *i.e.*, they must be of relevance and importance to terrorism."  *Id*. (emphasis in

original).

As a result, Judge Fisher concluded that

---

[30]  *See also* Peterson, at 23 ("[w]ould a UN diplomat who had allowed Yasir Arafat to use her office phone on one of his UN visits be presumptively providing 'material support' to a terrorist?  Attempting to read meaningful distinctions into the two uses of the term is nearly impossible").

> "material" means both importance and relevance is underscored by
> further examination of the statute.   First, mere "support" cannot be
> "material support."   As noted, "support" means "sustenance or
> maintenance."   There is no doubt that sustenance, such as food and
> water, or maintenance, such as shelter, are necessary for life, but
> they are not *per se* necessary for terrorism.   To hold differently
> would-in cases like this one, involving food and tents-automatically
> transmute mere "support" into "material support."   This would
> eviscerate the statute.

*Id.*, at 304-05.[31]

Other decisions do not, upon careful examination, hold differently.  In *Boim v. Quranic*

*Literacy Institute, et al.*, 291 F.3d 1000 (7th Cir. 2002), the Seventh Circuit held that "the term

[material support or resources] relates to the type of aid provided rather than whether it is

substantial or considerable."  291 F.3d at 1015.  However, that statement was in the context of

fundraising, the principal evil at which §2339B was directed: "Congress' goal of cutting off

funding for terrorism would be seriously compromised if terrorist organizations could avoid

liability by simply pooling together small donations to fund a terrorist act."  *See also HLP II*, 205

F.3d at 1136 ("as the government points out, terrorist organizations do not maintain open books . .

. even contributions earmarked for peaceful purposes can be used to give aid to the families of

those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more

attractive . . .").

Here, that concern simply does not apply – a single "power supply module" is simply that,

and not susceptible to aggregation or diversion in a manner that would precipitate the dangers

§2339B sought to prevent.

---

[31]  While the statute to which Judge Fisher referred was an immigration provision, 8
U.S.C. §1182(a)(3), it was the precursor to both §2339A and §2339B, and is similarly broad.
*See* Peterson, at 14-28.

Commentators, too, have criticized §2339B's blunderbuss approach. *See, e.g.,* Peterson, at 71 (solution is "to put the 'material' back into the 'material support'");[32] Stock, at 13-14 (sarcastically noting that Revolutionary War heroine Molly Pitcher's "act of providing water to the other Revolutionary War fighters during the battle would have been an act of providing 'material support' to terrorists"); *id.*, at 21-23.

By creating a categorical prohibition – a variation on a strict liability offense – the government's construction of §2339B amplifies the statute's vagueness intolerably, particularly since §2339B punishes provision material support to an FTO regardless of the provider's motivation. *See* Robert M. Chesney, *Civil Liberties and the Terrorism Prevention Paradigm: The Guilt By Association Critique*, 101 Mich. L. Rev. 1410, 1436 (2003) (§2339B "purposefully does not require proof of specific intent to further illegal conduct").

As the Congressional Research Service noted in its paper, with respect to the inclusive approach to defining "material support" adopted in the 2004 amendments, "[c]ritics might contend that by eliminating the ambiguity in favor of the more sweeping construction ('property, tangible or intangible, or services including' versus 'property . . . or other physical assets') the amendment is more likely to create than dissipate vagueness." CRS Paper, at 5. *See also* Peterson, at 70 (Congress has "clearly criminalized everything. Congress's approach is so broad, however, that it cannot be taken at face value. Reading the statute literally would violate the

---

[32] Peterson frames the question as one of "how to draw the line that criminalizes support to terrorists while protecting First Amendment rights. What is truly needed is a means of evaluating, before a terrorist act occurs, whether a person intends to aid or cause violence." Peterson, at 71. Breathing life into the "material" prong of "material support" would, in his opinion, protect First Amendment rights "while at the same preserving the ability of the government to argue that types of support not contemplated in the statute were in fact material to terrorist activity." *Id.*, at 73.

Constitution");  Chesney, at 1446 n. 164 ("[w]hile it is quite possible if not likely that a reviewing court would interpret the term "other physical assets" to reach only items which reasonably could be diverted or converted to harmful uses, this approach might in turn raise a question of vagueness").

Thus, again, the doctrine of constitutional avoidance, as well as the canons of statutory construction discussed **ante**, require that there be some *de minimis* standard applied to the concept of "material support" in the context of §2339B.  Here, such standard compels the dismissal of any counts that rely on the provision of a "power supply module" to serve as the "material support."

Accordingly, for any and all the reasons set forth above, Counts 1, 2, 7 & 8 – the "material support" counts charging a violation of §2339B – must be dismissed.

## POINT II

### COUNT FOUR SHOULD BE DISMISSED BECAUSE (A) THE INDICTMENT FAILS TO ALLEGE ANY SUBSTANTIVE OFFENSE; (B) THE CONDUCT ALLEGED IS EXEMPTED FROM 22 U.S.C. §287c, AND/OR BECAUSE THE STATUTE IS UNCONSTITUTIONALLY VAGUE AS APPLIED, AND/OR IS UNCONSTITUTIONALLY OVERBROAD

The counts charging violations of the United Nations Participation Act (hereinafter "UNPA") – Counts 3, 4, 5, 6, 9, 10 & 11 – are also fatally defective for essentially the same reasons as the "material support" counts addressed in POINT I.[33]  The UNPA counts fail to allege as essential element – the United Nations resolutions and regulations or Executive Order(s) allegedly violated by the defendants.  Also, UNPA by its terms applies only to countries and persons, not to an organization such as Hizballah.

---

[33]  Count 3 alleges, under 18 U.S.C. §371, a conspiracy to violate UNPA.

In addition, specific provisions exempt from UNPA coverage protected First Amendment activity.  If for some reason that exemption does not apply to the allegations in this case, then UNPA would be unconstitutionally vague on its face, as applied, and unconstitutionally overbroad as well.

**A.**      ***The UNPA Charges In the Indictment***

The Indictment alleges with respect to the UNPA counts that Mr. Iqbal and Dr. Elahwal committed violations as follows:

*Counts 3 & 4*

"by providing satellite television services to Hizballah's television station, Al Manar" ¶¶12, 15.

*Counts 5 & 6*

"by providing satellite television services to Al Manar in exchange for payments of thousands of dollars to HDTV" ¶¶18, 21.

*Counts 9 & 11*

"would and did provide electronic equipment relating to satellite television broadcasting to Hizballah's television station, Al Manar[,]" ¶¶29, 35 including a "power supply module" ¶¶30(f) & 36(a), and "HDTV's purchase of satellite equipment on behalf of Al Manar" ¶¶30(g), 36(b).

*Count 10*

"by providing electronic equipment relating to satellite television broadcasting in exchange for payments of thousands of dollars to HDTV" ¶32.

49