**B.**     *The UNPA Counts Fail to Allege An Essential Element*

**1.**     *The Relevant UNPA Provisions*

The UNPA counts allege a violation of 22 U.S.C. §287c.  However, that statute merely

sets forth Presidential authority to issue orders or delegate regulatory authority with respect to

prohibiting economic transactions with certain entities, and provides a penalty provision for

violation of those orders or regulations.  For example, §287c(a) provides in pertinent part as

follows:

> [n]otwithstanding the provisions of any other law, whenever the
> United States is called upon by the Security Council to apply
> measures which said Council has decided, pursuant to article 41 of
> said Charter, are to be employed to give effect to its decisions
> under said Charter, the President may, to the extent necessary to
> apply such measures, through any agency which he may designate,
> and under such orders, rules, and regulations as may be prescribed
> by him, investigate, regulate, or prohibit, in whole or in part,
> economic relations or rail, sea, air, postal, telegraphic, radio, and
> other means of communication between any foreign country or any
> national thereof or any person therein and the United States or any
> person subject to the jurisdiction thereof, or involving any property
> subject to the jurisdiction of the United States.

Subsection (b), the penalty provision, states in pertinent part that

> (b) Penalties
>
> Any person who willfully violates or evades or attempts to violate
> or evade any order, rule, or regulation issued by the President
> pursuant to subsection (a) of this section shall, upon conviction, be
> find [1] not more than $10,000 or, if a natural person, be imprisoned
> for not more than ten years, or both

22 U.S.C. §287c(b).

2.      *The UNPA Allegations In the Indictment*

The Indictment does not enumerate precisely which U.N. resolutions, Executive Orders, or regulations Mr. Iqbal and Dr. Elahwal allegedly violated.  The list of statutes appearing at the end of each UNPA count (except Count 3, which charges a conspiracy under 18 U.S.C. §371) includes reference to Executive Order 13224 and 31 C.F.R. Part 594.  However, that does not suffice.  E.O. 13224, which was issued September 23, 2001, does not name either Hizballah or Al Manar.  In fact, Al Manar was not designated as a terrorist entity until March 2006.

In addition, 31 C.F.R. Part 594, promulgated to implement E.O. 13224, is a ten-page document that includes *fifty* separate sections.  As a result, mere general reference cannot provide the type of specificity and notice required of an indictment under the case law set forth **ante**, in POINT I (C) (1).  Nor do the UNPA counts identify the U.N. resolutions that provide the President the authority vested in §287c(a).

Accordingly, since the UNPA counts fail to allege the essential element of the offense – in essence, the substantive offense itself – those counts must be dismissed.

C.      *UNPA By Its Terms Does Not Apply to Hizballah*

As set forth **ante**, §287c provides the President authority to regulate economic transactions "between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States."  §287(a).

Here, Hizballah and/or Al Manar do not qualify as a "foreign country or national thereof."  Therefore, UNPA cannot be used in this case.  Interestingly, UNPA is a substitute provision utilized by the government in this case.  Initially, Mr. Iqbal was arrested not on

"material support" or UNPA charges, but rather for violating the International Emergency Economic Powers Act, 50 U.S.C. §1705(b).

However, IEEPA's safe harbor provision for First Amendment activity, discussed **post**, precluded prosecution under §1705(b).  Thus, the government seized upon UNPA as a replacement.  Nevertheless, as detailed below, in part C of this POINT, the same safe harbor applies with equal force to UNPA, and negates those counts as well.

Regardless, UNPA cannot be used in place of IEEPA for the additional reason that UNPA applies only to a "foreign country or any national thereof."  Clearly, neither Hizballah nor Al Manar qualify as either.  Thus, the UNPA counts must be dismissed.

**D.**     ***Protected First Amendment Activity Is Exempt From UNPA***

Like §2339B(i), specific sections limit the application of §287c with respect to protected First Amendment activity.  For example, 50 U.S.C. §1702(b)(4) of IEEPA limits the President's authority by exempting from its reach and regulation:

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. §1702(b)(3).[1]

---

[1]  Other exemptions in §1702(b) apply to other First Amendment activity implicated by the charges:

> does not include the authority to regulate or prohibit, directly or indirectly *inter alia*, any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country

That provision, known as the "Berman Amendment" [so named after its sponsor, Rep. Howard Berman (D-Calif.)], also codified at 31 C.F.R. § 594.305, was enacted by Congress in 1988.  It amended not only IEEPA, but the Trading With the Enemy Act (hereinafter "TWEA") at 50 U.S.C. §5(b)(4).

In addition, following regulations promulgated by the Office of Foreign Asset Control (hereinafter "OFAC") that prescribed a narrow construction of the ambit of the Berman Amendment, and after court decisions upholding OFAC's interpretation, *see, e.g., Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990), Congress passed the Free Trade in Ideas Amendment (hereinafter "FTIA") (as §525 of the Foreign Relations Authorization Act, P.L. 103-236) for the purpose of overriding those regulations, and reiterating (and clarifying) the extent of the Berman Amendment.

The Conference Report accompanying the FTIA reaffirmed that the Berman Amendment "established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution," and that "the language [of the Berman Amendment] was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope."  H.R. Conf. Rep. No. 482, 103rd Cong., 2nd Sess., 1994 U.S.C.C.A.N. 398, 483.

Moreover, the Conference Report emphasized that Congress intended both provisions – the Berman Amendment and FTIA –

> to facilitate transactions and activities incident to the flow of

---

> including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

53

> information and informational material without regard to the type
> of information, its format, or means of transmission, and
> electronically transmitted information, transactions for which must
> normally be entered into in advance of the information's creation.

*Id*.

Consequently, it is beyond question that the terms of the Berman Amendment and FTIA are completely co-extensive with the First Amendment, and cover the activity alleged against Mr. Iqbal and Dr. Elahwal in this case. The provisions exempt "any information or informational materials, including but not limited to, . . . films, . . photographs, . . . tapes . . . and news wire feeds." They apply to "electronically transmitted information," and as well to "information and informational material without regard to the type of information, its format, or means of transmission. . . ." They also prohibit interference "directly or indirectly."[2]

While the Berman Amendment and FTIA did not explicitly amend UNPA, their exemptions apply to UNPA either directly or implicitly. Indeed, the very Executive Order cited in the Indictment, E.O. 13224, which in its first paragraph cites the authority granted by UNPA, expressly acknowledges that the E.O. applies "[e]xcept to the extent required by" §1702(b) – *the Berman Amendment itself*. Thus, the E.O. by its own terms circumscribes Presidential authority consistent with the Berman Amendment.

Also, even if the Berman Amendment did not apply to UNPA and this prosecution directly by virtue of E.O. 13224, the First Amendment limitations expressed in the Amendment and FTIA would constrain application of §287c just the same. *See Cernuda v. Heavey*, 720 F.

---

[2] Prior to passage of FTIA, the District Court in *Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fla. 1989), afforded the Berman Amendment an appropriately expansive interpretation that foreshadowed Congress's passage of FTIA.

Supp. 1544, 1553 (S.D. Fla. 1989) (construing TWEA not to bar First Amendment activity "avoids serious questions about the constitutionality of TWEA") (citations omitted).

As a result, the activity alleged in the Indictment is exempt from UNPA, and those counts – Counts 3, 4, 5, 6, 9, 10 & 11 – must be dismissed.

**E.**   ***If UNPA Applied to the Activity Alleged In the Indictment, the Statute Would Be Unconstitutionally Vague on Its Face and As Applied, and Unconstitutionally Overbroad***

The vagueness and overbreadth analysis with respect to the UNPA counts is very much the same as that for the "material support" counts charged under §2339B, and will not be repeated here. The First Amendment implications are the same, and UNPA coupled with E.O. 13224, like §2339B(i), provides an express exemption for the conduct alleged.

In addition, the First Amendment analysis performed in POINT I with respect to §2339B is completely applicable to UNPA as well. The statute, if applied to the conduct at issue, undoubtedly infringes – indeed, *charges as the offense* – protected conduct. The charges also would affect and chill the First Amendment activity of others.[3]

Accordingly, the UNPA counts – 3, 4, 5, 6, 9, 10 & 11 – must be dismissed because (a) the counts do not allege an offense because an essential element is absent from the allegations; (b)  UNPA covers only "foreign countr[ies]" and their nationals, and not either Hizballah or Al Manar;  (c)  the conduct alleged is explicitly exempted from the statute;  and /or (d)  if such conduct is within the ambit of UNPA and/or the C.F.R. regulations, the statute and regulations

---

[3]  In *Teague v. Regional Commissioner of Customs*, 404 F.2d 441 (2d Cir. 1968), the Second Circuit held that regulations promulgated pursuant to TWEA, while "imping[ing] on first amendment freedoms," did so only incidentally, and were therefore subject to review under the *O'Brien* standard. *See also Farrakhan v. Reagan*, 669 F.2d 506 (D.C. Cir. 1987).

are unconstitutionally vague as applied and/or on their face, and/or are unconstitutionally overbroad.

## POINT III

### THE MYRIAD MULTIPLICITOUS COUNTS IN THE INDICTMENT VIOLATE THE FIFTH AMENDMENT PROHIBITION AGAINST DOUBLE JEOPARDY AND MUST BE DISMISSED

The Indictment charges several multiplicitous counts in which similar conduct is alleged to violate the same statutes requiring the same elements of proof.  Certain counts of the Indictment charge Mr. Iqbal and Dr. Elahwal with conspiring to provide material support to Hizballah (Counts One and Seven) by agreeing to provide satellite television services (Count One) or electronic equipment related to satellite television broadcasting (Count Seven) to Al Manar.

Other counts charge the Defendants with the substantive act of actually providing such material support to Hizballah (Counts Two and Eight) by providing the television services (Count Two) or electronic equipment related to satellite television broadcasting (Count Eight) in exchange for money.  Additional counts charge Mr. Iqbal and Dr. Elahwal with conspiring to violate section 5 of the UNPA of 1945 (Counts Three, Five, Nine, and Eleven) by agreeing to engage in transactions and dealings with Hizballah by providing satellite television services (Count Three) or electronic equipment related to satellite television broadcasting (Count Nine) to Al Manar, or by agreeing to engage in transactions and dealings with Al Manar by providing satellite television services (Count Five) or electronic equipment related to satellite television broadcasting (Count Eleven) to Al Manar.

The remaining counts charge the defendants with the substantive act of violating section

5 of the UNPA of 1945 (Counts Four, Six, and Ten) by engaging in transactions and dealings with Hizballah by providing satellite television services (Count Four) or electronic equipment related to satellite television broadcasting (Count Ten) to Al Manar, or by engaging in transactions and dealings with Al Manar by providing satellite television services (Count Six) to it.

The Indictment either charges the Defendants with conspiracy to provide (and actually providing) material support to Hizballah and Al Manar, or with conspiracy to transact or deal with (and actually transacting or dealing with) Hizballah and Al Manar.  These overlapping counts of the Indictment contain the same conduct, the same statutes, and the same elements to be proven as other counts of the Indictment.  As such, they are multiplicitous, and should be dismissed.

## A.      *The Legal Principles of Multiciplicity*

An indictment is multiplicitous when it charges a single offense as an offense multiple times in separate counts, when in law and fact only one crime is alleged to have been committed. *See United States v. Chacko,* 169 F.3d 140, 145 (2d Cir. 1999); c.f. *State v. Muhammad*, 182 N.J. 551, 868 A.2d 302 (2005) (holding that single criminal transaction may violate more than one statute and be charged in several counts of indictment).

A multiplicitous indictment violates the Double Jeopardy Clause of the Fifth Amendment because it subjects a person to punishment for a single crime more than once.  *United States v. Dixon,* 509 U.S. 688, 696, (1993).  A defendant may be convicted only once for each offense, because the rule against multiplicity protects against multiple convictions for the same offense, not just against the imposition of multiple sentences for the same offense.  *Ball v. United States*,

470 U.S. 856 (1985).

The test for determining whether offenses charged in separate counts of an indictment are the same, and thus multiplicitous, is whether each statutory provision requires proof of an additional fact that the other count does not. *See Blockberger v. United States*, 284 U.S. 299 (1932). In *United States v. Josephberg*, 459 F.3d 350, 356 (2d Cir. 2006) (*per curiam*), the Second Circuit stated that the *Blockberger* inquiry is whether there is an element in each offense that is not contained in the other, not whether the conduct underlying the separate counts is identical.[4]

Specifically, the Court advised, "the touchstone is whether Congress intended to authorize separate punishments for the offensive conduct under separate statutes [. . .] it is critical [to determining] whether the 'offense'--in the legal sense, as defined by Congress-- complained of in one count is the same as that charged in another." *United States v. Chacko*, 169 F.3d 140, 146 (2d Cir. 1999); *Josephberg*, 459 F.3d at 356.

Furthermore, a conspiracy is an agreement of the conspirators to commit one or more unlawful acts. *See Braverman v. United States,* 317 U.S. 49, 53 (1942). Therefore, "[a] single agreement to commit several crimes constitutes one conspiracy," but "multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce,* 488 U.S. 563, 570-71 (1989).

---

[4] The Second Circuit's recent decision in *United States v. Josephberg* held that where there has been no conviction, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed. However, *Josephberg* addresses mulitiplicitous counts where the same conduct is charged in different statutes. Here, the same conduct has been charged under the *same* statutes. Therefore, *Josephberg* is distinguishable from the case at hand.

**B.**     *The Multiplicitous Counts of the Indictment*

The following analysis demonstrates that the enumerated Counts of the Indictment should be dismissed.

**1.**     *Count Seven*

Count Seven is multiplicitous with Count One.  Both counts make the same allegation, *i.e.*, that Defendants conspired to provide material support to Hizballah.  Both counts allege that the same statute was violated (18 U.S.C. 2339B), and both counts require that the same elements be proven.

The only difference between the counts is that the material support alleged in Count One is that satellite television services were provided, while the material support alleged in Count Seven is that electronic equipment was provided.  Therefore, because Count Seven is multiplicitous with Count One, Count Seven should be dismissed.

**2.**     *Count Eight*

Count Eight is multiplicitous with Count Two.  Both counts make the same allegation, i.e. that Defendants actually committed the substantive act of providing the material support to Hizballah.  Both counts allege that the same statutes were violated (18 U.S.C. 2339B & 2), and both counts require that the same elements be proven.

The only difference between the counts is that the material support alleged in Count Two is that satellite television services were provided, while the material support alleged in Count Eight is that electronic equipment was provided.  Therefore, because Count Eight is multiplicitous with Count Two, Count Eight should be dismissed.

3.      *Counts Five, Nine, and Eleven*

Counts Five, Nine, and Eleven are multiplicitous with Count Three. All of these make the

same allegation, *i.e.,* that Defendants conspired to violate section 5 of the UNPA of 1945 by

agreeing to engage in transactions and dealings with Hizballah or Al Manar by providing

satellite television services or electronic equipment to Al Manar.

Count Three alleges that Defendants agreed to engage in transactions or dealings with

*Hizballah* by providing *satellite television services* to Al Manar, while Count Nine alleges that

Defendants agreed to engage in transactions or dealings with *Hizballah* by providing *electronic*

*equipment* to Al Manar.  Count Five alleges that Defendants agreed to engage in transactions or

dealings with *Al Manar* by providing *satellite television services* to Al Manar, while Count

Eleven alleges that Defendants agreed to engage in transactions or dealings with *Al Manar* by

providing *electronic equipment* to Al Manar.

One difference among the counts is that two of them charge that Defendants agreed to the

transactions or dealings by providing television services (Counts Three and Five), while two of

them charge that electronic equipment was provided (Counts Nine and Eleven).  The

government's attempt to allege a conspiracy including two types of material support (services

versus equipment) does not permit separate counts of an indictment.

Another difference among the counts is that two of the counts charge that Defendants

agreed to engage in transactions or dealings with Hizballah (Counts Three and Nine), while two

of the counts charge that Defendants transacted or dealt with Al Manar, which is nothing more

than an alter-ego of Hizballah.[5]

Therefore, because Counts Five, Nine, and Eleven are multiplicitous with Count Three, counts Five, Nine, and Eleven should be dismissed.

### 4.   *Counts Six and Ten*

Counts Six and Ten are multiplicitous with Count Four.  All of these counts charge Defendants with the substantive act of actually violating section 5 of the UNPA of 1945 by engaging in transactions and dealings with Hizballah by providing satellite television services (Count Four) or electronic equipment related to satellite television broadcasting (Count Ten) to Al Manar, or by engaging in transactions and dealings with Al Manar by providing satellite television services (Count Six) to Al Manar.

One difference among the counts is that one of them charges that the defendants transacted or dealt with Hizballah by providing television services (Count Four) to Al Manar, while another charges that electronic equipment was provided (Count Ten).  Another difference is that two of the counts charge that Defendants agreed to engage in transactions or dealings with Hizballah (Counts Four and Ten), while one of the counts charge that Defendants transacted or dealt with Al Manar (Count Six), which, again, is nothing more than an alter-ego of Hizballah.

Therefore, because Counts Six and Ten are multiplicitous with Count Four, Counts Six and Ten should be dismissed.

Accordingly, for the reasons set forth above, Counts Five, Six, Seven, Eight, Nine, Ten

---

[5]  The Government alleges in the indictment that :  "At all times relevant to this Indictment, Hizballah has operated Al Manar (the "beacon"), a television station based in Lebanon, that is designed to cultivate support for Hizballah's activities and mission.  Through its broadcasts on Al Manar, Hizballah endeavors, among other things, to raise money for its activities and to recruit volunteers for future attacks."  See Indictment, at ¶ 2.

and Eleven of the Indictment are multiplicitous with the remaining counts.  As such, they violate

the Fifth Amendment prohibition against double jeopardy, and should be dismissed.

**C.**     ***Multiplicitous Counts In An Indictment Create Inherent Jeopardy to a Defendant***

The defendants will suffer "jeopardy" not only upon any sentence that may arise, but also

by any conviction of an offense.  In *Ball v. United States*, 470 U.S. 856, 861 (1985), the Supreme

Court found that:

> [f]or purposes of applying the *Blockburger* test in this setting as a
> means of ascertaining congressional intent, "punishment" must be
> the equivalent of a criminal conviction and not simply the
> imposition of sentence. Congress could not have intended to allow
> two convictions for the same conduct, even if sentenced under only
> one.

*Ball*, 470 U.S. at 861.

In his concurring opinion in *Ball*, Justice Stevens explained that:

> [w]hen multiple charges are brought, the defendant is 'put in
> jeopardy' as to each charge. To retain his freedom, the defendant
> must obtain an acquittal on all charges [. . .] The prosecution's
> ability to bring multiple charges increases the risk that the
> defendant will be convicted on one or more of those charges. The
> very fact that a defendant has been arrested, charged, and brought
> to trial on several charges may suggest to the jury that he must be
> guilty of at least one of those crimes [. . .] The submission of two
> charges rather than one gives the prosecution 'the advantage of
> offering the jury a choice-a situation which is apt to induce a
> doubtful jury to find the defendant guilty of the less serious offense
> rather than to continue the debate as to his innocence.'

*Ball v. United* States, 470 U.S. at 868 (quoting *Cichos v. Indiana,* 385 U.S. 76 [1966])(Fortas, J.,

dissenting from dismissal of certiorari).

Allowing the seven multiplicitous counts of the Indictment to survive dismissal in this

case would place Defendants in jeopardy, in violation of the Fifth Amendment.  It is respectfully

submitted that the Court should not wait to dismiss the multiplicitous counts of the instant

Indictment until the Government potentially gains a conviction in this case.

As a result, the Court should dismiss the multiplicitous counts in the Indictment, as

conviction on any one of them would violate Mr. Iqbal and Dr. Elahwal's Fifth Amendment right

against Double Jeopardy.

**POINT IV**

**STATEMENTS MADE BY MR. IQBAL
ON AUGUST 23, 2006, AND ANY AND
ALL FRUITS THEREOF, SHOULD BE
SUPPRESSED, AND/OR A HEARING
CONDUCTED TO DETERMINE
WHETHER THEY WERE VOLUNTARY**

**A.**     ***Mr. Iqbal's Statements Were Elicited Unlawfully Without a Valid* Miranda *Waiver***

The Court should suppress any statements the government seeks to introduce against Mr.

Iqbal because they were obtained in violation of Mr. Iqbal's rights under the Fifth Amendment to

the United States Constitution, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and 18 U.S.C.

§3501.[6]  In the alternative, it is respectfully requested that the Court conduct a hearing to

determine whether or not Mr. Iqbal's statements were made voluntarily.

**1.**     ***Mr. Iqbal Was Under Arrest When Agents Entered His Home***

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established procedural

safeguards to apply when a defendant is subject to custodial interrogation by law enforcement,

defining such "custodial interrogation" to include any questioning by law enforcement once a

---

[6]  The pertinent text of 18 U.S.C. § 3501(a) provides: "In any criminal prosecution
brought by the United States or by the District of Columbia, a confession . . . shall be admissible
in evidence if it is voluntarily given. Before such confession is received in evidence, the trial
judge shall, out of the presence of the jury, determine any issue as to voluntariness."

defendant "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.[7]

In determining whether a defendant is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on [the defendant's] freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

*Miranda* warnings are required when the circumstances of a detention escalate to those equivalent to a formal arrest. *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995), *modified on rehearing*, 86 F.3d 275 (1996). The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984). A police officer's subjective belief that the individual is not a suspect does not support an automatic or presumptive finding that the suspect is not in custody. *Standsbury v. California*, 511 U.S. 318, 324-325 (1994). *See United States v. Kirsteins*, 906 F.2d 919 (2d Cir. 1990).

Mr. Iqbal was taken into custody when agents first arrived at his family's home in the early morning hours of August 23, 2006.[8] Not only did at least five agents appear at his front door, but each was visibly armed when he entered Mr. Iqbal's residence. His wife, who had accompanied Mr. Iqbal to answer the door, was instantly whisked away from her husband and escorted upstairs into a bedroom, where she was forced to remain – separate from her three

---

[7] The meaning of "custody" under *Miranda* is narrower than the meaning of a "seizure" under the Fourth Amendment.

[8] These facts were first introduced and cited in the Statement of Facts, *see* **ante** at 6-9, and will not be cited again here.

64

young children – for the duration of the agents' occupation of their family home.

Immediately isolated and surrounded by JTTF agents, Mr. Iqbal suffered a severe anxiety attack but was not permitted the freedom to obtain his medication from an adjacent room. Rather, he was forced to remain seated by the agents. Upon detailing the extremity of his various medical conditions, an agent eventually found Mr. Iqbal's medication and provided it to him. Thereafter, he was subjected to four hours of uninterrupted interrogation without the benefit of *Miranda* warnings. His home was searched and his belongings seized, while he was forced to accompany agents around his home and the surrounding property, watching powerlessly as they ransacked his residence.

Mr. Iqbal was not informed that he was under arrest, nor informed of his *Miranda* rights, until *after* the agents had subjected him to hours of interrogation and had completed their search of his home – all while his family was forcibly sequestered in their bedrooms on the second floor under the constant gaze of armed JTTF agents.

Any reasonable person in Mr. Iqbal's shoes would have concluded that he retained no freedom of action – that he was in custody from the moment the agents arrived at the front door of his home in the dawn hours of August 23, 2006. *See Miranda*, 384 U.S. at 444; *Ali*, 68 F.3d at 1473. As the Supreme Court reiterated in *Standsbury*, "the inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Standsbury*, 511 U.S. at 322. Under the totality of these circumstances, it is clear that Mr. Iqbal had been formally arrested. No reasonable person would have believed they could exercise freedom of action and terminate the interrogation. *See Beheler*, 463 U.S. at 1125. Rather, these combined circumstances irrefutably communicate conditions of detention that are absolutely

inconsistent with the normal, unfettered exercise of freedom of movement.

Accordingly, all of Mr. Iqbal's statements made during the preliminary 4-hour interrogation in his home on the morning of August 23, 2006, and in the complete absence of *Miranda* warnings, must be suppressed. Moreover, any evidence or derivative evidence, including subsequent statements, seized as a consequence of Mr. Iqbal's unlawful custodial interrogation, "is subject to the fruit of the poisonous tree doctrine," the remedy for which is suppression of that evidence. *Wong Sun v. United States*, 371 U.S. 471 (1963).

> **2.** ***Mr. Iqbal's* Miranda *Waiver Was Not Voluntary***

>> **a.** ***Voluntariness of a* Miranda *Waiver Must Be Evaluated Under the "Totality of the Circumstances"***

When the government contends a defendant has voluntarily waived his *Miranda* rights, it must prove the voluntariness of the waiver by a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 609 n. 1 (2004) (*citing Colorado v. Connelly*, 479 U.S. 157, 169 (1986)). Thus, as the Supreme Court cautioned, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997).

The voluntariness test governing a *Miranda* waiver is essentially the same test applicable to the due process inquiry concerning the voluntariness of confessions themselves:

> [a] defendant's decision to relinquish his *Miranda* rights must be voluntary, knowing and intelligent. Thus, relinquishment must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with full awareness of both the nature of the right abandoned and the

66

consequences of the decision to abandon it.

*United States v. Miller*, 382 F. Supp. 2d 350, 371 (N.D.N.Y. 2005).  Thus, "[o]nly if the 'totality

of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the

requisite level of comprehension may a court properly conclude that *Miranda* rights have been

waived."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see also United States*

*v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997).

    In addition, as the Second Circuit has explained, "[f]actors relevant to the totality of the

circumstances are:  the characteristics of the accused, such as his experience, background, age

and intelligence; the conditions of interrogation; and police conduct, such as physical abuse,

handcuff restraint, and psychologically coercive tactics."  *Nelson v. Walker*, 121 F.3d 828, 833

(2d Cir.1997); *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988).

    Mr. Iqbal does not dispute that he signed a *Miranda* waiver.  *See* Exhibit 3.  However,

Mr. Iqbal was first informed that he was under arrest and read his *Miranda* rights *after*: (1) being

subjected to four hours of uninterrupted custodial interrogation; (2) his home and surrounding

property had been searched; (3) his family had been separated and detained in different rooms in

the house; and (4) he had suffered a severe anxiety attack which demanded immediate

medication.[9]  Not only was Mr. Iqbal already in custody when he was presented with the

*Miranda* waiver, but he also was frightened and in failing health.  Furthermore, he informed the

agents that he did not understand the various papers – including, but not limited to, the *Miranda*

waiver – but was instructed that "this was standard procedure" and the documents required his

_____

    [9]  As stated earlier, the facts referred to in this analysis have been cited previously in the
Statement of Facts, *see* **ante** at 6-9, and will not be repeated here.

signature.  He complied with the agents' orders.

It is clear from the foregoing discussion of the totality of the circumstances surrounding Mr. Iqbal's detention that his failing health combined with the psychologically coercive and physically intimidating tactics used during his interrogation corroded his ability to knowingly, intelligently or voluntarily waive his *Miranda* rights – particularly after he already had been subjected to hours of custodial interrogation.

His will overborne, Mr. Iqbal did not voluntarily waive his *Miranda* rights; instead, he yielded to the "deliberately coercive" and "improper tactics" employed by the government. *Oregon v. Elstad*, 470 U.S. 298 (1985).  *See also United States v. Duvall*, 537 F.2d 15, 24 (2d Cir. 1976) (waiver coerced where defendant was jailed overnight, not arraigned for over 20 hours, and threatened by prosecutor that he would go to prison for over 100 years).

### b.   *Mr. Iqbal's Subsequent* **Miranda** *Waiver Was Not Voluntary Under the Totality of the Circumstances*

However, assuming *arguendo* that Mr. Iqbal did, in fact, attempt to waive his *Miranda* rights four hours after his custodial interrogation began, the "subsequent" *Miranda* waiver could not have been a "knowing, intelligent and voluntary" waiver due to the extreme coerciveness shrouding the totality of the circumstances in which Mr. Iqbal was immersed, such as "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) (*citing United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)).  *See also Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir.1998) (court must "consider whether the circumstances surrounding [defendant's] 'first,' unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his 'second,' warned confession").

The Supreme Court recently established that, "[t]he threshold question in [evaluating the voluntariness of a subsequent waiver] is whether it would be reasonable to find that the [subsequent] warnings could function 'effectively' as *Miranda* requires."  *Seibert*, 542 U.S. at 601.  The Court concluded that "[t]here is no doubt about the answer.  By any objective measure, it is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content."  *Id.  See also Moran*, 475 U.S. at 424 (finding that the injection of *Miranda* warnings in the midst of a coordinated and continuing interrogation are likely to "deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them").

The agents' post-*Miranda* waiver interrogation of Mr. Iqbal was sufficiently close in time and similar in content to render the administered *Miranda* warnings, and resulting waiver, entirely meaningless.  The interrogation continued *uninterrupted*, without a pause in questioning as Mr. Iqbal was handcuffed, placed into the FBI vehicle and taken to his business office in Brooklyn.  Furthermore, the content of the subsequent interrogation was *identical* to what had been extracted from Mr. Iqbal prior to the *Miranda* warnings.  *See* Exhibit 2, at pp. 2-4.

By "any objective measure," as set forth by the Supreme Court in *Seibert,* 542 U.S. at 601, the subsequent *Miranda* warnings offered to Mr. Iqbal, after he had been subjected to hours of custodial interrogation, and his home searched and belongings seized, were "ineffective in preparing [him] for successive interrogation, close in time and similar in content" and thus render his alleged *Miranda* waiver from that same date invalid.

Consequently, all of Mr. Iqbal's statements made after *Miranda* warnings were

administered must be suppressed, and any evidence derived from those statements must be excluded under as fruits of the poisonous tree.  *Wong Sun v. United States*, 371 U.S. 471 (1963).

**B.**     ***Mr. Iqbal's Statements Were Elicited Unlawfully Without A Valid Waiver of Speedy Presentment***

The Court should suppress any statements the government seeks to introduce against Mr. Iqbal as they were obtained in violation of Mr. Iqbal's right to a speedy presentment under the Fifth Amendment to the United States Constitution, *see Mcnabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957), and 18 U.S.C. §3501(c).  In the alternative, it is respectfully requested that the Court conduct a hearing to determine whether or not Mr. Iqbal's waiver of speedy presentment was made knowingly, voluntarily and in a timely fashion.

Presentation before a magistrate judge "without unnecessary delay," *see* Rule 5(a), Fed.R.Crim.P., is required under the Fifth Amendment to afford a suspect opportunity to contest the legality of his arrest, to establish the terms on which the suspect will be held or bailed, pending a preliminary hearing or grand jury proceeding, to inform a suspect of his right to retain or request appointment of counsel, and, as is particularly relevant herein, to notify a suspect of his right not to not make post-arrest statements.

In particular, the government "must take [a] defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."  Rule 5(a)(1)(A), Fed.R.Crim.P.  In turn, Rule 5(c)(1) provides that, if a defendant is arrested in the district where the offense was allegedly committed and "if a magistrate judge is not reasonably available, the initial appearance may be before a state or local judicial officer."

The *McNabb-Mallory* rule, adopted by the Supreme Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts," *McNabb* at 341, "generally rendered inadmissible confessions made during periods of detention that violated the prompt presentment requirement of Rule 5(a) of the Federal Rules of Criminal Procedure." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994) (*citing Mallory*, 354 U.S. at 453).

As the Second Circuit has recognized, the appropriate remedy for the government's unnecessary delay in bringing a suspect before the nearest available federal magistrate judge is suppression of prejudicial statements made during the period of delay. *See United States v. Colon*, 835 F.2d 27, 31 (2d Cir. 1987).

However, Congress proscribed the broad suppression offered defendants under the *McNabb-Mallory* rule by passing §3501(c), which states that a confession made by a person within six hours following his arrest or other detention "shall not be inadmissible" solely because of a delay in presenting the person to a federal magistrate.  18 U.S.C. §3501(c).  Under this legislative framework, "unreasonable pre-arraignment, pre-confession delays of less than six hours" and "reasonable delays in excess of six hours" do not automatically require suppression. *See United States v. Perez*, 733 F.2d 1026, 1035 (2d Cir. 1984).

Although neither the Supreme Court nor this Court have held that §3501(c) mandates that a district court reflexively suppress all confessions made prior to presentment yet six hours after arrest, the Second Circuit has established that "a district court has the discretion to suppress a confession if the delay between arrest and presentment is greater than six hours and is found by the court to be unreasonable under the circumstances." *United States v. Fullwood*, 86 F.3d 27,

31 (2d Cir. 1996).

While a defendant may waive his right to a speedy presentment before a court, the government must show by a preponderance of the evidence that the defendant knowingly and voluntarily did so.  *See United States v. Berkovich*, 932 F.Supp. 582, 588 (S.D.N.Y. 1996).

Mr. Iqbal concedes that he signed a waiver of speedy presentment.  *See* Exhibit 4.  However, he did so only *after* being subjected to four hours of custodial interrogation, during which time his will was overborne, leaving him vulnerable to the JTTF agents' coercion – to which he ultimately succumbed.  *See* Exhibit 1, at ¶¶ 9, 11.  As detailed **ante** at 64-69, the totality of the circumstances clearly establish that Mr. Iqbal was in custody and in failing health when he signed the waiver of speedy presentment (which was presented to him simultaneously with the *Miranda* waiver).  Accordingly, such waiver was neither knowing or voluntary.

For the foregoing reasons, pursuant to the Fifth Amendment and 18 U.S.C. § 3501(c), Mr. Iqbal respectfully requests that his statements obtained on August 23, 2006, during his unlawful pre-presentment delay be suppressed because they were involuntary as a matter of law, that any fruits of those statements be suppressed as well, and/or that the Court conduct a hearing on the issue.  Moreover, any evidence or derivative evidence seized as a consequence of the illegal pre-presentment delay suffered by Mr. Iqbal "is subject to the fruit of the poisonous tree doctrine," the remedy for which is suppression of that evidence.  *Wong Sun v. United States*, 371 U.S. 471 (1963).

**POINT V**

**ALL PROPERTY SEIZED DURING THE
SEARCHES OF MR. IQBAL'S RESIDENCE,
BUSINESS, AND CAR SHOULD BE
SUPPRESSED, AND/OR A HEARING
CONDUCTED TO DETERMINE
WHETHER THEY WERE VOLUNTARY**

In the course of its custodial interrogation of Mr. Iqbal, the government conducted three separate, calculated, and intentional searches of Mr. Iqbal's car, home and business, invading the most cherished aspects of Mr. Iqbal's privacy, in a manner that violated his Fourth Amendment and statutory rights. Therefore, in all three instances, it is respectfully submitted that the evidence seized must be suppressed, and any fruits thereof must likewise be suppressed. In the alternative, if, assuming *arguendo*, the evidence of the government's wrongdoing is not sufficient to suppress as a matter of law, it is respectfully submitted that the Court conduct hearings on the validity of the government's searches of Mr. Iqbal's car, home and business.

**A.**     *The August 23, 2006, Search of Mr. Iqbal's Vehicle
        Was Conducted in Violation of the Fourth Amendment*

While Mr. Iqbal endured hours of custodial interrogation in his home, JTTF agents conducted a search of Mr. Iqbal's vehicle – a 2005 red Dodge Durango, which was parked directly in front of his residence. *See* Exhibit 2, at p.1. FBI records assert that Mr. Iqbal consented to this search, relying on a signed "Consent to Search" form. *See id.*; Exhibit 5.

However, as detailed below, the totality of the circumstances demonstrate that Mr. Iqbal was coerced into signing the form (as he was coerced into signing the *Miranda* waiver and waiver of speedy presentment), rendering his consent involuntary and the ensuing search unlawful. Consequently, the seized items, and any fruits thereof, must be suppressed.

73

An individual's consent to search is valid if that consent is voluntary.  As the Second

Circuit has made clear, "[t]he government has the burden of proving, by a preponderance of the

evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230-31

(2d Cir. 2004), *citing United States v. Calvente*, 722 F2d 1019, 1023 (2d Cir. 1983).  In order to

determine whether or not consent was voluntary, no single factor is the linchpin;  instead, the

court must examine the totality of the circumstances.  *See Schneckloth v. Bustamonte*, 412 U.S.

218, 227 (1973).

The totality of  the circumstances surrounding Mr. Iqbal's custodial interrogation on the

morning of August 23, 2006, demonstrate that Mr. Iqbal never voluntarily consented to the

search of his vehicle – and, in fact, given the conditions of his detention and his failing health,

could not have voluntarily, knowingly, and intelligently consented.  As has been discussed at

length **ante** at 6-9, 64-69, 72, Mr. Iqbal was taken into JTTF custody immediately upon the

agents' arrival at his home and, in spite of his deteriorating health, was forced to watch as agents

searched his home and the surrounding areas, and seized his belongings – for a full *four* hours

before he "consented" to the search of his car, which was stationed right outside of his residence.

*See* Exhibit 1, at ¶¶ 9-11; *United States v. Moreno*, 897 F.2d 26 (2d Cir. 1990).

According to the government, Mr. Iqbal  memorialized his consent by signing a "Consent

to Search" form.  *See* Exhibit 5.  However, evidence of a signed piece of paper is only that:

evidence of a signature, not of Mr. Iqbal's voluntariness.  In order for his consent to be valid it

must have been a "product of [Mr. Iqbal's] free and unconstrained choice, rather than a mere

acquiescence in a show of authority." *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2002)

(*citing United States v. Garcia*, 56 F.3d. 418 (2d Cir. 1995)).  Yet, Mr. Iqbal's signature reflects

just that:  his mere submission to the agents' command to sign the "Consent to Search" form (which was presented to him simultaneously with the *Miranda* waiver and the waiver of speedy presentment), despite his clearly expressed lack of understanding of those documents.  *See* Exhibit 1, at ¶ 11.

Such equivocation by Mr. Iqbal demonstrates the exact *opposite* of what the government attempts to portray.  Mr. Iqbal did not consent to the search; rather, with his will overborne and his intent confused and dubitable at best, Mr. Iqbal did not – and could not – voluntarily, knowingly, and intelligently consent.  *See Bustamonte*, 412 U.S. at 227; *Isofia*, 370 F.3d at 230-31.

As such, the "consent" that the government ascribed to Mr. Iqbal was derived through duress, specifically through the creation of a coercive custodial environment to which Mr. Iqbal ultimately succumbed.  *See Pelligrino*, 303 F.3d at 124.  Accordingly, without valid consent to search Mr. Iqbal's vehicle, and in the absence of any search warrant, JTTF agents conducted an unlawful search in violation of the Fourth Amendment.  All seized items must be suppressed, and any derivative evidence obtained from this search must be suppressed as fruits of the poisonous tree.  *Wong Sun v. United States*, 371 U.S. 471 (1963).

**B.**     ***The August 23, 2006, Searches of Mr. Iqbal's Residence and Business Were Conducted In Violation of the Fourth Amendment***

Government agents conducted a search of Mr. Iqbal's Staten Island home, where Mr. Iqbal was residing with his wife and children, *see* Exhibit 1, at ¶ 1, and a search of his business office in Brooklyn, *see id*., at ¶ 13, on August 23, 2006, the date of Mr. Iqbal's arrest.  Although these searches were executed pursuant to a search warrant signed by the Honorable Gabriel W. Gorenstein of the Southern District of New York on August 22, 2006, *see* Search Warrant, at p.1,

attached to the Dratel Declaration as Exhibit 8, the warrant was overbroad, acting as a "general warrant" rather than a particularized one, and thereby rendered unlawful.

### 1.    *General Warrants Are Not Permissible Under the Fourth Amendment*

As the Supreme Court has instructed, "[i]t is familiar history that searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). General warrants – authorizing police agents to undertake an indiscriminate rummaging through citizens' personal effects – are prohibited by the Fourth Amendment's command that "no Warrants shall issue [unless] particularly describing the place to be searched, and the persons or things to be seized." *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (plurality).

In order to prevent a "wide-ranging exploratory search," *Maryland v. Garrison,* 480 U.S. 79, 84 (1987), the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize. *See Steele v. United States*, 267 U.S. 498, 503 (1925); *United States v. Vargas*, 621 F.2d 54, 56 (2d Cir.), *cert. denied*, 449 U.S. 854 (1980). *See also  In United States v. George*, 975 F.2d 72 (2d Cir. 1992) (warrant's broad authorization to search for "any other evidence relating to the commission of a crime" was not sufficiently particular to satisfy the Fourth Amendment).

As a result, a search warrant may issue only upon a showing of probable cause to believe that the items described in the warrant are presently in the place authorized to be searched, *Michigan v. Tyler*, 436 U.S. 499, 512 (1978); *Franks v. Delaware*, 438 U.S. 154 165 (1978); *Steagald v. United States*, 451 U.S. 204, 217 (1981), and there must exist reasonable grounds to believe that the specified items are connected to criminal activity.  *Zurcher v. Stanford Daily*,

436 U.S. 547, 556-7 (1978); *Steagald,* 451 U.S. at 213.  The warrant must also describe with specificity both the things to be seized and the place to be searched.  *Stanford v. Texas*, 379 U.S. 476 (1965);  *Lo-J Sales, Inc. v. New York*, 442 U.S. 319, 325 (1979).

Moreover, the government cannot assert that the its agents reasonably relied in "good faith" on a search warrant they knew or should have known to be defective.  *See generally United States v. Leon*, 468 U.S. 1250 (1984).  While a search warrant provides for the detached scrutiny of a neutral magistrate, "[d]eference to the magistrate is not... boundless."  The Supreme Court in *Leon* detailed at least four circumstances where reliance on a search warrant would not be objectively reasonable: first, where the officer knew, or would have known but for his reckless disregard for the truth, that the issuing magistrate was misled by false information in the affidavit for the warrant; second, where the magistrate acted as a rubber stamp, thereby abandoning  his neutral, judicial role, and instead acted as an adjunct to law enforcement; third, where the warrant was so lacking in indicia of probable cause; and, fourth, where the warrant was facially deficient because it failed to particularize the place or items to be seized.  *See Leon*, 468 U.S. at 923.  *See also Franks v. Delaware* 438 U.S. 154 (1978).

    **2.**    ***A Search Warrant Issued Based on the Possession and Use of Satellite Communication Equipment Violates the First Amendment***

In the instant case**,** the search warrant was based on allegations that Mr. Iqbal was engaged in First Amendment protected activity, s*ee* **ante** at POINT I (E)(2) & I (F), namely that Mr. Iqbal was in possession of approximately eight satellite dishes from which he operated a business that sold satellite television services, including access to Al-Manar television broadcasts.  *See* Exhibit 8, at ¶¶ 8, 17, 18, 20.  Consequently, the warrant authorized an expansive search of Mr. Iqbal's personal and business property and the overbroad confiscation of

documents, computer equipment, and satellite equipment – irrespective of whether those items were for personal or business use – found in Mr. Iqbal's home, surrounding property and business.

The possession and use of satellite communication equipment – the modern day equivalent of the printing press – is clearly protected by the First Amendment and cannot provide the basis for probable cause for a search warrant.  The government cannot use possession of satellite broadcasting equipment to show a defendant's knowledge or intent without specific proof that the defendant shared the point of view expressed therein, particularly with respect to the charged conduct in Counts One and Seven (conspiracy to provide material support to a foreign terrorist organization) and Counts Two and Eight (provision of material support to a foreign terrorist organization).

As pointed out by the Ninth Circuit, "[t]he Government's theory . . . that the ideas of an author of a book may properly be attributed to the reader of the book and then used against him to prove disposition to commit a crime, motive to undertake criminal action, or proof that he did the acts charged . . . is [not] constitutionally permissible."  *United States v. Giese*, 597 F.2d 1170, 1209 (9th Cir. 1979) (Hufstedler, J., dissenting).  As Judge Hufstedler notes, '[f]reedom of speech would be totally destroyed if the shadow of the prosecutor fell across the pages of the books we read.  Even during the evil thralldom of McCarthyism, we did not embrace the concept of guilty by book association."  *Id.*

Such presumed guilt by association is exponentially compounded here.  Mr. Iqbal's alleged criminal conduct emanates from his possession of satellite equipment for business purposes.  As such, he is not acting as the "reader" of a book, but rather as the librarian offering

the book to readers in the public at large.

By authorizing a search warrant based on conduct shielded by the First Amendment, the magistrate abandoned his role as a neutral arbitrator and instead "acted as an adjunct to law enforcement." *Leon*, 468 U.S. at 923. The resulting warrant, thereby, lacked probable cause, and consequently this confiscated property, taken in violation of the Fourth Amendment, must be suppressed.

Under the totality of circumstances, it is clear that the August 23, 2006, searches of Mr. Iqbal's home and place of business were violations of his Fourth Amendment rights by government agents who simply expected to execute an overbroad, general warrant. These searches represent a transparent attempt to avoid the warrant requirement and present exactly the type of situation to which the exclusionary rule applies.

Accordingly, it is respectfully submitted that the searches of Mr. Iqbal's home and place of business, and any fruits thereof, should be suppressed, since the exclusionary rule requires the suppression of any evidence that is either the direct or indirect product of illegal conduct by law enforcement authorities, *Wong Sun v. United States,* 371 U.S. 471 (1963). At the very least, it is respectfully submitted that the Court should conduct a hearing with respect to the issues raised herein.

**POINT VI**

**THE INDICTMENT SHOULD BE DISMISSED
BECAUSE MR. IQBAL AND DR. ELAHWAL
HAVE BEEN SUBJECT TO SELECTIVE
PROSECUTION, OR, IN THE ALTERNATIVE,
THE COURT SHOULD CONDUCT A HEARING**

The Indictment should be dismissed because it represents a selective prosecution of Mr.

Iqbal and Dr. Elahwal because they of their perceived religion and/or ethnicity.  Of the many

entities that either provide Al Manar by either television broadcast transmission or internet

streaming, only Mr. Iqbal and Dr. Elahwal have been prosecuted.  In the alternative, it is

respectfully submitted that the Court should conduct an evidentiary hearing on the issue.

**A.**      ***Other Entities Have Either Provided Al Manar In the United
States, or Engaged In Business Transactions With Al Manar***

Both *before* and *after* the government's designation of Al Manar as an FTO in March

2006, several United States-based broadcast corporations and multinational corporations

regularly conducted business with Al Manar.  Though not an exhaustive list of the offending

entities, it is clear that Fox News, CNN and NBC each provided television programming and/or

internet streaming of Al Manar broadcasts over the *same* period of time charged in the

Indictment.  Likewise, the Coca-Cola Corporation, Pepsi Corporation, and Procter & Gamble

each advertised on Al Manar, or its affiliated website, over the course of the charged criminal

conduct – and, unlike the Defendants, actually paid money *to* Al Manar in order access its

viewers.  However, these broadcast and business corporations escaped prosecution altogether.

**B.**     *The Applicable Legal Standard for Selective Prosecution Motions*

In *United States v. Wayte*, 470 U.S. 598 (1985), the Supreme Court set forth the standards

controlling the determination whether there has been a selective prosecution.  Under *Wayte*, a

claim of selective prosecution requires proof of discriminatory effect and discriminatory intent.

470 U.S. at 608.  In *Wayte*, the defendant had refused to register for the draft.  He was

prosecuted under a "passive enforcement" governmental policy that targeted those who self-

identified themselves as draft refusers in communication with the government.  *Id.* at 600.  The

Court held that this policy did not violate equal protection of the laws or the First Amendment.

Rather, the Court explained:

> [i]t is appropriate to judge selective prosecution claims according
> to ordinary equal protection standards.  Under our prior cases,
> these standards require petitioner to show both that the passive
> enforcement system had a discriminatory effect and that it was
> motivated by a discriminatory purpose. All petitioner has shown
> here is that those eventually prosecuted, along with many not
> prosecuted, reported themselves as having violated the law.   He
> has not shown that the enforcement policy selected nonregistrants
> for prosecution on the basis of their speech.

*Id.* at 608-09 (internal citations omitted).

In *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992), which in turn adopted the test

applied in *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983), *cert. denied*, 466 U.S. 971

(1984), the Second Circuit explained that it has :

> that in order to support a defense of selective prosecution, the
> defendant must make at least a prima facie showing both "(1)  that,
> while others similarly situated have not generally been proceeded
> against because of conduct of the type forming the basis of the
> charge against [the defendant], he has been singled out for
> prosecution, and (2)  that the government's discriminatory
> selection of [the defendant] for prosecution has been invidious or
> in bad faith, *i.e.*, based upon such impermissible considerations as

81

race, religion, or the desire to prevent his exercise of constitutional rights."

**C.**      ***The Indictment In This Case Is the Product of a Selective Prosecution***

Here, both prongs of the test have been satisfied.  As recited **ante**, there has been no shortage of entities willing either to broadcast Al Manar or stream it in the U.S., or to engage in commercial relationships with the station.  Yet only Mr. Iqbal and Dr. Elahwal face criminal prosecution.  Also, the distinction is patent:  while those who remain free to pursue their First Amendment rights and advertising markets are large corporate interests with long histories in the U.S., Mr. Iqbal and Dr. Elahwal are immigrants, of Middle Eastern or South Asian origin, and of Muslim heritage and background.  In addition, clearly this prosecution has been instituted "to prevent [their] exercise of constitutional rights" – *e.g.,* to provide news and information under the guarantees afforded by the First Amendment.

It is undisputed that prosecutors possess wide discretion in choosing whom to charge and for what.  *Cf. United States v. Sattar*, 314 F. Supp. 2d 279, 311-12 (S.D.N.Y. 2004) (in context of a vindictive prosecution motion).  However, the Constitution places limits on this discretion.

One such historic limit is rooted in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).  In *Yick Wo*, San Francisco used a facially neutral ordinance to target Chinese laundry owners.  Nevertheless, the Court saw through the subterfuge:

> [t]hough the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

118 U.S. at 373-74.

Nor is the presumption of regularity that attends prosecutorial decision-making availing to the government in this case.  In *United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958), the Supreme Court considered whether prosecutors had misused the grand jury.  On remand, the District Court held that "this presumption or regularity, being a mere presumption, is effective, like other presumptions of fact, only in the absence of evidence to the contrary.  Here what defendants seek is to ascertain if there is evidence to the contrary.  They cannot be deprived of this right by that presumption."  *United States v. Procter & Gamble Co.*, 174 F. Supp. 233, 237 (D.N.J. 1959).  As a result, the court authorized inquiry of DOJ officials.

Here, too, if the showing made above is insufficient to demonstrate selective prosecution, certainly the evidence is adequate to warrant further discovery and an evidentiary hearing.  This is not the sort of case that would require a court to engage in judicial review of complex prosecution policies, a task that a court may not be competent to undertake.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  This is not a case involving statistical analysis or extrapolation.  Instead, the unitary nature of this prosecution is striking.

Consequently, it is respectfully submitted that, at the very least, further discovery is appropriate in this case, which presents circumstances and a record vastly different from that in *Fares*.  In *Fares*, while the defendant claimed his prosecution was unique, the government pointed to 13 other prosecutions for the same offense within a reasonable time period.  978 F.2d at 58.  Here, obviously, that is not the case.  Also, in *Fares*, the government provided a neutral and independent basis for the prosecution (dismissal of state court charges in contemplation of Fares's deportation), *id*., while here the government has not, and cannot, provide a legitimate basis for prosecuting Mr. Iqbal and Dr. Elahwal, and not the others who have engaged in the

same or similar conduct with respect to Al Manar.[10]

Nor did the defendant in *Fares* present any evidence that his prosecution was motivated by some improper consideration;  rather, his alleged connections to Hizbollah represented only an *additional* reason for the prosecution.  978 F.2d at 60.  Here, in contrast, there is no other apparent reason for prosecuting Mr. Iqbal and Dr. Elahwal other than their ethnicity and religious heritage.  There is no visible legitimate or articulable distinction between Mr. Iqbal and Dr. Elahwal on the one hand, and the other entities on the other.

Thus, unlike the situation in *Fares*, Mr. Iqbal and Dr. Elahwal's selective prosecution motion is neither "speculative nor unduly myopic."  *Id*.  Instead, it is based on incontrovertible facts:  they, among the many who performed the same conduct, are the only persons to face prosecution.  Therefore, Mr. Iqbal and Dr. Elahwal meet the standard enunciated in *Wayte*:  they were "selected . . . on the basis of [their] speech" as well on their race and/or religion.

Accordingly, it is respectfully submitted the charges in the Indictment are the product of selective prosecution, and should be dismissed.  In the alternative, it is respectfully submitted that the Court should order discovery[11] and an evidentiary hearing on the matter.

---

[10]  The inconsistent and asymmetrical nature of prosecutions under §2339A has been the subject of academic criticism. *See* Stock, at 14-19, 24-25 (noting that the People's Mujahedin of Iran, an FTO, operates in Iraq under the auspices and protection of the U.S. military, thereby making U.S. military personnel operate clearly in violation of §2339B, and making the U.S. itself, "under the express terms of the current law," a "'state sponsor' of terrorism," and urging a "legally consistent" application of §2339B that avoids charges of U.S. "hypocrisy").

[11]  It is respectfully submitted that the Court should issue an Order directing the government to produce all memoranda prepared by government agents and officials regarding the reasons for (a)  commencing the investigation in this case;  (b)  sending an informant to visit Mr. Iqbal;  (c)  arresting Mr. Iqbal;  and (d)  seeking the instant Indictment against Mr. Iqbal and Dr. Elahwal.

## POINT VII

### THE COURT SHOULD GRANT DR. ELAHWAL SEVERANCE BECAUSE HE WILL SUFFER UNDUE PREJUDICE IF TRIED JOINTLY WITH MR. IQBAL AGAINST WHOM THE MAJORITY OF THE GOVERNMENT'S EVIDENCE IS DIRECTED, AND WHOSE STATEMENTS CREATE A *BRUTON* ISSUE

**A.**   *Dr. Elahwal Will Suffer Undue Prejudice If Tried Jointly With Mr. Iqbal*

The Due Process clause of the United States Constitution and Rule 14, Fed.R.Crim.P.,

protect a defendant from a joint trial if undue prejudice will result.  Dr. Elahwal will suffer

overwhelming and incurable prejudice if he is tried jointly with Mr. Iqbal.  A joint trial in this

case will subject Dr. Elahwal to a magnitude of prejudicial spillover that neither he nor the jury

will be able to overcome with respect to the requisite particularized determination of Mr. Iqbal's

guilt or innocence of charges alleged against him.

Under these circumstances, a joint trial would be unfair and would deprive Dr. Elahwal

of his right to a fair trial.  A joint trial would result in a biased jury that would be unable to

compartmentalize the proof adequately.  In turn, the jury's consideration of evidence relating to

Mr. Iqbal will inevitably taint the jury's consideration of Dr. Elahwal, influencing the jury to

convict him based on evidence unrelated to him.

In order to prevent such a miscarriage of justice, it is respectfully submitted that the

Court grant severance, permitting Dr. Elahwal to be tried separately from Mr. Iqbal.

**1.**   *The Applicable Legal Standard*

Courts generally prefer joinder, severing when there is a serious risk that a joint trial

would compromise "a specific trial right" of one of the defendants, or prevent the jury from

making a reliable judgment about "guilt or innocence."  *Zafiro v. United States*, 506 U.S. 534

85

(1993).  Further, joint trials are often appropriate where the defendants are charged with

participating in the same criminal conspiracy." *United States v. Spinelli*, 352 F.3d 48, 53 (2d

Cir. 2003).

However, the decision of whether or not to grant severance is "committed to the sound

discretion of the trial court[.]"  *United States v. Vanwort*, 887 F.2d 375, 384 (2d Cir.1989).

Thus, under Rule 14, Fed.R.Crim.P.:

> [i]f it appears that a defendant or the government is prejudiced by a
> joinder of offenses or of defendants in an indictment or
> information or by such joinder for trial together, the court may
> order an election or separate trials of counts, grant a severance of
> defendants or provide whatever other relief justice requires.

Rule 14 allows a court to sever defendants for trial where a defendant can demonstrate

that the prejudice suffered "is sufficiently severe to outweigh the judicial economy that would be

utilized by avoiding multiple-linked trials."  *See United States v. Walker,* 142 F.3d 103, 110 (2nd

Cir. 1998).

In addressing applications for severance under Rule 14, courts have recognized that joint

trials may precipitate extreme prejudice, necessitating severance if there exists the danger that

the quality and quantity of proof against one defendant is much greater than against the other.

Thus, severance is required if the character of the evidence against one defendant creates

"prejudicial spillover" against the other, thereby increasing the possibility that the jury will infer

one defendant's guilt based on the "enhanced likelihood of the guilt of the other defendant." *See*

*United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980).

### 2.    *Dr. Elahwal Will Be Unfairly Prejudiced If Not Granted a Severance*

Dr. Elahwal should be severed from the Indictment, and tried separately from Mr. Iqbal.

The Government has turned over to Dr. Elahwal a multitude of discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. Minus a small fraction of that discovery, almost all of the evidence turned over to Dr. Elahwal relates not to the doctor himself, but to Mr. Iqbal. Thus, there exists the very real danger that the quality and quantity of proof against Mr. Iqbal is much greater than such proof against Dr. Elahwal.

Therefore, Dr. Elahwal will suffer unfair prejudice if forced to proceed to a joint trial with Mr. Iqbal. Thus, the Court should order that Dr. Elahwal be severed from the Indictment and tried separately.

## B.    Bruton v. United States *Requires a Severance In This Case*

In addition, there appears to be a *Bruton* issue that requires severance of Dr. Elahwal from the Indictment. Although the Indictment alleges that Dr. Elahwal and Mr. Iqbal conspired together in various counts, they should not be tried jointly because incurable potential *Bruton* and *Crawford* problems would infect a joint trial. *See Bruton v. United States*, 391 U.S. 123 (1968) (explaining that the inability of a defendant to cross-examine his or her co-defendant, who presumably will be an unavailable witnesses, violates that defendant's rights under the Confrontation Clause of the Sixth Amendment); *see also Crawford v. Washington*, 541 U.S. 36 (2004) (right to confrontation).

It appears from the discovery provided by the government that Mr. Iqbal made certain post-arrest statements that tend to inculpate Dr. Elahwal.[12] Dr. Elahwal does not know the sum

---

[12]   The Government may also seek to introduce statements allegedly made by Dr. Elahwal to law enforcement. Portions of these statements may be inculpatory as to Mr. Iqbal, thus creating another *Bruton* issue that may require severance. To the extent that the Government seeks to introduce as evidence at trial any statements it alleges that Dr. Elahwal made during a custodial interrogation without proper *Miranda* warnings, counsel for Dr. Elahwal respectfully requests that Dr. Elahwal's right be reserved to supplement these motions with a

and substance of those statements, but, pursuant to *Bruton*, he can receive redacted versions of those statements.  However, redacted, or *Bruton*-ized, statements are testimonial in nature and, for the purposes of testifying at trial, Mr. Iqbal is considered "unavailable," hence triggering Dr. Elahwal's *Crawford* protections.  As such, there is an irreconcilable tension between *Bruton* and *Crawford*, should Dr. Elahwal be tried together with Mr. Iqbal.

Given the allegations in the Indictment that intricately intertwine Dr. Elahwal's alleged conduct with that of Mr. Iqbal's (notwithstanding the lack of such evidence in the Rule 16 discovery), the *Bruton-Crawford* conflict between these two co-defendants is particularly severe. In this instance, severance is required to preserve each defendant's Fifth Amendment Due Process rights and Sixth Amendment Confrontation Clause rights.

If Dr. Elahwal is not severed from the Indictment, and is instead tried jointly with Mr. Iqbal, he will not be able to cross-examine Mr. Iqbal who has a Fifth Amendment right to remain silent.  Consequently, Dr. Elahwal's Sixth Amendment Right to Confrontation will be violated. These are the kind of "specific trial rights" referred to by the Supreme Court in *Zafiro v. United States*, 506 U.S. 534 (1993).

Therefore, the Court should sever Dr. Elahwal from the Indictment and order that he be tried separately.

## POINT VIII

### THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE THE DEMANDED DISCOVERY, BRADY MATERIAL, AND BILL OF PARTICULARS

The Indictment's failure to allege any acts of "material support" in Counts 1, 2, 7 & 8, as

---

motion to suppress such statements under the 5th Amendment.

well as the absence of any citation to the United Nations resolutions, regulations, and/or

Executive Order(s) Mr. Iqbal and Dr. Elahwal allegedly violated with respect to Counts 3, 4, 5,

6, 9, 10 & 11 (the UNPA counts), requires a Bill of Particulars.

This motion proposes a modest Bill of Particulars directed at these two discrete issues,

which seek information necessary to permit the defendants to identify with sufficient

particularity the nature of the charges pending against them and prepare for trial, as well as to

interpose a plea of double jeopardy should they be prosecuted a second time for the same

offense.

As the Second Circuit has held,

> [a] bill is appropriate to permit a defendant "to identify with
> sufficient particularity the nature of the charge pending against
> him, thereby enabling defendant to prepare for trial, to prevent
> surprise, and to interpose a plea of double jeopardy should he be
> prosecuted a second time for the same offense."

*United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), *quoting United States v.*

*Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

As a result, it is respectfully requested that the Court direct the government to provide the

following particulars:

### Regarding Counts 1, 2, 7 & 8

> identify the "material support or resources" each of the defendants
> is alleged to have provided, or conspired to have provided, or
> attempted to have provided with respect to each separate Count.

### Regarding Counts 3, 4, 5, 6, 9, 10 & 11

> identify the United Nations resolutions, regulations and/or
> Executive Order(s) each of the defendants is alleged to have
> violated with respect to each separate Count.

89

Absent the particularization demanded above, essential elements of the charged offenses will, in effect, be "moving targets," and susceptible to modification before or at trial.  Granting the Bill of Particulars sought would eliminate that potential problem.[13]  In addition, in light of the technological complexity of certain aspects of this case (satellite broadcast technology and business practices), as well as the possible need to obtain evidence and witnesses from distant locales (*i.e.*, Lebanon, Europe, and South America),[14] particularization now is especially crucial to adequate preparation of the defense.

In that context, if not notified sufficiently in advance of trial of these particulars, defendants will be unable, at the eleventh hour, to mount a defense based on witnesses, documents, and/or other information.  As the Second Circuit held in *Davidoff* and *Bortnovsky*, that result is untenable.

A demand for a bill of particulars should also be granted "to save a defendant wholly needless labor in preparing his defense."  *United States v. Philippe,* 173 F. Supp. 582, 585 (S.D.N.Y. 1959), *quoting United States v. Dolan,* 113 F. Supp. 757, 759 (D. Conn. 1953).  When a defendant is "legitimately concerned to know" whether he need prepare a defense against allegations of his participation in acts not specified in the indictment, particularization is required.  *United States v. Biaggi*, No. 87 Cr. 265, 1987 WL 27722 (S.D.N.Y. Dec. 3, 1987), *on*

---

[13]  As an example of an appropriate response to defendants' needs in preparing for trial, attached as Exhibit 9 to the April 6, 2007 Declaration of Joshua L. Dratel, Esq., is a sample chart provided by the prosecution in *United States v. Hassoun (Jose Padilla)*, 04-60001 (S.D.Fla.), identifying the specific "material support" alleged with respect to the individual counts in the indictment.

[14]  Al Manar originates in Lebanon.  Satellite transmission providers for HDTV relevant to this case include corporate entities (and personnel) in the Netherlands and Brazil.

*re-submission from*, 675 F. Supp. 790, 808-09 (S.D.N.Y.1987), *cited in United States v.*

*DeGroote*, 122 F.R.D. 131, 138 (W.D.N.Y. 1988).

Here, there is a long list of items that §2339A(b)(1) categorizes as "material support,"

and even that list is not exhaustive.  Defendants should not have to prepare to meet every

conceivable item on that list, or *off* it, in preparation for trial.  In addition, as detailed **ante**, in

POINT I (F), parts of the definition of "material support" have already be found

unconstitutionally vague and overbroad.

As the Second Circuit recognized in *Davidoff*, 845 F.2d at 1154, a RICO case, the

principles relevant to consideration of motion for bill of particulars "must be applied with some

care when the Government charges criminal offenses under [broad] statutes . . . . Such is the case

because "[w]ith the wide latitude accorded the prosecution to frame a charge that a defendant has

'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity'

comes an obligation to particularize the nature of the charge to a degree that might not be

necessary in the prosecution of crimes of more limited scope."  *Id.*

The Indictment in this case does not provide sufficient notice to the defendants of

essential elements of the offenses and conduct for which they are alleged to be criminally liable

under 18 U.S.C. §2339B or UNPA.  *See United States v. Bobo*, No. 02-11011, 2003 WL

22006279, at *7 (11th Cir. Aug. 26, 2003) [indicating that indictment alleging a violation of 18

U.S.C. § 1347(1), which prohibits defrauding a health care benefit program in connection with

the delivery of or payment for health care benefits, items, or services, failed to specify whether

the defendant was allegedly trying to defraud the program of benefits, items, services, or

money].  The failure to specify the types of material support or resources alleged in this case, or

the specific United Nations resolutions, regulations, or Executive Order(s) defendants allegedly violated, simply renders it impossible for defendants to prepare their defense.

Accordingly, it is respectfully submitted that the Court should order the government to produce the demanded Bill of Particulars.

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that

defendants' pretrial motions should be granted in their entirety, and the Indictment dismissed, or

the alternative relief requested herein granted.

Dated: 6 April 2007
New York, New York

Respectfully submitted,

    _____/ s /_____

Joshua L. Dratel, Esq.
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street,  3rd floor
– Of Counsel –          New York, NY 10005
Joshua L. Dratel          (212) 732-0707
Renita K. Thukral          *Attorneys for Defendant Javed Iqbal*

Edward V. Sapone, Esq.
Law Office of Edward V. Sapone
1 Penn Plaza, Suite 5315
New York, NY 10119
(212) 974-0600
*Attorney for Defendant Saleh Elahwal*