**Introduction**

This Memorandum of Law is submitted on behalf of defendants Javed Iqbal and Dr.

Saleh Elahwal in support of their pretrial motions to dismiss the Indictment and for other relief.

**Statement of Facts**

This Memo of Law incorporates by reference the accompanying Declaration by Joshua L.

Dratel, Esq., and the Exhibits thereto, including the Declaration by Javed Iqbal.  Familiarity with

the Indictment is assumed.

**POINT I**

**THE "MATERIAL SUPPORT" COUNTS (1, 2, 7 & 8)
SHOULD BE DISMISSED BECAUSE (A)  THEY FAIL
TO STATE AN OFFENSE UNDER THE STATUTE,
18 U.S.C. §2339B;  (B) THE CONDUCT ALLEGED IS
EXEMPTED FROM §2339B;  AND/OR (C)  §2339B IS
UNCONSTITUTIONALLY VAGUE ON ITS FACE OR
<u>AS APPLIED, AND IS UNCONSTITUTIONALLY OVERBROAD</u>**

The four Counts (1, 2, 7 & 8) that charge a violation of 18 U.S.C. §2339B – providing

"material support" to a designated Foreign Terrorist Organization (hereinafter "FTO") – must be

dismissed because they fail to state an offense, and/or the statute is unconstitutionally vague on

its face or as applied, and/or §2339B is unconstitutionally overbroad.

The Indictment alleges that Mr. Iqbal and Dr. Elahwal provided "material support" in the

form of "satellite television broadcasting services" to Hizballah or Al Manar.  *See* Indictment, at

¶¶ 6, 9, 23 & 26 (Counts 1, 2, 7 & 8).

The "material support" statute under which Mr. Iqbal and Dr. Elahwal are charged,

§2339B, requires that the "material support" be destined for an FTO.  A violation of §2339B is

defined as follows:

1

> [w]hoever, knowingly provides material support or resources to a
> foreign terrorist organization, or attempts or conspires to do so . . .
> [violates §2339B].  To violate this paragraph, a person must have
> knowledge that the organization is a designated terrorist
> organization . . . or that the organization has engaged in or engages
> in terrorist activity . . . or . . . terrorism[.]

18 U.S.C. §2339B(a)(1).

The term "material support or resources" in §2339B is defined in §2339A(b), and

presently includes:

> (1)  any property, tangible or intangible, or services, including
> currency or monetary instruments or financial securities, financial
> services, lodging, training, expert advice or assistance, safehouses,
> false documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, and other physical assets, except medicine or
> religious materials[.]

As the Second Circuit stated in *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000), "[a]n

indictment that fails to allege the essential elements of the crime charged offends both the Fifth

and Sixth Amendments." *Id.* at 92, *citing Russell v. United States*, 369 U.S. 749, 760-61 (1962).

The Sixth Amendment "guaranty of the defendant's right 'to be informed of the nature

and cause of the accusation' against him is also offended by an indictment that does not state the

essential elements of the crime." 212 F.3d at 93, *quoting Russell*, 369 U.S. at 761, *and citing*

*United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

While Counts 1, 2, 7 & 8 allege violations of §2339B, not one count alleges an essential

element of the offense:  that a defendant "must have knowledge that the organization is a

designated terrorist organization . . . or that the organization has engaged in or engages in

terrorist activity . . . or . . . terrorism[.]"

2

Consequently, Counts 1, 2, 7 & 8 patently fail to state an offense under §2339B and must be dismissed.  Section 2339B includes *two* knowledge requirements.  The first knowledge requirement, as pleaded in the Indictment, refers to the knowing provision of material support.  The knowledge requirement at issue here, however, is the *second* knowledge element: that the recipient of the material support was an FTO, or has engaged in terrorism.  The Indictment simply does not plead that second knowledge requirement, an essential element added by amendment to the statute in December 2004.

Indeed, prior to the 2004 amendment, the government invariably argued that the first "knowingly" referred only to the provision of material support, *i.e.*, that the defendant knew that he or she was providing some form of material support as defined in §2339A(b), and did *not* require knowledge that the recipient of that material support was an FTO.  *See, e.g., Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1138 & n. 5 (9th Cir.2000) (hereinafter "*HLP I*");[1] *United States v. Sattar*, 314 F. Supp.2d 279, 296 (S.D.N.Y. 2004) (hereinafter "*Sattar II*");  *United States v. Al-Arian*, 308 F. Supp.2d 1322, 1336-37 (M.D. Fla. 2004).  *See also United States v. Sattar*, 272 F. Supp.2d 348, 355-59 (S.D.N.Y. 2003) (hereinafter "*Sattar I*").[2]  Accordingly, Counts 1, 2, 7 & 8 fail to include an essential element of §2339B, and must be

---

[1]  In *Humanitarian Law Project v. Ashcroft*, 352 F.3d 382, 400 (9th Cir. 2003) (hereinafter "*HLP II*"), the Ninth Circuit revisited its prior ruling in *HLP I* that "knowingly" did not apply to the FTO element of §2339B.  In *HLP II*, the Ninth Circuit read a second scienter element into the statute in order to preserve its constitutionality.

[2]  In fact, it was the courts' negative reaction to the statute's failure to include that second scienter requirement that precipitated the amendment adding the clause, and the second knowledge element.  *See cases cited ante.  See also* "Material Support of Terrorists and Foreign Terrorist Organizations: Sunset Amendments," Updated March 17, 2007, at 2 (RL33035) (Charles Doyle, Senior Specialist, American Law Division) (hereinafter "CRS Paper") (2004 amendments were "in response to judicial decisions that either found them unconstitutionally

3

dismissed as a result.

Counts 1, 2, 7 & 8 suffer from an additional material infirmity: they fail to allege adequately the "material support or resources" element of §2339B. For example, Counts 1 and 2 list "satellite television broadcasting services" as the "material support." Yet that is not listed in the definition of "material support," and an essential element of the offense is not to be left to the vernacular, or to guesswork. The same is true with respect to the "material support" alleged in Counts 7 and 8: "electronic equipment relating to satellite television broadcasting." Thus, the "specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute." *United States v. Panarella*, 227 F.3d 678, 685 (3d. Cir. 2000).

Nor does *receiving* material support constitute a violation of §2339B, even though Count 2 includes the allegation that the "satellite television broadcasting services" were provided by Mr. Iqbal and Dr. Elahwal "in exchange for payments of thousands of dollars to HDTV" (their company). *See* Indictment, at ¶9. While the Indictment is carefully crafted not to allege that receipt of money by Mr. Iqbal and Dr. Elahwal as the violation of §2339B, in fact that is the gravamen of the conduct charged in those counts.

Moreover, even if Counts 1, 2, 7 & 8 adequately alleged an offense under §2339B, and even if the conduct alleged constituted "material support" under the statutory definition, those four counts would still be deficient because the "material support" they allege encompasses

---

vague or suggested a demanding mens rea (knowledge) requirement"); Andrew Peterson, *Addressing Tomorrow's Terrorists*, 2 J. Nat'l Security & Pol'y ___ (forthcoming) (hereinafter "Peterson"), advance copy at 51 n. 152 (addition of second knowledge element was "in response to court decisions which require specific intent to further the organization['']s illegal activities, not simply to aid the organization") (citation omitted). (Due to its length, a separate copy of the advance version of Mr. Peterson's article is being provided separately with the instant motions.)

4

protected First Amendment conduct that is expressly exempted from §2339B by explicit statutory language, by its legislative history, and the case law interpreting the statute. Indeed, even the Department of Justice (hereinafter "DoJ") itself shares that point of view.

As discussed below, Congress and the courts have struggled to rein §2339B in so that it does not penalize the exercise of First Amendment rights. *See* Peterson, at 14 ("[a] balancing of associational and free speech rights with the government's interest in preventing terrorist activity was present from the conception of 'material support'"). Only rigorous adherence to the restrictions that Congress and the courts have placed on §2339B in that context can save the statute from unconstitutional application.

In December 2004, §2339B was amended to include, *inter alia*, the following provision in §2339B(i):

> [n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.

18 U.S.C. §2339B(I). *See also* CRS Paper, at 4 (2004 amendments "may rely on [their] section 2339B First Amendment disclaimer clause to answer the concern that the uncertain term might lead to prosecution of mere advocacy or other First Amendment protected activities – at least with regard to prosecutions under 2339B").

That plain language merely codified and reinforced in unambiguous terms what Congress intended all along with respect to the scope of §2339B, which was not designed to cover protected speech:

> the ban does not restrict an organization's or an individual's ability to freely express a particular ideology or political philosophy. Those inside the United States will continue to be free to advocate,

> think and profess the attitudes and philosophies of the foreign
> organizations. They are simply not allowed to send material
> support or resources to those groups, or their subsidiary groups,
> overseas.

*United States v. Sattar*, 272 F. Supp.2d 348, 357-58 (S.D.N.Y. 2003) (hereinafter "*Sattar I*"),

*quoting* H.R. Rep. 104-383 at 45. *See also* H.R. Rep. No. 104-383, at 44 ("[t]here is no

proscription on one's right to think, speak, or opine in concert with, or on behalf of, [a foreign

terrorist] organization.").

The Courts, too, have been clear in distinguishing "material support" from

constitutionally protected First Amendment activity, including speech. For instance, in *United

States v. Sattar*, 314 F. Supp.2d 279, 296 (S.D.N.Y. 2004) (hereinafter "*Sattar II*"), the Court

recapitulated its analysis of the initial Indictment in *Sattar I* by stating that "by prohibiting the

provision of personnel, including oneself, to a foreign terrorist organization, §2339B could

conceivably apply to someone engaging in advocacy on behalf of such an organization, conduct

protected by the First Amendment." *Sattar II*, 314 F. Supp.2d at 296, *citing Sattar I*, 272 F.

Supp.2d at 358-59 (internal quotations omitted).

Other courts, too, have recognized the critical and dispositive distinction between

"material support" and constitutionally protected activity and speech. In *Humanitarian Law

Project v. Ashcroft*, 352 F.3d 382 (9th Cir. 2003) (hereinafter "*HLP II*"), the Ninth Circuit

explained that §2339B,

> does not prohibit being a member of one of the designated groups
> or vigorously promoting and supporting the political goals of the
> group. Plaintiffs are even free to praise the groups for using
> terrorism as a means of achieving their ends.

205 F.3d at 1133. *See also HLP II*, 205 F.3d at 1134 ("[a]dvocacy is always protected under the

First Amendment"); *Id.* at 1137 ("advocacy is pure speech protected by the First Amendment");
*Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000, 1026-27 (7th Cir. 2002).

In *Boim*, the Seventh Circuit stated that §2339B did *not* impose liability "on the basis of
membership alone or because a person espouses the views of an organization that engages in
illegal activities[,]" adding that the defendants could "with impunity, become members of
Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies
of Hamas." 291 F.3d at 1026.

The Fourth Circuit, too, in *United Sates v. Hammoud*, 381 F.3d 316, 329 (4th Cir. 2004),
*remanded for resentencing on other grounds*, 405 F.3d 1034 (4th Cir. 2005), a case involving
material support to Hizballah, stated that §2339B "does not prohibit mere association;  it
prohibits the *conduct* of providing material support to a designated FTO." *See also Hammoud*,
381 F.3d at 330 ("Hammoud is free to advocate in favor of Hizballah or its political objectives –
§ 2339B does not target such advocacy").

That protected First Amendment activity cannot constitute "material support" is precisely
the interpretation of "material support" DoJ has adopted in other cases.  For instance, in the
*Humanitarian Law Project* cases, DoJ repeatedly urged a construction that would leave First
Amendment activity unaffected, or conceded that such activity was not within the law's ambit.
*See, e.g., HLP II*, 205 F.3d at 1137-38;  *Humanitarian Law Project v. U.S. Dept. Of Justice*, 352
F.3d 382 (9th Cir. 2003) (hereinafter "*HLP III*"), *vacated on other grounds by* 393 F.2d 902 (9th
Cir. 2004) (*en banc*); *Humanitarian Law Project v. U.S. Dept. Of Justice*, 2004 WL 547534, at
*15 (C.D. Cal. March 17, 2004) (hereinafter "*HLP IV*").

Indeed, in *HLP III*, DoJ even pointed to additions to the United States Attorney's Manual

7

(at §9-91.100) with respect to the definition of "personnel" for the purpose of removing any threat to First Amendment activity. *See HLP III*, 352 F.3d at 403. *See also United States v. Khan*, 309 F. Supp.2d 789, 822 (E.D. Va. 2004).

As a result, it is clear that Congress, the Courts, and even DoJ all agree that "material support" does not include protected First Amendment activity. Here, examination of the parameters of protected First Amendment activity compels the conclusion that the allegations underlying Counts 1, 2, 7 & 8 fail to constitute anything more than protected speech.

The First Amendment right to free speech includes the freedom to advocate the use of force or violation of the law, *see Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969), to advocate for illegal action at some indefinite time in the future, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (*per curiam*), to advocate the political goals of a terrorist organization, including praising such groups for using terrorism to achieve its objectives, *HLP II*, 205 F.3d at 1133, and even to advocate for action that makes it more likely that someone will be harmed at some unknown time in the future by an unrelated third party. *Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists*, 244 F.3d 1007, 1015 (9th Cir. 2001) (hereinafter "*PPCW I*"), *vacated on other grounds by* 290 F.3d 1058 (9th Cir. 2002) (*en banc*) (hereinafter "*PPCW II*").

The Complaint in this case, as well as the allegations throughout the Indictment, make clear, as detailed **ante**, that the "material support" counts include within their allegations conduct protected under the First Amendment: speech in the form of political expression, news, and artistic and entertainment programming. Consequently, this application of §2339B abridges those rights if the statute is construed to proscribe such First Amendment activities, and runs afoul of §2339B(i). Conversely, as detailed **post**, at section F, if §2339B(i) does not so limit the

8

reach of §2339B, and permits its application to the circumstances herein, the statute would be unconstitutional as applied.

*Brandenburg*, the Supreme Court's definitive advocacy case, established that mere advocacy for the use of force or violation of the law is constitutionally protected. 395 U.S. at 449 (stating that a statute which "purports to punish for mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action . . . falls within the condemnation of the [First Amendment]").

In striking down the Ohio statute under which Brandenburg had been convicted, the Court reasoned that its prior decision in *Noto v. United States*, 367 U.S. 290, 297-98 (1961), distinguished between the mere abstract teaching of the moral propriety or moral necessity to resort to force and violence and actually preparing a group for violence and setting it into action. 395 U.S. at 447-48.

In doing so, the Court established a new (and by now enduring) standard for the constitutional guarantee of free speech by holding that the First Amendment provides protection for the advocacy of force or the violation of the law "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 448.

Applying this test to the Ohio statute, the Court found that it:

> punishes persons who advocate or teach the duty, necessity, or propriety of violence as a means of accomplishing . . . political reform; *or who publish or circulate or display any book or paper containing such advocacy*; or who justify the commission of violent acts with intent to exemplify, spread or advocate the propriety of the doctrines of criminal syndicalism; . . .

9

*Id.* (emphasis added).

Accordingly, the Court found that the Ohio statute violated the First Amendment because it failed to distinguish between mere advocacy and the incitement of imminent lawless action. 395 U.S. at 448-49.

The Court's next treatment of the issue occurred in *Hess v. Indiana*, 414 U.S. 105 (1973), in which the Court held that advocating illegal action at some indefinite time in the future was protected by the First Amendment.    The Supreme Court rejected the Indiana court's determination that Hess's statement was designed to "incite further lawless action" and "was likely to produce such action," declaring:

> [u]nder our decisions, *the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.*  Since the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it cannot be said that he was advocating, in the normal sense, any action.

414 U.S. at 108-09 (internal citations and quotations omitted) (emphasis added).  Accordingly, the Court reversed Hess's conviction. 414 U.S. at 109.

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), provided the Court with its next opportunity to identify the limits of protected First Amendment activity.  In *Claiborne*, a boycott included watching the targeted stores, recording the names of African-Americans who violated the boycott, and publishing their names in a local paper entitled "Black Times."  458 U.S. at 903-04.

In the course of its analysis, the Court first rejected liability based upon the defendants'

10

participation in the boycott itself, noting that all such acts consisted of various forms of protected

conduct and speech.  458 U.S. at 907.  The Court emphasized the importance of group advocacy,

*id*. [*quoting Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290,

294 (1981)], the constitutional protections afforded such activities, 458 U.S. at 908 (*quoting*

*Citizens Against Rent Control*, 454 U.S. at 296) ("[t]here are, of course, some activities, legal if

engaged by one, yet illegal if performed in concert with others, but political expression is not one

of them"), as well as the fact that such protections are not foregone by members of the group

merely because other members may have participated in unprotected conduct.  458 U.S. at 908-

09, *citing De Jonge v. Oregon*, 299 U.S. 353, 365 (1937) ("[t]he question, if the rights of free

speech and peaceable assembly are to be preserved, is not as to the auspices under which the

meeting is held but as to its purpose; not as to the relations of the speakers, but whether their

utterances transcend the bound of the freedom of speech which the Constitution protects").  *See*

*also Scales v. United States*, 367 U.S. 203, 224-25 (1961).

      The First Amendment right to disseminate news and information is as important and

fundamental as any in the Bill of Rights.   Courts have recognized that *political* speech or First

Amendment activity merits maximum protection, and is at the core of the First Amendment's

protection.  *Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1079 (9th Cir. 1990) ("[p]olitical

speech lies at the core of the First Amendment's protections").  *See also Mills v. Alabama,* 384

U.S. 214, 218 (1966) ( "there is practically universal agreement that a major purpose of [the

First] Amendment was to protect the free discussion of governmental affairs"); *Boim*, 291 F.3d

at 1026 ("[a]dvocacy is always subject to the highest levels of scrutiny under the First

Amendment"); *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960).

Here, Mr. Iqbal and Dr. Elahwal's conduct as alleged in this case – broadcasting the signal of Al Manar's television programming – falls squarely within First Amendment parameters. As a result, the conduct alleged against Mr. Iqbal and Dr. Elahwal herein cannot be prosecuted under §2339B, because to do so would clearly abridge First Amendment rights in violation of §2339B(i), and contrary to the statute's legislative history and interpretation by the courts.

Holding otherwise would also contravene the doctrine of constitutional avoidance, which applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General, v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). *See also Jones v. United States*, 526 U.S. 227, 239-40 (1999). *Accord Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997); *United States v. Al-Arian*, 329 F. Supp.2d 1294, 1298 & n. 11 (M.D. Fla. 2004) (relative to §2339B); *United States v. Khan*, 309 F. Supp.2d at 822 (applying the same principle to "personnel" in the context of §2339A).

Also, to the extent there is any ambiguity whether the conduct at issue here constitutes "material support" under §2339A(b)(1) or is exempted under §2339B(i), the rule of lenity should be applied at this stage because the §2339B charge, which relies on protected First Amendment activity to satisfy the "material support" element, will at the very least create the "grievous ambiguity or uncertainty" necessary for invocation of the rule of lenity. *See Chapman v. United States,* 500 U.S. 453, 463 (1991). Accordingly, Counts 1, 2, 7 & 8, which charge "material support" under §2339B, must be dismissed.

As the foregoing analysis demonstrates, the conduct alleged against Mr. Iqbal and Dr.

Elahwal in Counts 1, 2, 7 & 8 is not encompassed by §2339B.  However, if somehow that

conduct is deemed within the definition of "material support," §2339B would be unconstitutional

on its face and/or as applied.  In addition, it would be unconstitutionally overbroad in violation of

the First Amendment.

Vague laws offend two aspects of the Fifth Amendment's Due Process guarantee:  they

fail to provide adequate notice of what conduct is proscribed, and the lack of definable standards

makes them susceptible to arbitrary and discriminatory enforcement.  *Grayned v. City of*

*Rockford,* 408 U.S. 104, 108-09 (1972).

There has been much debate whether a challenge to a statute's facial vagueness requires

that such an enactment be vague in *all* its applications.  *See Farrell v. Burke*, 449 F.3d 470, 495-

96 & ns. 11-12 (2d Cir. 2006).  However, as the Court in *Farrell v. Burke* explained, "[w]hen

fundamental rights are implicated, however, the rules are different."  449 F.3d at 496.  Thus, as

the Court elaborated, quoting the Supreme Court,

> [o]ur cases . . . recognize a different approach where the statute at
> issue purports to regulate or proscribe rights of speech or press
> protected by the First Amendment.  Although a statute may be
> neither vague, overbroad, nor otherwise invalid as applied to the
> conduct charged against a particular defendant, he is permitted to
> raise its vagueness or unconstitutional overbreadth as applied to
> others.  And if the law is found deficient in one of these respects,
> it may not be applied to him either, until and unless a satisfactory
> limiting construction is placed on the statute.

*Id.*, *quoting Coates v. City of Cincinnati,* 402 U.S. 611, 619-20 (1971) (internal citations

omitted).

As a result, "[t]he general rule disfavoring facial vagueness challenges does not apply in

the First Amendment context."  *Farrell v. Burke*, 449 F.3d at 496, *citing Advance Pharm., Inc. v.*

13

*United States,* 391 F.3d 377, 396 (2d Cir. 2004).  As such, "'[f]acial vagueness challenges may

go forward only if the challenged regulation "reaches a substantial amount of constitutionally

protected conduct.'" 449 F.3d at 496-97, *quoting Kolender v. Lawson,* 461 U.S. 352, 358 n. 8

(1983) (internal citation and quotation marks omitted), and *citing Young v. Am. Mini Theatres,*

*Inc.,* 427 U.S. 50, 60 (1976).

      Another potential intermediate standard of review exists pursuant to the Supreme Court's

decision in *United States v. O'Brien,* 391 U.S. 367 (1968).  Under *O'Brien,* the government

action must be content-neutral and within the government's constitutional authority;  it must

serve substantial or important interests;  and it must "not 'burden substantially more speech than

is necessary to further the government's legitimate interests.'" *Turner Broadcast System v. FCC,*

512 U.S. 622, 662 (1994), *quoting Ward v. Rock Against Racism,* 491 U.S. 781, 799 (1989).

      A content-neutral provision has only incidental impact on First Amendment activity.

Courts have held §2339B to be content-neutral with respect to the First Amendment, thus

implicating the *O'Brien* standard.  *See Sattar I,* 272 F. Supp.2d 348, 361-62 (S.D.N.Y. 2003).

*See also HLP II,* 205 F.3d at 1134-35 (§2339B's funding ban is content-neutral).

      In determining whether a defendant may challenge a statute on its face, the Court "must

first determine whether the [statute] will have a substantial chilling effect on protected conduct."

449 F.3d at 497, *citing United States v. Loy,* 237 F.3d 251, 259 2d Cir. 2001) ("[a] defendant

whose conduct is at the 'core' of the activities clearly covered by the statute's terms may only

raise a vagueness defense if the statute is one that is likely to chill the exercise of constitutionally

protected conduct").

      Here, it is beyond dispute that "core" First Amendment values – speech and the right to

14

publish news and information – are at stake.  Thus, a facial vagueness challenge to §2339B is appropriate.  *See HLP II*, 205 F.3d at 1137-38 (holding certain portions of the definition of "material support" vague on their face).

Regarding overbreadth, as the Second Circuit explained in *Farrell v. Burke*, "[o]verbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing."  449 F.3d at 498, *citing Broadrick v. Okla.*, 413 U.S. 601-12 (1973).  As a result, "[a] party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them."  *Id., citing Broadrick*, 413 U.S. at 612.  *See also American Booksellers Foundation v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) ("[i]n the context of the First Amendment, a party whose speech could be constitutionally regulated is permitted to challenge a statute based on its overbreadth, the fact that the statute regulates not only their unprotected speech but also a substantial amount of protected speech") (citation omitted).

As the Second Circuit has stated, "[a] law is overbroad, and hence void, if it 'does not aim specifically at evils within the allowable area of State control, but, on the contrary, sweeps within its ambit other activities that . . . constitute an exercise of freedom of speech or of the press.'"  *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999), *quoting Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

However, as the Second Circuit noted in *Farrell*, "[o]verbreadth and vagueness are different doctrines."  449 F.3d at 498.  In fact, "'[a] clear and precise enactment [for vagueness purposes] may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct.'"  *Grayned v. City of Rockford*, 408 U.S. at 114.  Thus, as in *Farrell*, even an

15

unsuccessful vagueness challenge will

> not be a barrier to [an] overbreadth challenge[], because
> overbreadth challenges are based upon the hypothetical application
> of the statute to third parties. A plaintiff claiming overbreadth
> need not show that the challenged regulation injured his or her
> First Amendment interests in any way in order to bring the
> overbreadth challenge.

449 F.3d at 498-99.

These canons of statutory construction dictate that Mr. Iqbal and Dr. Elahwal's "as

applied" challenge be considered first. In *American Booksellers Foundation*, 342 F.3d at 105,

the Court stated, "[a]s the Supreme Court held in *Board of Trustees v. Fox*, it is 'generally [not]

desirable [ ] to proceed to an overbreadth issue unnecessarily.' 492 U.S. 469, 484-85 (1989).

Thus, 'the lawfulness of the particular application of the law should ordinarily be decided first.'

*Id.* at 485; *see also Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504 (1985)." *See also*

*Broadrick*, 413 U.S. at 613 (if the statute is overbroad, it may not be enforced "until and unless a

limiting construction or partial invalidation so narrows it as to remove the seeming threat or

deterrence to constitutionally protected expression").

Here, §2339B is unconstitutional as applied to Mr. Iqbal and Dr. Elahwal. The protected

nature of their conduct in the First Amendment context is patent. The dissemination of

information and news is central to the First Amendment. The use of equipment to facilitate that

dissemination is essential to and inextricably intertwined with the exercise of those First

Amendment rights.

As the Court in *United States v. Rosen*, 445 F. Supp.2d 602 (E.D. Va. 2006), recounted,

"[a]s James Madison put it in 1822: 'A popular Government, without popular information, or a

means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.'" 445 F.

Supp.2d at 633, *citing United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson,

J., *concurring*) [*quoting* 9 Writings of James Madison 103 (G. Hunt ed.1910)]. *See also New*

*York Times v. United States,* 403 U.S. 713, 728 (1971) (Stewart J., *concurring*) ("enlightened

citizenry" particularly important in fields of "national defense and international affairs"); *New*

*York Times v. Sullivan,* 376 U.S. 254, 269 (1964) (libel cannot claim "talismanic immunity from

constitutional limitations").

    Under the *O'Brien* standard, as well, §2339B is unconstitutional as applied herein. Even

if §2339B's ban on the conduct alleged in the Indictment can be deemed content-neutral,

application herein unquestionably "burden[s] more speech than is necessary to further the

government's legitimate interests" – indeed, it suppresses Mr. Iqbal's and Dr. Elahwal's free

speech rights categorically. Thus, as applied herein, §2339B is not sufficiently tailored to

achieve the government's ostensible purpose. In addition, several items within the "material

support" definition have been found unconstitutionally vague as applied. *See HLP IV*, 309 F.

Supp. 2d 1185, 1198-99 (C.D. Cal. 2004); *Sattar I*, 272 F. Supp.2d 348, 360-61 (S.D.N.Y.

2003). *See also HLP III*.

    Regarding facial vagueness, for the same reasons §2339B "infringes on constitutionally

protected rights." *Parker v. Levy*, 417 U.S. 733, 759 (1974).[3] By in effect proscribing *any*

relationship with an FTO, §2339B collides directly with the doctrine the Supreme Court

_____

    [3] The 2004 amendments' addition of the second knowledge requirement does not
ameliorate the vagueness that arises from the impact of the "material support"definition upon
First Amendment activities. *See* CRS Paper, at 6 (noting that the additional element for §2339B
(knowledge of FTO status or terrorist activities) "seems to foreclose [ ] problems [relating to
inadvertent support], but it does little for any vagueness problems").

enunciated in *Scales*, and has reaffirmed repeatedly since: a "blanket prohibition of association with a group having both legal and illegal aims" would pose "a real danger that legitimate political expression or association would be impaired." *Scales*, 367 U.S. at 229.

In *Scales*, Justice Harlan distinguished between ordinary criminal conspiracies and "hybrid groups" – those with legal and illegal functions (just like Hizballah, which has members serving as members of the Lebanese parliament and government). 367 U.S. at 229. Justice Harlan concluded that if the government could punish mere membership in or association with a "hybrid group," there existed "a real danger that legitimate political expression or association would be impaired[.]" *Id.* Thus, the Court required that the government may not punish membership in a hybrid group without "clear proof that a defendant 'specifically intended to accomplish [the organization's aims] by resort to violence.'" 367 U.S. at 229, *quoting Noto v. United States*, 367 U.S. 290, 299 (1961) (decided the same day as *Scales*).

Here, §2339B manifests that "real danger to legitimate political expression" without the requisite corresponding allegation of the defendants' *specific intent* to accomplish Hizballah's goals "by resort to violence." As a result, §2339B is unconstitutionally vague on its face, and the "material support" counts must be dismissed.

Regarding overbreadth, there cannot be any question that §2339B chills First Amendment rights – even *abridges* them in violation of §2339B(i). *Anyone* who would seek to provide news or information, much less *advocacy*, with respect to sensitive political subjects relating to an FTO would not just hesitate, but would be intimidated altogether for fear that the simple act of dissemination would generate criminal charges. Thus, in the context in which First Amendment freedoms, including political speech, is most important – at the margins, and with respect to

18

controversial subjects and situations -- conduct would be most chilled.

Nor is this the only conceivable circumstance in which §2339B could be used to stifle the most critical First Amendment rights. Any forms of advocacy, of education, of providing information and news – including by means of radio, newspapers, magazines, books, theatre, and films – would be vulnerable to prosecution under §2339B.

Also, the fact that Hizballah commits violent acts does not justify abridging the exercise of First Amendment rights. In *Planned Parenthood* ("*PPCW I*"), the Ninth Circuit concluded that if such were allowed to occur, "it could have a highly chilling effect on public debate on any cause where somebody, somewhere has committed a violent act in connection with that cause . . . [because a] party who does not intend to threaten harm, nor say anything at all suggesting violence, would risk liability by speaking out in the midst of a highly charged environment." 244 F.3d at 1018. *See also Claiborne Hardware*, 458 U.S. at 908-09, *citing De Jonge v. Oregon*, 299 U.S. at 365.

Moreover, the content of Hizballah's message cannot serve as a justification for repressing it, and/or for prosecuting Mr. Iqbal and Dr. Elahwal for communicating it. As the Supreme Court made clear in *Texas v. Johnson*, 491 U.S. 397, 414 (1989), in invalidating a flag-burning statute because such conduct was protected when constituting a means of political expression, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea because society finds the idea itself offensive or disagreeable." *See also New York Times v. Sullivan*, 376 U.S. at 279 n. 19 [quoting from John Stuart Mill, *On Liberty* (1st ed. 1859): "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and

livelier impression of truth, produced by its collision with error"].

Consequently, §2339B "brings within its scope – and thus threatens to chill – conduct

protected by the First Amendment." *Sattar II*, 314 F. Supp.2d at 304, *citing Virginia v. Hicks,*

539 U.S. 113, 123 (2003).  Moreover, as required for overbreadth, the statute's overbreadth is not

only "real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."

*Broadrick v. Oklahoma,* 413 U.S. at 615.

The Ninth Circuit envisioned such a chill on the First Amendment in *PPCW I* when it

described the potential results of a similar set of circumstances:

> [i]f this were a permissible inference, *it could have a highly*
> *chilling effect on public debate on any cause where somebody,*
> *somewhere has committed a violent act in connection with that*
> *cause.*  A party who does not intend to threaten harm, nor say
> anything at all suggesting violence, would risk liability by speaking
> out in the midst of a highly charged environment.

244 F.3d 1007, 1018 (9th Cir. 2001) (emphasis added), *vacated on other grounds by* 290 F.3d

1058 (9th Cir. 2002) (*en banc*).

Also, the breadth of §2339B is stunning.  The government has taken the position that

providing an FTO even a "glass of water"constitutes a violation of the statute.  *See Singh-Kaur v.*

*United States*, 385 F.3d 293, 312-13 (3d Cir. 2004) (Fisher, J., *dissenting*) (noting government's

suggestion at oral argument that "the provision of a cup of water to a terrorist could constitute

'material support').

Indeed, in *Singh-Kaur*, the provision of food and setting up of tents for a meeting of

members of an FTO was found sufficient to constitute "material support" warranting exclusion in

the immigration context. *Id.*, at 294. *See also* Testimony of Attorney General John Ashcroft

before the House Judiciary Committee in June 2003, *The Justice Department and the USA PATRIOT Act: Hearing Before the House Comm. On the Judiciary*, 107th Cong. (2003), available at 2003 WL 21291138 ("we need for the law to make it clear that it's just as much a conspiracy to aid and assist the terrorist to go and fight – to join them for fighting purposes, as it is to carry them a lunch or to provide them a weapon");  Margaret D. Stock, *Providing Material Support to a Foreign Terrorist Organization: The Pentagon, The Department of State, the People's Mujahedin of Iran, & the Global War On Terrorism*, Bender's Immigration Bulletin (2006) (hereinafter "Stock"), at 21 ("[a]ccording to any attorney for the Department of Homeland Security, there is no *de minimis* exception to the concept of material support;  a person falls within the ambit of the "material support" statutes by giving even a dime to a terrorist") (footnote omitted).[4]

Yet in order to avoid vagueness and overbreadth, §2339B must contain *some* threshold *de minimis* level of "material support" before criminal liability attaches.  Otherwise, purely innocent and immaterial conduct will fall within the statute's parameters.  That not only implicates the lack of notice, but the other equally important prong of vagueness analysis: arbitrary and discriminatory enforcement.  Regarding the former, this case presents the paradigmatic facts: that provision of a "power supply module" – an ordinary device available in any hardware store – could subject Mr. Iqbal and Dr. Elahwal to fifteen years' imprisonment.  The latter has manifested itself here most powerfully, too, and is addressed **post**, in POINT VI.

Commentators, as well as the dissenting judge in *Singh-Kaur*, have condemned the

---

[4] Due to its length, the article by Ms. Stock, an Associate Professor at the U.S. Military Academy, West Point, New York, and Lieutenant Colonel, Military Police Corps, U.S. Army Reserve, is provided separately with this motion (rather than as an Exhibit).

government's position because of the constitutional implications, and also because it defies the plain statutory language and the rules of statutory construction. In effect, it "reads 'material' out of 'material support' and treats half of the statutory term as surplusage." 385 F.3d at 303 (Fisher, J., *dissenting*). *See also* Peterson, at 13, 54 ("[a]s Congress increasingly read the 'material' out of 'material support,' it had to find ways to limit the incredible scope of the statute[;]" "[t]he 'material' in material support has been read out of the statute").

Certainly the definition of the terms requires that the support be of some consequence to terrorist activity before it can be deemed "material." According to the majority in *Singh-Kaur*, Black's Law Dictionary defines "material" in this context as either "[h]aving some logical connection with the consequential facts," or "significant" or "essential." 385 F.3d at 298, *citing Black's Law Dictionary*, at 991 (7th ed. 1999). Similarly, *Webster's* defines "material" in part as "being of real importance or great consequence." *Webster's Third New Int'l Dictionary*, at 1392 (1981). *See also* 385 F.3d at 304 (Fisher, J., *dissenting*).

The companion term, "support," is defined as "[s]ustenance or maintenance; esp., articles such as food and clothing that allow one to live in the degree of comfort to which one is accustomed." *Black's Law Dictionary*, at 1453. 385 F.3d at 298. When applying a statute, as the majority in *Singh-Kaur* noted, "[w]e start with 'the language employed by Congress, ... and we assume that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Id., quoting INS v. Phinpathya,* 464 U.S. 183, 189 (1984) (internal quotations and citations omitted).

In addition, as the dissent in *Singh-Kaur* pointed out, "[a]n indisputable axiom of statutory construction is that 'whenever possible each word in a statutory provision is to be given

meaning and not to be treated as surplusage.'" 385 F.3d at 305, *quoting Acceptance Ins. Co. v. Sloan,* 263 F.3d 278, 283 (3d Cir.2001) (quotation marks omitted).  Moreover, avoiding "'unintended or absurd results'" is a "'deeply rooted rule of statutory construction.'"  385 F.3d at 299, *quoting United States v. Hodge,* 321 F.3d 429, 434 (3d Cir.2003) (internal quotations and citation omitted); *see also* 385 F.3d at 306 (Fisher, J., *dissenting*).

Here, all three canons abhor applying "material support" to *any* support, regardless of its lack of impact on the anti-terrorism objectives of §2339B:  (a)  the "ordinary meaning of the words used," as reflected in their legal and lay definitions, requires that the "support" be essential or of some importance, or connected logically to the "consequential facts," *i.e.*, *material*;  (b) unless the "support" provided must also be "material," the latter term is indeed mere surplusage; and (c)  it would be a supremely absurd result if Mr. Iqbal and Dr. Elahwal were convicted of a 15-year felony for provision of a "power supply module" – an ordinary power strip.[5]

While the majority in *Singh-Kaur* – an immigration, *not* a criminal, case – found otherwise, it is respectfully submitted that this Court should adopt the reasoning of the dissent in *Singh-Kaur.*  Judge Fisher reasoned that "an act 'affording material support' must move the ball down the field for terrorism." 385 F.3d at 304 (Fisher, J., *dissenting*).

Commentators, too, have criticized §2339B's blunderbuss approach. *See, e.g.,* Peterson, at 71 (solution is "to put the 'material' back into the 'material support'");  Stock, at 13-14 (sarcastically noting that Revolutionary War heroine Molly Pitcher's "act of providing water to

---

[5]  *See also* Peterson, at 23 ("[w]ould a UN diplomat who had allowed Yasir Arafat to use her office phone on one of his UN visits be presumptively providing 'material support' to a terrorist?  Attempting to read meaningful distinctions into the two uses of the term is nearly impossible").

the other Revolutionary War fighters during the battle would have been an act of providing 'material support' to terrorists"); *id.*, at 21-23.

By creating a categorical prohibition – a variation on a strict liability offense – the government's construction of §2339B amplifies the statute's vagueness intolerably, particularly since §2339B punishes provision of material support to an FTO regardless of the provider's motivation. *See* Robert M. Chesney, *Civil Liberties and the Terrorism Prevention Paradigm: The Guilt By Association Critique*, 101 Mich. L. Rev. 1410, 1436 (2003) (§2339B "purposefully does not require proof of specific intent to further illegal conduct").

As the Congressional Research Service noted in its paper, with respect to the inclusive approach to defining "material support" adopted in the 2004 amendments, "[c]ritics might contend that by eliminating the ambiguity in favor of the more sweeping construction ('property, tangible or intangible, or services including' versus 'property . . . or other physical assets') the amendment is more likely to create than dissipate vagueness." CRS Paper, at 5. *See also* Peterson, at 70 (Congress has "clearly criminalized everything. Congress's approach is so broad, however, that it cannot be taken at face value. Reading the statute literally would violate the Constitution"); Chesney, at 1446 n. 164 ("[w]hile it is quite possible if not likely that a reviewing court would interpret the term "other physical assets" to reach only items which reasonably could be diverted or converted to harmful uses, this approach might in turn raise a question of vagueness").

Thus, again, the doctrine of constitutional avoidance requires that there be some *de minimis* standard applied to the concept of "material support" in the context of §2339B. Here, such standard compels the dismissal of any counts that rely on the provision of a "power supply

24

module" to serve as the "material support."

## POINT II

**COUNTS 3-6 & 9-11 SHOULD BE DISMISSED BECAUSE
(A) THE INDICTMENT FAILS TO ALLEGE ANY
SUBSTANTIVE OFFENSE; (B) THE CONDUCT ALLEGED
IS EXEMPTED FROM 22 U.S.C. §287c, AND/OR BECAUSE
THE STATUTE IS UNCONSTITUTIONALLY VAGUE AS
APPLIED, AND/OR IS UNCONSTITUTIONALLY OVERBROAD**

The counts charging violations of the United Nations Participation Act (hereinafter "UNPA") – Counts 3, 4, 5, 6, 9, 10 & 11 – are also fatally defective for essentially the same reasons as the "material support" counts addressed in POINT I.[6] The UNPA counts fail to allege as essential element – the United Nations resolutions and regulations or Executive Order(s) allegedly violated by the defendants. Also, UNPA by its terms applies only to countries and persons, not to an organization such as Hizballah.

In addition, specific provisions exempt from UNPA coverage protected First Amendment activity. If for some reason that exemption does not apply to the allegations in this case, then UNPA would be unconstitutionally vague on its face, as applied, and unconstitutionally overbroad as well.

The Indictment alleges with respect to the UNPA counts that Mr. Iqbal and Dr. Elahwal committed violations "by providing satellite television services to Hizballah's television station, Al Manar" ¶¶ 12, 15, 18, 21, 29, 32 & 35 (Counts 3-6, 9-11), including a "power supply module" ¶¶ 30(f) & 36(a), and "HDTV's purchase of satellite equipment on behalf of Al Manar" ¶¶ 30(g), 36(b) (Counts 9 & 11).

---

[6] Count 3 alleges, under 18 U.S.C. §371, a conspiracy to violate UNPA.

The UNPA counts allege a violation of 22 U.S.C. §287c. However, that statute merely sets forth Presidential authority to issue orders or delegate regulatory authority with respect to prohibiting economic transactions with certain entities, §287c(a), and, at §287c(b), provides a penalty provision for violation of those orders or regulations.

The Indictment does not enumerate precisely which U.N. resolutions, Executive Orders, or regulations Mr. Iqbal and Dr. Elahwal allegedly violated. The list of statutes appearing at the end of each UNPA count (except Count 3, which charges a conspiracy under 18 U.S.C. §371) includes reference to Executive Order 13224 and 31 C.F.R. Part 594. However, that does not suffice. E.O. 13224, which was issued September 23, 2001, does not name either Hizballah or Al Manar. In fact, Al Manar was not designated as a terrorist entity until March 2006.

In addition, 31 C.F.R. Part 594, promulgated to implement E.O. 13224, is a ten-page document that includes *fifty* separate sections. Nor do the UNPA counts identify the U.N. resolutions that provide the President the authority vested in §287c(a). *See United States v. Seeger*, 303 F.2d 478, 484 (2d Cir. 1962) (internal citations and quotations omitted) (discussing insufficient pleading of the authority of the subcommittee before which the crime was allegedly committed). Accordingly, since the UNPA counts fail to allege the essential element of the offense – the substantive offense itself – those counts must be dismissed.

Also, UNPA provides the President authority to regulate economic transactions "between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States." §287c(a). Here, Hizballah and/or Al Manar do not qualify as a "foreign

country or national thereof." Therefore, UNPA cannot be used in this case.[7]

Like §2339B(i), specific sections limit the application of §287c with respect to protected

First Amendment activity. For example, 50 U.S.C. §1702(b)(4) of IEEPA limits the President's

authority by exempting from its reach and regulation:

> the importation from any country, or the exportation to any
> country, whether commercial or otherwise, regardless of format or
> medium of transmission, of any information or informational
> materials, including but not limited to, publications, films, posters,
> phonograph records, photographs, microfilms, microfiche, tapes,
> compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. §1702(b)(3).

That provision, known as the "Berman Amendment" [so named after its sponsor, Rep.

Howard Berman (D-Calif.)], also codified at 31 C.F.R. § 594.305, was enacted by Congress in

1988. It amended not only IEEPA, but the Trading With the Enemy Act (hereinafter "TWEA")

at 50 U.S.C. §5(b)(4).

In addition, following regulations promulgated by the Office of Foreign Asset Control

(hereinafter "OFAC") that prescribed a narrow construction of the ambit of the Berman

Amendment, and after court decisions upholding OFAC's interpretation, *see, e.g., Capital*

*Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007 (S.D.N.Y. 1990), Congress passed the Free Trade

in Ideas Amendment (hereinafter "FTIA") (as §525 of the Foreign Relations Authorization Act,

P.L. 103-236) for the purpose of overriding those regulations, and reiterating (and clarifying) the

---

[7] Interestingly, initially Mr. Iqbal was arrested not on "material support" or UNPA charges, but rather for violating the International Emergency Economic Powers Act, 50 U.S.C. §1705(b). However, IEEPA's safe harbor provision for First Amendment activity, discussed **post**, precluded prosecution under §1705(b). Thus, the government seized upon UNPA as a replacement. Nevertheless, as detailed **post**, the same safe harbor applies with equal force to UNPA, and negates those counts as well.

extent of the Berman Amendment.

The Conference Report accompanying the FTIA reaffirmed that the Berman Amendment "established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution," and that "the language [of the Berman Amendment] was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope." H.R. Conf. Rep. No. 482, 103rd Cong., 2nd Sess., 1994 U.S.C.C.A.N. 398, 483.

Moreover, the Conference Report emphasized that Congress intended both provisions – the Berman Amendment and FTIA –

> to facilitate transactions and activities incident to the flow of information and informational material without regard to the type of information, its format, or means of transmission, and electronically transmitted information, transactions for which must normally be entered into in advance of the information's creation.

*Id.*

Consequently, it is beyond question that the terms of the Berman Amendment and FTIA are completely co-extensive with the First Amendment, and cover the activity alleged against Mr. Iqbal and Dr. Elahwal in this case.[8] While the Berman Amendment and FTIA did not explicitly amend UNPA, their exemptions apply to UNPA. Indeed, the very Executive Order cited in the Indictment, E.O. 13224, which in its first paragraph cites the authority granted by UNPA, expressly acknowledges that the E.O. applies "[e]xcept to the extent required by" §1702(b) – *the Berman Amendment itself.* Thus, the E.O. by its own terms circumscribes Presidential authority

---

[8] Prior to passage of FTIA, the District Court in *Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fla. 1989), afforded the Berman Amendment an appropriately expansive interpretation that foreshadowed Congress's passage of FTIA.

consistent with the Berman Amendment.

Also, even if the Berman Amendment did not apply to UNPA and this prosecution directly by virtue of E.O. 13224, the First Amendment limitations expressed in the Amendment and FTIA would constrain application of §287c just the same. *See Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989) (construing TWEA not to bar First Amendment activity "avoids serious questions about the constitutionality of TWEA") (citations omitted). As a result, the activity alleged in the Indictment is exempt from UNPA, and those counts – Counts 3, 4, 5, 6, 9, 10 & 11 – must be dismissed.

The vagueness and overbreadth analysis with respect to the UNPA counts is very much the same as that for the "material support" counts charged under §2339B. The First Amendment implications are the same, and UNPA coupled with E.O. 13224, like §2339B(i), provides an express exemption for the conduct alleged. Accordingly, the UNPA counts must be dismissed.

### POINT III

### THE MULTIPLICITOUS COUNTS IN THE INDICTMENT VIOLATE THE FIFTH AMENDMENT PROHIBITION AGAINST <u>DOUBLE JEOPARDY AND MUST BE DISMISSED</u>

The Indictment charges several multiplicitous counts in which similar conduct is alleged to violate the same statutes requiring the same elements of proof. The Indictment charges the Defendants with either conspiracy to provide (and actually providing) material support to Hizballah and Al Manar, or with conspiracy to transact or deal with (and actually transacting or dealing with) Hizballah and Al Manar. These overlapping counts of the Indictment contain the same conduct, the same statutes, and the same elements to be proven as other counts of the

Indictment. As such, they are multiplicitous, and should be dismissed.

An indictment is multiplicitous when it charges a single offense as an offense multiple times in separate counts, when in law and fact only one crime is alleged to have been committed. *See United States v. Chacko,* 169 F.3d 140, 145 (2d Cir. 1999), in violation the Double Jeopardy Clause of the Fifth Amendment. *See United States v. Dixon,* 509 U.S. 688, 696 (1993). A defendant may be convicted only once for each offense because the rule against multiplicity protects against multiple convictions for the same offense – not just against the imposition of multiple sentences for the same offense. *Ball v. United States,* 470 U.S. 856 (1985). Here, defendants will suffer "jeopardy" not only upon any sentence that may arise, but also by any conviction of an offense. *Ball,* 470 U.S. at 861.

The test for determining whether offenses charged in separate counts of an indictment are the same, and thus multiplicitous, is whether each statutory provision requires proof of an additional fact that the other count does not. *See Blockberger v. United States,* 284 U.S. 299 (1932). In *United States v. Josephberg,* 459 F.3d 350, 356 (2d Cir. 2006) (*per curiam*), the Second Circuit stated that the *Blockberger* inquiry is whether there is an element in each offense that is not contained in the other, not whether the conduct underlying the separate counts is identical.

Under this standard, the Indictment in this case is clearly, and unlawfully, multiplicitous. For example, Counts Three, Five, Nine and Eleven all make the same allegation – that Defendants conspired to violate Section 5 of the UNPA of 1945 by agreeing to engage in transactions and dealings with Hizballah or Al Manar by providing satellite television services or electronic equipment to Al Manar. However, as the Indictment alleges, at ¶ 2, Al Manar is the

alter-ego of Hizballah, and, as such, constitutes the same entity.  Likewise, Counts Four, Six and Ten are multiplicitous, as they charge Defendants with the substantive act of actually violating section 5 of the UNPA of 1945 by engaging in transactions and dealings with either Hizballah or Al Manar, but, again, as the government itself acknowledges in the Indictment, Hizballah and Al Manar are one and the same.  Accordingly, all seven counts are multiplicitous.

Furthermore, Counts One and Seven are multiplicitous, as both charge Defendants with conspiring to provide material support to Hizballah, as are Counts Two and Eight, charging Defendants with the substantive act of providing material support to Hizballah.  However, all four counts allege violations of the material support statute, 18 U.S.C. §2339B, but define the type of material support allegedly given so broadly, and with such vagueness, to render the four counts multiplicitous.  The government's attempt to recast a single alleged conspiracy into two separate conspiracies, under the same statute and based on an overbroad and contorted definition of "material support," must fail.

**POINT IV**

**STATEMENTS MADE BY MR. IQBAL
ON AUGUST 23, 2006, AND ANY AND
ALL FRUITS THEREOF, SHOULD BE
SUPPRESSED, AND/OR A HEARING
CONDUCTED TO DETERMINE
<u>WHETHER THEY WERE VOLUNTARY</u>**

The Court should suppress any statements the government seeks to introduce against Mr. Iqbal because they were obtained in violation of Mr. Iqbal's rights under the Fifth Amendment to the United States Constitution, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and 18 U.S.C. §3501.  In the alternative, it is respectfully requested that the Court conduct a hearing to

determine whether or not Mr. Iqbal's statements were made voluntarily.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established procedural safeguards to apply when a defendant is subject to custodial interrogation by law enforcement, defining such "custodial interrogation" to include any questioning by law enforcement once a defendant "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444.

In determining whether a defendant is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on [the defendant's] freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

*Miranda* warnings are required when the circumstances of a detention escalate to those equivalent to a formal arrest. *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995), *modified on rehearing*, 86 F.3d 275 (1996). The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984).

Mr. Iqbal was taken into custody when agents first arrived at his family's home in the early morning hours of August 23, 2006. Not only did at least five agents appear at his front door, but each was visibly armed when he entered Mr. Iqbal's residence. His wife, who had accompanied Mr. Iqbal to answer the door, was instantly whisked away from her husband and escorted upstairs into a bedroom, where she was forced to remain – separate from her three young children – for the duration of the agents' occupation of their family home.

Immediately isolated and surrounded by JTTF agents, Mr. Iqbal suffered a severe anxiety

attack but was not permitted the freedom to obtain his medication from an adjacent room. Rather, he was forced to remain seated by the agents. Upon detailing the extremity of his various medical conditions, an agent eventually found Mr. Iqbal's medication and provided it to him. Thereafter, he was subjected to four hours of uninterrupted interrogation without the benefit of *Miranda* warnings. Mr. Iqbal was not informed that he was under arrest, nor informed of his *Miranda* rights, until *after* the agents had subjected him to hours of interrogation.

Any reasonable person in Mr. Iqbal's shoes would have concluded that he retained no freedom of action – that he was in custody from the moment the agents arrived at the front door of his home in the dawn hours of August 23, 2006. *See Miranda*, 384 U.S. at 444; *Ali*, 68 F.3d at 1473. As the Supreme Court reiterated in *Standsbury*, "the inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Standsbury*, 511 U.S. at 322. Under the totality of these circumstances, it is clear that Mr. Iqbal had been formally arrested. No reasonable person would have believed they could exercise freedom of action and terminate the interrogation. *See Beheler*, 463 U.S. at 1125.

Accordingly, all of Mr. Iqbal's statements made during the preliminary 4-hour interrogation in his home on the morning of August 23, 2006, and in the complete absence of *Miranda* warnings, must be suppressed.

When the government contends a defendant has voluntarily waived his *Miranda* rights, it must prove the voluntariness of the waiver by a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 609 n. 1 (2004) (*citing Colorado v. Connelly*, 479 U.S. 157, 169 (1986)). Thus, as the Supreme Court cautioned, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may

33

a court properly conclude that *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997).

Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir.1997).

In addition, as the Second Circuit has explained, "[f]actors relevant to the totality of the circumstances are: the characteristics of the accused, such as his experience, background, age and intelligence; the conditions of interrogation; and police conduct, such as physical abuse, handcuff restraint, and psychologically coercive tactics." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997); *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988).

Mr. Iqbal does not dispute that he signed a *Miranda* waiver. *See* Exhibit 3. However, Mr. Iqbal was first informed that he was under arrest and read his *Miranda* rights *after*: (1) being subjected to four hours of uninterrupted custodial interrogation; (2) his home and surrounding property had been searched; (3) his family had been separated and detained in different rooms in the house; and (4) he had suffered a severe anxiety attack which demanded immediate medication. Mr. Iqbal informed the agents that he did not understand the various papers – including, but not limited to, the *Miranda* waiver – but was instructed that "this was standard procedure" and the documents required his signature. He complied with the agents' orders.

His will overborne, Mr. Iqbal did not voluntarily waive his *Miranda* rights; instead, he yielded to the "deliberately coercive" and "improper tactics" employed by the government.

*Oregon v. Elstad*, 470 U.S. 298 (1985). *See also United States v. Duvall*, 537 F.2d 15, 24 (2d Cir. 1976) (waiver coerced where defendant was jailed overnight, not arraigned for over 20 hours, and threatened by prosecutor that he would go to prison for over 100 years).

However, assuming *arguendo* that Mr. Iqbal did, in fact, attempt to waive his *Miranda* rights four hours after his custodial interrogation began, the "subsequent" *Miranda* waiver could not have been a "knowing, intelligent and voluntary" waiver due to the extreme coerciveness shrouding the totality of the circumstances in which Mr. Iqbal was immersed, such as "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003) (*citing United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991)). *See also Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir.1998).

The Supreme Court recently established that, "[t]he threshold question in [evaluating the voluntariness of a subsequent waiver] is whether it would be reasonable to find that the [subsequent] warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 601. The Court concluded that "[t]here is no doubt about the answer. By any objective measure, it is likely that warnings withheld until after interrogation and confession will be ineffective in preparing a suspect for successive interrogation, close in time and similar in content." *Id.* *See also Moran*, 475 U.S. at 424 (finding that the injection of *Miranda* warnings in the midst of a coordinated and continuing interrogation are likely to "deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them").

The agents' post-*Miranda* waiver interrogation of Mr. Iqbal was sufficiently close in time and similar in content to render the administered *Miranda* warnings, and resulting waiver,

entirely meaningless. The interrogation continued *uninterrupted*, without a pause in questioning as Mr. Iqbal was handcuffed, placed into the FBI vehicle and taken to his business office in Brooklyn. Furthermore, the content of the subsequent interrogation was *identical* to what had been extracted from Mr. Iqbal prior to the *Miranda* warnings. *See* Exhibit 2, at pp. 2-4.

By "any objective measure," as set forth by the Supreme Court in *Seibert,* 542 U.S. at 601, the subsequent *Miranda* warnings offered to Mr. Iqbal, after he had been subjected to hours of custodial interrogation, and his home searched and belongings seized, were "ineffective in preparing [him] for successive interrogation, close in time and similar in content" and thus render his alleged *Miranda* waiver from that same date invalid.

The Court should also suppress any statements the government seeks to introduce against Mr. Iqbal as they were obtained in violation of Mr. Iqbal's right to a speedy presentment under the Fifth Amendment to the United States Constitution, *see McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957), and 18 U.S.C. §3501(c). In the alternative, it is respectfully requested that the Court conduct a hearing to determine whether or not Mr. Iqbal's waiver of speedy presentment was made knowingly, voluntarily and in a timely fashion.

Presentation before a magistrate judge "without unnecessary delay," *see* Rule 5(a), Fed.R.Crim.P., is required under the Fifth Amendment. The government "must take [a] defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Rule 5(a)(1)(A), Fed.R.Crim.P. In turn, Rule 5(c)(1) provides that, if a defendant is arrested in the district where the offense was allegedly committed and "if a magistrate judge is not reasonably available, the

initial appearance may be before a state or local judicial officer."

The *McNabb-Mallory* rule, adopted by the Supreme Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts," *McNabb* at 341, "generally rendered inadmissible confessions made during periods of detention that violated the prompt presentment requirement of Rule 5(a) of the Federal Rules of Criminal Procedure." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994) (*citing Mallory*, 354 U.S. at 453).

As the Second Circuit has recognized, the appropriate remedy for the government's unnecessary delay in bringing a suspect before the nearest available federal magistrate judge is suppression of prejudicial statements made during the period of delay. *See United States v. Colon*, 835 F.2d 27, 31 (2d Cir. 1987).

However, Congress proscribed the broad suppression offered defendants under the *McNabb-Mallory* rule by passing §3501(c), which states that a confession made by a person within six hours following his arrest or other detention "shall not be inadmissible" solely because of a delay in presenting the person to a federal magistrate. 18 U.S.C. §3501(c). Under this legislative framework, "unreasonable pre-arraignment, pre-confession delays of less than six hours" and "reasonable delays in excess of six hours" do not automatically require suppression. *See United States v. Perez*, 733 F.2d 1026, 1035 (2d Cir. 1984).

Although neither the Supreme Court nor this Court have held that §3501(c) mandates that a district court reflexively suppress all confessions made prior to presentment yet six hours after arrest, the Second Circuit has established that "a district court has the discretion to suppress a confession if the delay between arrest and presentment is greater than six hours and is found by

37

the court to be unreasonable under the circumstances." *United States v. Fullwood*, 86 F.3d 27, 31 (2d Cir. 1996).

While a defendant may waive his right to a speedy presentment before a court, the government must show by a preponderance of the evidence that the defendant knowingly and voluntarily did so. *See United States v. Berkovich*, 932 F.Supp. 582, 588 (S.D.N.Y. 1996).

Mr. Iqbal did sign a waiver of speedy presentment. *See* Exhibit 4. However, he did so only *after* being subjected to four hours of custodial interrogation, during which time his will was overborne, leaving him vulnerable to the JTTF agents' coercion – to which he ultimately succumbed. *See* Exhibit 1, at ¶¶ 9, 11. As detailed **ante**, the totality of the circumstances clearly establish that such waiver was neither knowing or voluntary.

Thus, pursuant to the Fifth Amendment and 18 U.S.C. § 3501(c), Mr. Iqbal's statements should be suppressed, and/or the Court conduct a hearing. Moreover, any evidence or derivative evidence seized as a consequence of the statements "is subject to the fruit of the poisonous tree doctrine," and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

## POINT V

### ALL PROPERTY SEIZED DURING THE SEARCHES OF MR. IQBAL'S RESIDENCE, BUSINESS, AND CAR SHOULD BE SUPPRESSED, AND/OR A HEARING CONDUCTED TO DETERMINE WHETHER THEY WERE VOLUNTARY

In the course of its custodial interrogation of Mr. Iqbal, the government conducted three separate, calculated, and intentional searches of Mr. Iqbal's car, home and business in a manner that violated his Fourth Amendment and statutory rights. Therefore, in all three instances, it is

38

respectfully submitted that the evidence seized must be suppressed, and any fruits thereof must likewise be suppressed. In the alternative, if, assuming *arguendo*, the evidence of the government's wrongdoing is not sufficient to suppress as a matter of law, it is respectfully submitted that the Court conduct hearings on the validity of the government's searches of Mr. Iqbal's car, home and business.

While Mr. Iqbal endured hours of custodial interrogation in his home, JTTF agents conducted a search of Mr. Iqbal's vehicle – a 2005 red Dodge Durango, which was parked directly in front of his residence. *See* Exhibit 2, at p.1. FBI records assert that Mr. Iqbal consented to this search, relying on a signed "Consent to Search" form. *See id.*; Exhibit 5.

However, the totality of the circumstances demonstrate that Mr. Iqbal was coerced into signing the form (as he was coerced into signing the *Miranda* waiver and waiver of speedy presentment), rendering his consent involuntary and the ensuing search unlawful.

An individual's consent to search is valid if that consent is voluntary. As the Second Circuit has made clear, "[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004), *citing United States v. Calvente*, 722 F2d 1019, 1023 (2d Cir. 1983). In order to determine whether or not consent was voluntary, no single factor is the linchpin; instead, the court must examine the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

The totality of the circumstances surrounding Mr. Iqbal's custodial interrogation on the morning of August 23, 2006, demonstrate that Mr. Iqbal never voluntarily consented to the search of his vehicle – and, in fact, given the conditions of his detention and his failing health,

could not have voluntarily, knowingly, and intelligently consented. As discussed **ante**, Mr. Iqbal

was taken into JTTF custody immediately upon the agents' arrival at his home and, in spite of his

deteriorating health, was forced to watch as agents searched his home and the surrounding areas,

and seized his belongings – for a full *four* hours before he "consented" to the search of his car,

which was stationed right outside his residence. *See* Exhibit 1, at ¶¶ 9-11; *United States v.*

*Moreno*, 897 F.2d 26 (2d Cir. 1990).

According to the government, Mr. Iqbal memorialized his consent by signing a "Consent

to Search" form. *See* Exhibit 5. However, evidence of a signed piece of paper is only that:

evidence of a signature, not of Mr. Iqbal's voluntariness. In order for his consent to be valid it

must have been a "product of [Mr. Iqbal's] free and unconstrained choice, rather than a mere

acquiescence in a show of authority." *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2002)

(*citing United States v. Garcia*, 56 F.3d. 418 (2d Cir. 1995)).

The "consent" that the government ascribed to Mr. Iqbal was derived through duress,

specifically through the creation of a coercive custodial environment to which Mr. Iqbal

ultimately succumbed. *See Pelligrino*, 303 F.3d at 124. Accordingly, without valid consent to

search Mr. Iqbal's vehicle, and in the absence of any search warrant, JTTF agents conducted an

unlawful search in violation of the Fourth Amendment.

Government agents conducted a search of Mr. Iqbal's Staten Island home, where Mr.

Iqbal was residing with his wife and children, *see* Exhibit 1, at ¶ 1, and a search of his business

office in Brooklyn, *see id.*, at ¶ 13, on August 23, 2006, the date of Mr. Iqbal's arrest. Although

these searches were executed pursuant to a search warrant signed by the Honorable Gabriel W.

Gorenstein of the Southern District of New York on August 22, 2006, *see* Search Warrant, at p.1,

attached to the Dratel Declaration as Exhibit 8, the warrant was overbroad, acting as a "general warrant" rather than a particularized one, and thereby rendered unlawful.

As the Supreme Court has instructed, "[i]t is familiar history that searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 583 (1980). General warrants – authorizing police agents to undertake an indiscriminate rummaging through citizens' personal effects – are prohibited by the Fourth Amendment's command that "no Warrants shall issue [unless] particularly describing the place to be searched, and the persons or things to be seized." *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (plurality).

In order to prevent a "wide-ranging exploratory search," *Maryland v. Garrison,* 480 U.S. 79, 84 (1987), the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize. *See Steele v. United States*, 267 U.S. 498, 503 (1925); *United States v. Vargas*, 621 F.2d 54, 56 (2d Cir.), *cert. denied*, 449 U.S. 854 (1980). *See also United States v. George*, 975 F.2d 72 (2d Cir. 1992) (warrant's broad authorization to search for "any other evidence relating to the commission of a crime" was not sufficiently particular to satisfy the Fourth Amendment).

As a result, a search warrant may issue only upon a showing of probable cause to believe that the items described in the warrant are presently in the place authorized to be searched, *Michigan v. Tyler*, 436 U.S. 499, 512 (1978); *Franks v. Delaware*, 438 U.S. 154 165 (1978); *Steagald v. United States*, 451 U.S. 204, 217 (1981), and there must exist reasonable grounds to believe that the specified items are connected to criminal activity. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556-7 (1978); *Steagald,* 451 U.S. at 213. The warrant must also describe with

41

specificity both the things to be seized and the place to be searched. *Stanford v. Texas*, 379 U.S. 476 (1965); *Lo-J Sales, Inc. v. New York*, 442 U.S. 319, 325 (1979).

Moreover, the government cannot assert that the its agents reasonably relied in "good faith" on a search warrant they knew or should have known to be defective. *See generally United States v. Leon*, 468 U.S. 897 (1984). While a search warrant provides for the detached scrutiny of a neutral magistrate, "[d]eference to the magistrate is not . . . boundless." *Id.*, at 914. *See also Franks v. Delaware* 438 U.S. 154 (1978).

Here, the search warrant was based on allegations that Mr. Iqbal was engaged in First Amendment protected activity, namely that Mr. Iqbal was in possession of approximately eight satellite dishes from which he operated a business that sold satellite television services, including access to Al-Manar television broadcasts. *See* Exhibit 8, at ¶¶ 8, 17, 18, 20. Consequently, the warrant authorized an expansive search of Mr. Iqbal's personal and business property and the overbroad confiscation of documents, computer equipment, and satellite equipment – irrespective of whether those items were for personal or business use – found in Mr. Iqbal's home, surrounding property and business.

As pointed out by the Ninth Circuit, "[t]he Government's theory . . . that the ideas of an author of a book may properly be attributed to the reader of the book and then used against him to prove disposition to commit a crime, motive to undertake criminal action, or proof that he did the acts charged . . . is [not] constitutionally permissible." *United States v. Giese*, 597 F.2d 1170, 1209 (9th Cir. 1979) (Hufstedler, J., dissenting). As Judge Hufstedler notes, '[f]reedom of speech would be totally destroyed if the shadow of the prosecutor fell across the pages of the books we read. Even during the evil thralldom of McCarthyism, we did not embrace the concept of guilty

42

by book association." *Id*.

Such presumed guilt by association is exponentially compounded here. Mr. Iqbal's alleged criminal conduct emanates from his possession of satellite equipment for business purposes. As such, he is not acting as the "reader" of a book, but rather as the librarian offering the book to readers in the public at large.

Under the totality of circumstances, it is clear that the August 23, 2006, searches of Mr. Iqbal's home and place of business were violations of his Fourth Amendment rights by government agents who simply expected to execute an overbroad, general warrant. Accordingly, it is respectfully submitted that the searches of Mr. Iqbal's home and place of business, and any fruits thereof, should be suppressed, since the exclusionary rule requires the suppression of any evidence that is either the direct or indirect product of illegal conduct by law enforcement authorities. *See Wong Sun v. United States,* 371 U.S. 471 (1963). At the very least, it is respectfully submitted that the Court should conduct a hearing with respect to these issues.

**POINT VI**

**THE INDICTMENT SHOULD BE DISMISSED
BECAUSE MR. IQBAL AND DR. ELAHWAL
HAVE BEEN SUBJECT TO SELECTIVE
PROSECUTION, OR, IN THE ALTERNATIVE,
THE COURT SHOULD CONDUCT A HEARING**

The Indictment should be dismissed because it represents a selective prosecution of Mr. Iqbal and Dr. Elahwal because of their perceived religion and/or ethnicity. Of the many entities that either provide Al Manar by either television broadcast transmission or internet streaming, only Mr. Iqbal and Dr. Elahwal have been prosecuted. In the alternative, it is respectfully submitted that the Court should conduct an evidentiary hearing on the issue.

43

Both *before* and *after* the government's designation of Al Manar as an FTO in March 2006, several United States-based broadcast corporations and multinational corporations regularly conducted business with Al Manar. Though not an exhaustive list of the offending entities, it is clear that Fox News, CNN and NBC each provided television programming and/or internet streaming of Al Manar broadcasts over the *same* period of time charged in the Indictment. Likewise, the Coca-Cola Corporation, Pepsi Corporation, and Procter & Gamble each advertised on Al Manar, or its affiliated website, over the course of the charged criminal conduct – and, unlike the Defendants, actually paid money *to* Al Manar in order access its viewers. However, these broadcast and business corporations escaped prosecution altogether.

In *United States v. Wayte*, 470 U.S. 598 (1985), the Supreme Court set forth the standards controlling the determination whether there has been a selective prosecution. Under *Wayte*, a claim of selective prosecution requires proof of discriminatory effect and discriminatory intent. 470 U.S. at 608. As the Court explained:

> [i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards. Under our prior cases, these standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose. All petitioner has shown here is that those eventually prosecuted, along with many not prosecuted, reported themselves as having violated the law. He has not shown that the enforcement policy selected nonregistrants for prosecution on the basis of their speech.

*Id.* at 608-09 (internal citations omitted).

In *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992), which in turn adopted the test applied in *United States v. Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983), *cert. denied*, 466 U.S. 971 (1984), the Second Circuit explained that it has :

> that in order to support a defense of selective prosecution, the
> defendant must make at least a prima facie showing both "(1) that,
> while others similarly situated have not generally been proceeded
> against because of conduct of the type forming the basis of the
> charge against [the defendant], he has been singled out for
> prosecution, and (2) that the government's discriminatory selection
> of [the defendant] for prosecution has been invidious or in bad
> faith, *i.e.*, based upon such impermissible considerations as race,
> religion, or the desire to prevent his exercise of constitutional
> rights."

Here, both prongs of the test have been satisfied. There has been no shortage of entities willing either to broadcast Al Manar or stream it in the U.S., or to engage in commercial relationships with the station. Yet only Mr. Iqbal and Dr. Elahwal face criminal prosecution. Also, the distinction is patent: while those who remain free to pursue their First Amendment rights and advertising markets are large corporate interests with long histories in the U.S., Mr. Iqbal and Dr. Elahwal are immigrants, of Middle Eastern or South Asian origin, and of Muslim heritage and background. Clearly this prosecution has been instituted "to prevent [their] exercise of constitutional rights" – *e.g.,* to provide news and information under the guarantees afforded by the First Amendment.

It is undisputed that prosecutors possess wide discretion in choosing whom to charge and for what. *Cf. United States v. Sattar*, 314 F. Supp. 2d 279, 311-12 (S.D.N.Y. 2004) (in context of a vindictive prosecution motion). However, the Constitution places limits on this discretion, as the Supreme Court did in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886):

> [t]hough the law itself be fair on its face, and impartial in
> appearance, yet, if it is applied and administered by public
> authority with an evil eye and an unequal hand, so as practically to
> make unjust and illegal discriminations between persons in similar
> circumstances, material to their rights, the denial of equal justice is
> still within the prohibition of the constitution.

45

118 U.S. at 373-74.

If the showing made above is insufficient to demonstrate selective prosecution, certainly the evidence is adequate to warrant further discovery and an evidentiary hearing.[9] Thus, unlike the situation in *Fares*, Mr. Iqbal and Dr. Elahwal's selective prosecution motion is neither "speculative nor unduly myopic." 978 F.2d at 60. Instead, it is based on incontrovertible facts: they, among the many who performed the same conduct, are the only persons to face prosecution. Therefore, Mr. Iqbal and Dr. Elahwal meet the standard enunciated in *Wayte*: they were "selected . . . on the basis of [their] speech" as well on their race and/or religion.

POINT VII

**THE COURT SHOULD GRANT DR. ELAHWAL SEVERANCE BECAUSE HE WILL SUFFER UNDUE PREJUDICE IF TRIED JOINTLY WITH MR. IQBAL AGAINST WHOM THE MAJORITY OF THE GOVERNMENT'S EVIDENCE IS DIRECTED, AND WHOSE STATEMENTS CREATE A *BRUTON* ISSUE**

The Due Process clause of the United States Constitution and Rule 14, Fed.R.Crim.P., protect a defendant from a joint trial if undue prejudice will result. Dr. Elahwal will suffer overwhelming and incurable prejudice if he is tried jointly with Mr. Iqbal. A joint trial would result in a biased jury that would be unable to compartmentalize the proof adequately. In turn, the jury's consideration of evidence relating to Mr. Iqbal will inevitably taint the jury's consideration of Dr. Elahwal, influencing the jury to convict him based on evidence unrelated to

---

[9] It is respectfully submitted that the Court should issue an Order directing the government to produce all memoranda prepared by government agents and officials regarding the reasons for (a) commencing the investigation in this case; (b) sending an informant to visit Mr. Iqbal; (c) arresting Mr. Iqbal; and (d) seeking the instant Indictment against Mr. Iqbal and Dr. Elahwal.

him.

Courts generally prefer joinder, severing when there is a serious risk that a joint trial would compromise "a specific trial right" of one of the defendants, or prevent the jury from making a reliable judgment about "guilt or innocence." *Zafiro v. United States*, 506 U.S. 534 (1993). Further, "joint trials are often appropriate where the defendants are charged with participating in the same criminal conspiracy." *United States v. Spinelli*, 352 F.3d 48, 53 (2d Cir. 2003).

However, the decision of whether or not to grant severance is "committed to the sound discretion of the trial court[.]" *United States v. Vanwort*, 887 F.2d 375, 384 (2d Cir.1989). Rule 14 authorizes severance when a defendant can demonstrate that the prejudice suffered "is sufficiently severe to outweigh the judicial economy that would be utilized by avoiding multiple-linked trials." *See United States v. Walker*, 142 F.3d 103, 110 (2nd Cir. 1998).

In addressing applications for severance under Rule 14, courts have recognized that joint trials may precipitate extreme prejudice, necessitating severance if there exists the danger that the quality and quantity of proof against one defendant is much greater than against the other. Thus, severance is required if the character of the evidence against one defendant creates "prejudicial spillover" against the other, thereby increasing the possibility that the jury will infer one defendant's guilt based on the "enhanced likelihood of the guilt of the other defendant." *See United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980).

Dr. Elahwal should be severed from the Indictment, and tried separately from Mr. Iqbal. The Government has turned over to Dr. Elahwal a multitude of discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. Minus a small fraction of that discovery, almost all of

the evidence turned over to Dr. Elahwal relates not to the doctor himself, but to Mr. Iqbal.  Thus, there exists the very real danger that the quality and quantity of proof against Mr. Iqbal is much greater than such proof against Dr. Elahwal.

In addition, there appears to be a *Bruton* issue that requires severance of Dr. Elahwal from the Indictment.  Although the Indictment alleges that Dr. Elahwal and Mr. Iqbal conspired together in various counts, they should not be tried jointly because incurable potential *Bruton* and *Crawford* problems would infect a joint trial.  *See Bruton v. United States*, 391 U.S. 123 (1968) (explaining that the inability of a defendant to cross-examine his or her co-defendant, who presumably will be an unavailable witnesses, violates that defendant's rights under the Confrontation Clause of the Sixth Amendment); *see also Crawford v. Washington*, 541 U.S. 36 (2004) (right to confrontation).

### POINT VIII

### THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE THE DEMANDED DISCOVERY, BRADY MATERIAL, AND BILL OF PARTICULARS

As the Second Circuit has held,

> [a] bill is appropriate to permit a defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."

*United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), *quoting United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

As a result, it is respectfully requested that the Court direct the government to provide the following particulars:

**Regarding Counts 1, 2, 7 & 8**

> identify the "material support or resources" each of the defendants
> is alleged to have provided, or conspired to have provided, or
> attempted to have provided with respect to each separate Count.

**Regarding Counts 3, 4, 5, 6, 9, 10 & 11**

> identify the United Nations resolutions, regulations and/or
> Executive Order(s) each of the defendants is alleged to have
> violated with respect to each separate Count.

Absent the particularization demanded above, essential elements of the charged offenses will, in effect, be "moving targets," and susceptible to modification before or at trial. Granting the Bill of Particulars sought would eliminate that potential problem. In addition, in light of the technological complexity of certain aspects of this case (satellite broadcast technology and business practices), as well as the possible need to obtain evidence and witnesses from distant locales (*i.e.*, Lebanon, Europe, and South America),[10] particularization now is especially crucial to adequate preparation of the defense.

A demand for a bill of particulars should also be granted "to save a defendant wholly needless labor in preparing his defense." *United States v. Philippe*, 173 F. Supp. 582, 585 (S.D.N.Y. 1959), *quoting United States v. Dolan*, 113 F. Supp. 757, 759 (D. Conn. 1953). Here, there is a long list of items that §2339A(b)(1) categorizes as "material support," and even that list is not exhaustive. Defendants should not have to prepare to meet every conceivable item on that list, or *off* it, in preparation for trial.

---

[10] Al Manar originates in Lebanon. Satellite transmission providers for HDTV relevant to this case include corporate entities (and personnel) in the Netherlands and Brazil.

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that

defendants' pretrial motions should be granted in their entirety, and the Indictment dismissed, or

the alternative relief requested herein granted.

Dated: 17 April 2007
      New York, New York

                           Respectfully submitted,

                                / s /

                           Joshua L. Dratel, Esq.
                           Law Offices of Joshua L. Dratel, P.C.
                           2 Wall Street, 3rd floor
                           New York, NY 10005
                           (212) 732-0707
                           *Attorneys for Defendant Javed Iqbal*

                           Edward V. Sapone, Esq.
                           Law Office of Edward V. Sapone
                           1 Penn Plaza, Suite 5315
                           New York, NY 10119
                           (212) 974-0600
                           *Attorney for Defendant Saleh Elahwal*

– Of Counsel –
Joshua L. Dratel
Renita K. Thukral
Edward V. Sapone

50