UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

           – against –                    :            06 Cr. 1054 (RMB)

JAVED IQBAL and                              :            FILED ELECTRONICALLY

SALEH ELAHWAL,                               :

             Defendants.
------------------------------------------------------------x


## JOINT REPLY MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' PRE-TRIAL MOTIONS

Joshua L. Dratel, Esq.
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street,   3rd floor

   – Of Counsel –        New York, NY 10005
   Joshua L. Dratel       (212) 732-0707
   Renita K. Thukral     *Attorneys for Defendant Javed Iqbal*


Edward V. Sapone, Esq.
Law Office of Edward V. Sapone
1 Penn Plaza, Suite 5315
New York, NY 10119
(212) 974-0600
*Attorney for Defendant Saleh Elahwal*

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

THE "MATERIAL SUPPORT" COUNTS (1, 2, 7 & 8)
SHOULD BE DISMISSED BECAUSE (A)  THEY FAIL
TO STATE AN OFFENSE UNDER THE STATUTE,
18 U.S.C. §2339B;  (B) THE CONDUCT ALLEGED IS
EXEMPTED FROM §2339B;  AND/OR (C)  §2339B IS
UNCONSTITUTIONALLY VAGUE ON ITS FACE OR
AS APPLIED, AND IS UNCONSTITUTIONALLY OVERBROAD  . . . . . . . . . . . . . . . . . . . . . 2

   A.    *Defendants' Alleged Broadcasting of Al Manar*
        *Is Not "Commercial Speech"*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   B.    *The §2339B Counts Are Defective Because They Fail*
        *to Allege Essential Elements*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT II

COUNTS 3-6 & 9-11 SHOULD BE DISMISSED BECAUSE
(A)  THE INDICTMENT FAILS TO ALLEGE ANY
SUBSTANTIVE OFFENSE; (B) THE CONDUCT ALLEGED
IS EXEMPTED FROM 22 U.S.C. §287c, AND/OR BECAUSE
THE STATUTE IS UNCONSTITUTIONALLY VAGUE AS
APPLIED, AND/OR IS UNCONSTITUTIONALLY OVERBROAD . . . . . . . . . . . . . . . . . . . . 12

POINT V[1]

ALL PROPERTY SEIZED DURING THE SEARCHES
OF MR. IQBAL'S RESIDENCE AND BUSINESS
SHOULD BE SUPPRESSED, OR A HEARING
CONDUCTED TO DETERMINE WHETHER THE
THE SEARCHES WERE EXECUTED IN "GOOD FAITH" . . . . . . . . . . . . . . . . . . . . . . . . . 14

---

[1] For ease of reference, he numerical order of the "Points,"though not sequential in this document, correspond to the original point headings in Defendants' Initial Memo of Law.

POINT VI

THE INDICTMENT SHOULD BE DISMISSED
BECAUSE MR. IQBAL AND DR. ELAWAL
HAVE BEEN SUBJECT TO SELECTIVE
PROSECUTION, OR, IN THE ALTERNATIVE
THE COURT SHOULD CONDUCT A HEARING ................................. 16

POINT VII

THE COURT SHOULD SEVER DEFENDANTS' TRIALS .......................... 20

Conclusion ........................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Bleecker Charles Co. v. 350 Bleecker St. Apt. Corp.*, 327 F.3d 197 (2d Cir.2003) . . . . . . . . . . 11

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 11

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n.*,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,5

*Franks v. Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 11

*Humanitarian Law Project v. Ashcroft*, 309 F. Supp.2d 1185 (C.D. Cal. 2004) . . . . . . . . . . . . 10

*Humanitarian Law Project v. U.S. Dept. of Justice*, 352 F.3d 382 (9th Cir. 2003),
    *vacated*, 393 F.3d 902 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Humanitarian Law Project v. U.S. Dept. of Justice*, 393 F.3d 902 (9th Cir. 2004) . . . . . . . . . . 10

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Michigan v. Tyler*, 436 U.S. 499 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*OFAC v. Voices In the Wilderness*, 329 F. Supp.2d 71 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . 13

*Stanford v. State of Texas*, 379 U.S. 476 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Steagald v. United States*, 451 U.S. 204 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Stirone v. United States*, 361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Armstrong*, 517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Awan*, 459 F. Supp.2d 167 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . 8,9,11,19

*United States v. Correa-Gomez*, 160 F. Supp. 2d 748 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Crowley*, 79 F.Supp.2d 138 (E.D.N.Y.1999)
   (*rev'd on other grounds* ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Danzey*, 594 F.2d 905 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Fares*, 978 F.2d 52 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,19

*United States v. Foley*, 73 F.3d 484 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Hoang van Tran*, 234 F.3d 798 (2d Cir. 2000),
   *overruled on other grounds by United States v. Thomas*,
   274 F.3d 655 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Huff*, 512 F.2d 66 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Kelley*, 349 F.2d 720 (2nd Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Lamont*, 236 F.2d 312 (2d Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,16

*United States v. Sattar*, 272 F. Supp.2d 348 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . 10,11

*United States v. Seeger*, 303 F.2d 478 (2d Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Wayte*, 470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,19

*United States v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Van Liew v. United States*, 321 F.2d 664 (5th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wong Sun v. United States*, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................... 14,15

## STATUTES

U.S. Const., Amend. I ...................................................... *passim*

U.S. Const., Amend. VI ..................................................... 8,20

18 U.S.C. §924(c) .......................................................... 9

18 U.S.C. §2339A(b) ....................................................... 8

18 U.S.C. §2339A(b)(3) .................................................... 9

18 U.S.C. §2339B ......................................................... *passim*

18 U.S.C. §2339B(i) ....................................................... 1,2,10

21 U.S.C. §841 ............................................................ 7,12

22 U.S.C. §287 et. seq. .................................................... 1,11,12,13,16

22 U.S.C. §287c ........................................................... 12

22 U.S.C. §287c(a) ........................................................ 13

50 U.S.C. §1701 et. seq. ................................................... 11,15,16

50 U.S.C. §1702(b) ........................................................ 13,16

Rule 8, Fed.R.Crim.P. ..................................................... 20

## OTHER AUTHORITIES

Andrew Peterson, *Addressing Tomorrow's Terrorists,*
  2 J. Nat'l Security & Pol'y ___ .............................................. 8

*Congressional Research Service RL33035,* "Material Support of Terrorists
  and Foreign Terrorist Organizations: Sunset Amendments," Updated March 17, 2007,
  Charles Doyle, Senior Specialist, American Law Division .......................... 10

v

## Introduction

This Reply Memorandum of Law is submitted in reply to the government's opposition to Defendants' pretrial motions. Much of the government's response does require rejoinder, as it recites boilerplate legal principles inapplicable to the specifics of this case, or was anticipated and addressed in Defendants' Initial Memorandum of Law. However, certain aspects of the government's response merit comment.

The government's response constitutes nothing less than a full frontal assault on the fundamental values inscribed in the First Amendment. In an effort to pigeonhole Defendants' activity as "commercial speech," the government reveals its abject lack of understanding of basic constitutional principles and threatens to erase bedrock First Amendment protections for newspapers, broadcasting, magazines, and books (and any profit-seeking venture) and beyond. That cannot be countenanced, and must be rejected if the First Amendment is to retain its vitality.

The government's gross mischaracterization of First Amendment "commercial speech" doctrine overshadows its *complete avoidance* of the principal argument against the "material support" counts – that 18 U.S.C. §2339B simply *does not cover Defendants' alleged conduct*.

In fact, as discussed below, in 51 pages of its response, the government fails to mention §2339B's most relevant provision in the context of this prosecution, §2339B(i), which explicitly limits application of the statute to not abridge First Amendment activity. That extraordinary evasion is as momentous as it is deliberate: it demonstrates the government does not have the slightest answer to Defendants' motion. Regarding the United Nations Participation Act charges, the government resorts to wholly conclusory claims, unsupported by the statute, the case law, or even the sources the government cites. Similarly, the government fails to address the key issues

1

raised in Mr. Iqbal's challenge to the search warrants executed on his home and office.

The government at least addresses Defendants' selective prosecution claim, but does so in a manner that amply proves Defendants' point:  that they are being prosecuted in an effort to deny them the exercise of their constitutional rights, and that a host of others who have performed the same conduct have not been prosecuted.

**POINT I**

**THE "MATERIAL SUPPORT" COUNTS (1, 2, 7 & 8)
SHOULD BE DISMISSED BECAUSE (A)  THEY FAIL
TO STATE AN OFFENSE UNDER THE STATUTE,
18 U.S.C. §2339B;  (B) THE CONDUCT ALLEGED IS
EXEMPTED FROM §2339B;  AND/OR (C)  §2339B IS
UNCONSTITUTIONALLY VAGUE ON ITS FACE OR
<u>AS APPLIED, AND IS UNCONSTITUTIONALLY OVERBROAD</u>**

Whether wittingly or not, the government has proved conclusively the validity of Defendants' primary point and, in effect, surrendered on the "material support" charges (Counts 1, 2, 7 & 8) without contest.  Astonishingly, *not once* in its 51-page Memo does the government even *mention*, much less confront, the most important feature of 18 U.S.C. §2339B:  §2339B(i), which was added in 2004 and states unequivocally that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States."  *See* Defendants' Initial Memo of Law (hereinafter, "D. Mem.") at 5.  In fact, the government evades altogether Defendants' principal argument, based on §2339B(i), Congressional intent, case law, and even the Department of Justice's interpretation of §2339B:  that the §2339B charges in the Indictment fail to *state an offense* because it does not cover the conduct alleged.  *Id.* at 1-4.

Instead, the government ignores that argument entirely, and mischaracterizes Defendants'

2

claims as being solely constitutional in nature (vagueness and overbreadth), bypassing the threshold statutory issue. The reason for the government's abject avoidance is patent: it does not have an answer for Defendants' challenge. Also, the government's tactic is futile, as the Court need not reach the constitutional issues because it can grant Defendants' motion solely on the basis of the clear and oft-repeated limits on §2339B's scope.

Rather than engage Defendants' primary points, the government chooses to propose an outrageous and irresponsible re-invention of First Amendment jurisprudence that would leave the entirety of the journalistic, broadcasting, and publishing industries at the mercy of the government with respect to content regulation.

## A.   *Defendants' Alleged Broadcasting of Al Manar Is Not "Commercial Speech"*

The government's Memo of Law (hereinafter, "G. Mem.") makes it apparent that Defendants' alleged offense conduct is limited to making Al Manar broadcasts available in the U.S. Thus, unmistakably, the §2339B charges are based on First Amendment speech, which the government contends constitutes "commercial speech." *See* G. Mem. at 8-9.

However, the government's gross mischaracterization of the Defendants' speech as "commercial speech" proves entirely unavailing, as the government misapprehends the very definition of "commercial speech" in asserting that the "business nature of the [D]efendants' conduct," *id.*, at 8, transforms their *political* speech into *commercial* speech – a metamorphosis that is hardly tenable, and a standard which would render all speech flowing from underlying contractual relationships (such as those attendant to the publication of *The New York Times*) subject to limited First Amendment protection.

Commercial speech represents "expression related solely to the economic interests of the

3

speaker and its audience," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S.

557, 561 (1980), and "does no more than propose a commercial transaction." *Va. State Bd. of*

*Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976). *See also Lorillard*

*Tobacco Co. v. Reilly*, 533 U.S. 525, 554-55 (2001). Consistent with that clear and limited

definition, in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), the Supreme Court

held that speech could properly be characterized as commercial when (1) the speech is

admittedly advertising; (2) the speech references a specific product; and (3) the speaker has an

economic motive for engaging in the speech. *Id.*, at 66-67.

Clearly, Defendants' speech cannot be commercial speech: broadcast service of Al

Manar is not "admittedly advertising" nor does it "reference a specific product." *Bolger*, 463

U.S. at 466-67. While Defendants received money for the service provided, such economic

motivation, and the contractual relationships therein, do not automatically render speech

commercial in nature such that it is stripped of the full fabric of First Amendment protection

afforded noncommercial speech such as political speech and advocacy.[2]

Otherwise, all for-profit publication and broadcasting would be branded "commercial

speech" in its entirety – indeed, because *The New York Times* charges money for its editions,

under the government's ludicrous construction the publication of *The Pentagon Papers* thirty-six

years ago would have constituted merely "commercial" speech. Indisputably, that is not the case,

and the government's argument is not only baseless, but it provides a rather disturbing window

on the government's total misapprehension of First Amendment protections.

---

[2] Content-based regulation of commercial speech is reviewed under the less rigorous
"intermediate scrutiny" standard, *see Central Hudson*, 447 U.S. at 566, rather than the strict scrutiny
standard applicable to regulation of all other First Amendment protected speech. *See* D. Mem. at 8-12.

Broadcast, as well as print, radio and internet media, receive money (from subscribers to advertisers) for providing access to programming – and do so without jeopardizing their First Amendment right to disseminate news, information, ideas, political expression, art and entertainment. Under the government's contorted "commercial speech" definition, however, *all* forums for public discourse that operated pursuant to business contracts – from *The Times* and FOX News and www.slate.com and Random House to all newspapers, broadcasting outlets, internet services, and book publishing houses – would lose traditional First Amendment protection and be subject to untrammeled content-based regulation.[3] Such a result is manifestly and dangerously absurd, as it annihilates the purpose of the First Amendment altogether.

Nor can characterizing the issue as one of "equipment" change the analysis. As the Supreme Court declared in its landmark decision in *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969), First Amendment protections cover all "persons who . . . publish any book or paper containing such advocacy; or who 'justify' the commission of violent acts 'with intent to exemplify, spread or advocate the propriety'" of their doctrines (as long as the expression is not intended to and capable of inciting imminent lawless action). *See* D. Mem. at 8-10.

Consequently, despite the government's unsubstantiated assertion to the contrary, *see* G. Mem. at 8, commercial speech encompasses *only* advertising and engenders a lower standard of review in *only* that context. *See Central Hudson*, 447 U.S. at 561. Permitting the government to

---

[3] That the government is attempting content regulation is clear from its unconscionable effort to miscast Defendants' alleged broadcast of Al Manar as "commercial speech," as the government uses that mis-construction to note that "commercial speech" "must concern lawful activity and not be misleading." G. Mem. at 9 (citation omitted). That is the essence of content regulation, and the government's evident desire to extend that doctrine to television broadcasting of politically unpopular opinions by a proscribed organization is nothing less than a direct attack on core First Amendment values.

re-write the definition of commercial speech, and expand its scope immeasurably, would

eviscerate First Amendment protections across the entire spectrum of speech.

**B.**     ***The §2339B Counts Are Defective Because They Fail to Allege Essential Elements***

Besides the government's transparent and insupportable attempt to collapse the entire

First Amendment into the concept of "commercial speech," there are other aspects of the

government's response regarding the material support counts that cannot pass uncorrected.

Among the government's arguments is that the term "knowingly" in the Indictment

suffices to allege the requisite knowledge of the FTO's designation or underlying terrorist

activities. *See* G. Mem. at 4-6.  That assertion is incorrect.  Section 2339B includes *two*

knowledge requirements.  The first, as pleaded in the Indictment, refers to the knowing provision

of material support. *See, e.g.,* Indictment at ¶¶ 6, 9, 23, 26; D. Mem. at 2-4.

The knowledge requirement at issue here, however, is the *second* knowledge element:

that the recipient of the material support was an FTO, or has engaged in terrorism.  The

Indictment simply does not plead that second knowledge requirement, an essential element added

by amendment to the statute in December 2004. *See also* D. Mem. at 3-4.

Thus, the government cannot seek refuge in case law that states that an indictment is

sufficient if it "tracks the language of the statute," *see* G. Mem. at 4, because the §2339B counts

herein *do not track the language of the statute.*  Rather, in omitting the second knowledge

requirement of §2339B, they do so only halfway.

As the cases make clear, all essential elements must be pleaded adequately – and the

government agrees that the second "knowingly" requirement is an essential element. *See* G.

Mem. at 16 n. 11, 18.[4]   For example, in *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996),

the Second Circuit explained that an indictment charging an offense of which one element is

implicit was insufficient because the indictment tracked language of statute but failed to allege

the implicit element explicitly.  Here, the Indictment fails even to track the statutory language.

*See United States v. Yefsky*, 994 F.2d 885, 893-94 (1st Cir. 1993); *United States v. Huff*, 512 F.2d

66 (5th Cir. 1975).

Moreover, when First Amendment freedoms are at stake, an indictment is subject to

enhanced scrutiny, in part to avoid, if possible, deciding the constitutional issues.  *See United*

*States v. Lamont*, 236 F.2d 312, 314-16 (2d Cir. 1956) (holding indictments "fatally defective"

without reaching the constitutional issues).

Consequently, the §2339B Counts (1, 2, 7 & 8), which as presently pleaded require

knowledge only with respect to the provision of material support, and not to the recipient's status

as an FTO (or the underlying terrorist conduct), are fatally deficient, and must be dismissed.

The government also claims the Indictment need not enumerate the specific statutory

form of "material support" Defendants are alleged to have provided in violation of §2339B.

Thus, the government would have the defense prepare to defend against *every* class of material

support enumerated in the statute – not unlike listing every Schedule controlled substance in an

indictment charging a violation of 21 U.S.C. §841, thereby compelling the defense to guess as to

which apply to the particular case, and affording the government impermissible flexibility with

---

[4]  The government has the audacity to cite the second "knowledge" requirement as a basis for finding §2339B constitutional, *see* G. Mem. at 16 n. 11, 18 ("the statute's scienter requirement further narrows the scope of its application"), while at the same time denying that it has to plead that essential element in the Indictment.

respect to the limits of its proof at trial.[5]

The government claims that notice has been and will be provided by the criminal

Complaints and discovery. *See* G. Mem. at 13-17. Yet that is not "notice" that is required by the

Sixth Amendment's Indictment Clause. In addition, considering the government will not identify

a particular type of "material support" that is charged in the Indictment, how are defendants

supposed to discern it from the other materials cited?

The government's evasiveness with respect to just what "material support" Defendants

allegedly provided raises another important issue: what specific "material support" the grand

jury found. The government cannot speculate now about what material support may be sufficient

to sustain the Indictment. It must be limited to what the grand jury found, and which serves as

the basis for the Indictment, and the only permissible basis for trial. Otherwise, the government

is creating an amendment of the Indictment even *before* trial. *See, e.g., Stirone v. United States,*

361 U.S. 212 (1960).

That is the very problem identified by the Court in *United States v. Awan,* 459 F. Supp.2d

167 (E.D.N.Y. 2006), in which the Court dismissed the subject counts. As the Court explained,

> the indictment uses the generic expression "material support," as
> defined in 18 U.S.C. §2339A(b), without specifying which of a
> variety of activities, any one of which would be criminal, that the
> defendant must defend against or which the grand jury considered.
> The government has indicated in its papers on this motion that it
> plans to prove that defendant provided "money," referring
> presumably to "currency or monetary instruments or financial
> securities," and "personnel," referring to "1 or more individuals

---

[5] The lack of adequate notice is aggravated by the expansive nature of the definition of "material support" in §2339A(b), which was deliberate. *See* Andrew Peterson, *Addressing Tomorrow's Terrorists,* 2 J. Nat'l Security & Pol'y ___, 8-9 ("[t]he broad scope of 'material support' in the criminal code is part of a legal strategy the DOJ labels 'strategic overinclusiveness'").

> who may or may not include [the defendant]," to the KCF.
> However, there is no way of knowing whether the grand jury
> considered both categories (or, for that matter, either) of those
> activities under the general heading of material support.[ ]

459 F. Supp.2d at 175-76, *citing United States v. Crowley,* 79 F.Supp.2d 138, 159

(E.D.N.Y.1999) (*rev'd on other grounds* ) (dismissing an indictment which referred to "sexual

conduct" on the grounds that such conduct could refer to any or all of the acts specifically

defined in the statute and finding that "[g]iven the variety of ways in which this statute could be

violated, the conduct alleged to comprise the charged 'sexual act' must be delineated in the

indictment").[6] *See also United States v. Hoang van Tran,* 234 F.3d 798, 802 (2d Cir. 2000)

(indictment under 18 U.S.C. § 924(c) insufficient because did not allege type of firearm used),

*overruled on other grounds by, United States v. Thomas,* 274 F.3d 655 (2d Cir. 2001).

It is unclear whether the government is committing to "expert advice or assistance" as the

type of "material support" Defendants allegedly provided – it is not delineated in the Indictment,

and the government does not represent that it is the only type it claims was provided.  In any

event, "expert advice or assistance" is, as courts have previously held, unconstitutionally vague.

The government claims that the definition of "expert advice or assistance," which was

amended in 2004, §2339A(b)(3) ("advice or assistance derived from scientific, technical, or other

specialized knowledge") provides the ordinary person sufficient notice of what is proscribed

under §2339B.  Yet how would that ordinary person know that merely broadcasting a television

station's signal would constitute "expert advice or assistance" to a Foreign Terrorist Organization

---

[6] The Court in *Awan* added in a footnote that "[f]or similar reasons, the error cannot be 'cured' by a bill of particulars or statement in papers on this motion since those filings will not reveal what the grand jury found."  459 F. Supp.2d at 175 n.7.

9

(hereinafter "FTO"), particularly in light of the plain limitations imposed by §2339B(i), and the restrictions imposed by the First Amendment generally?

The government also fails to acknowledge that "expert advice or assistance" was, in its incarnation prior to the 2004 amendments, declared unconstitutionally vague because it threatened to infringe on advocacy and other First Amendment rights. *See Humanitarian Law Project v. Ashcroft*, 309 F. Supp.2d 1185, 1200-01 (C.D. Cal. 2004). *See also Humanitarian Law Project*, 352 F.3d 382, 404 (9th Cir. 2003) ("expert advice or assistance" "could be construed to include unequivocally pure speech and advocacy protected by the First Amendment" or to "encompass First Amendment protected activities"), *vacated* 393 F.3d 902 (9th Cir. 2004) (*en banc*). *See United States v. Sattar*, 272 F. Supp.2d 348, 358-61 (S.D.N.Y. 2003).

While explicating the definition somewhat has perhaps alleviated the facial vagueness – *see Humanitarian Law Project*, 393 F.3d 902 (9th Cir. 2004) (*en banc*) – obviously this case demonstrates that "expert advice and assistance" is certainly still eminently capable of breaching First Amendment protections, and being unconstitutionally vague as applied. See *Congressional Research Service RL33035*, "Material Support of Terrorists and Foreign Terrorist Organizations: Sunset Amendments," Updated March 17, 2007, Charles Doyle, Senior Specialist, American Law Division, at 4 ("[c]ritics might argue that the attempted fix [the 2004 amendment] appears to turn on the dubious premise that effective advocacy, *e.g.*, peaceful conflict resolution through the use of human rights laws) is not a skill[,]" and that "[t]he same might be said of [the] new definition of 'expert advice or assistance' plucked from the Federal Rules of Evidence").[7]

---

[7] *See also* "The Congressional Research Service Monograph," at 4 (noting that "[t]he [2004] amendments "may rely on [their] section 2339B First Amendment disclaimer clause to answer the concern that the uncertain term might lead to prosecution of mere advocacy or other First Amendment

10

In addition, all of the cases cited by the government, *see* G. Mem. at 11 – *Humanitarian Law Project*, 205 F.3d 1130 (9th Cir. 2000), *Sattar*, *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), and *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2003) – upheld §2339B only because it was construed *not to reach protected First Amendment activity*. *See also* D. Mem. at 5-8. Thus, the government's arguments are as misleading as they are ineffectual. *See Awan* at 178-79.[8]

Nor does the government posit a genuine answer to Defendants' point that §2339B impermissibly lacks any *de minimis* standard, and so reduces the response to a footnote. *See* G. Mem. at 23 n.14. However, that again misstates Defendants' point: they are not asking to the Court to "engraft" a *de minimis* standard on to §2339B; rather it is required to save §2339b from vagueness and overbreadth. *See* D. Mem. at 20-24.

In, *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), the Second Circuit instructed that "an interpretation of a statute must comport with the statute's primary purpose and not lead to anomalous or unreasonable results." *Id.*, at 210, *quoting.Bleecker Charles Co. v. 350 Bleecker St. Apt. Corp.*, 327 F.3d 197, 203 (2d Cir.2003). Here, continued prosecution of Defendants on the §2339B Counts would indeed lead, inexorably, to "anomalous or unreasonable results." Accordingly, it is respectfully submitted that Counts 1, 2, 7 & 8 should be dismissed.

---

protected activities – at least with regard to prosecutions under 2339B").

   [8] The government's citation to cases involving the International Economic Emergency Powers Act, 50 U.S.C. §1701 (hereinafter "IEEPA"), *see* G. Mem. at 10 n. 9, is inapposite because IEEPA applies to *all* transactions with designated persons, while §2339B reaches only "material support" to an FTO. Moreover, the government's citation is further disingenuous because the Berman Amendment to IEEPA (*see* D. Mem. at 27-29) exempts Defendants' conduct from IEEPA regulations – *which is why the government did not proceed with the IEEPA charges that were in the criminal Complaint, but which have since been discarded and replaced* by the United Nations Participation Act, 22 U.S.C. §287, counts.

**POINT II**

**COUNTS 3-6 & 9-11 SHOULD BE DISMISSED BECAUSE
(A) THE INDICTMENT FAILS TO ALLEGE ANY
SUBSTANTIVE OFFENSE; (B) THE CONDUCT ALLEGED
IS EXEMPTED FROM 22 U.S.C. §287c, AND/OR BECAUSE
THE STATUTE IS UNCONSTITUTIONALLY VAGUE AS
<u>APPLIED, AND/OR IS UNCONSTITUTIONALLY OVERBROAD</u>**

Regarding the Counts charging a violation of the United Nations Participation Act (hereinafter "UNPA"), the government, as it did with respect to Defendants' challenge to the §2339B charges, miscasts them as solely constitutional issues, when, in fact, there are dispositive threshold statutory problems with those Counts. *See* D. Mem. at 25-29.

The government claims, however, that the Indictment need not state the United Nations resolutions upon which the UNPA Counts are based. Yet it cannot cite any authority for that proposition. That is not surprising, since the statute itself requires UN resolutions as a predicate, regardless of subsequent regulations.

In addition, in *Van Liew v. United States*, 321 F.2d 664 (5th Cir. 1963), the Fifth Circuit ruled that an indictment was insufficient because it failed to identify the regulatory provisions allegedly violated. Nor does the government provide any answer to *United States v. Seeger*, 303 F.2d 478, 484 (2d Cir. 1962), cited in D. Mem. at 26.

Thus, the reference to the Executive Order is a red herring. The EO merely authorizes regulations. Regarding the government's continued refusal to identify which regulations are at issue, the government *cites them all* as possible bases. *See* G. Mem. at 25 n. 15. That, of course, does not make those Counts any more sufficient, and merely replicates the problem present in the "material support" Counts: it provides no more adequate notice than would citing in a 21 U.S.C. §841 prosecution the entire schedule of illicit drugs.

12

Similarly, the government's response that it does not matter that Al Manar or Hizballah do not qualify as a "foreign country or any national thereof or any person therein," 22 U.S.C. §287c(a), is without authority, or foundation in law or logic. Indeed, the government suggests, remarkably, that persons defendants met in Lebanon, who are not named or otherwise identified in the Indictment – who may or may *not* be Specially Designated Global Terrorists, or named in the Executive Order, and who would have to be directly involved in the transactions allegedly banned – could suffice. That argument is simply frivolous. *See also* D. Mem. at 25-26, 29.

The government also contends that the Berman Amendment, 50 U.S.C. §1702(b), does not apply to UNPA in this case. *See* G. Mem. at 26-27. In support, the government cites a single civil case, *OFAC v. Voices In the Wilderness*, 329 F. Supp.2d 71 (D.D.C. 2004), in which the issue was not whether the Berman Amendment applied – in fact, the Court proceeded under the assumption that it *did*, *see id.*, 329 F. Supp.2d at 75-78, because the Executive Order referenced §1702(b), *id.*, at 75 – but whether subsequent Treasury Department regulations could require that persons seeking to provide "humanitarian articles" – *not* First Amendment materials – as aid to Iraq first obtain a license from the Office of Foreign Assets Control. *Id.*, at 76-78.

The case did not involve a *ban* on transactions, or criminal sanctions, but rather the extent of permissible regulation. Also, the reason the Court noted that the Berman Amendment did not affect its analysis of UNPA was because UNPA contained its own authority for licensing requirements. *See* 329 F. Supp.2d at 78 n. 2. Moreover, even if the Berman Amendment did not apply to UNPA, application of UNPA to Defendants for the conduct alleged would violate the First Amendment. *See* D. Mem at 28-29.

Thus, rather than support the government's position, *Voices In the Wilderness* refutes it.

13

Accordingly, it is respectfully submitted that Counts 3-6 & 9-11 should be dismissed.

### POINT V[9]
### ALL PROPERTY SEIZED DURING THE SEARCHES
### OF MR. IQBAL'S RESIDENCE AND BUSINESS
### SHOULD BE SUPPRESSED, OR A HEARING
### CONDUCTED TO DETERMINE WHETHER THE
### THE SEARCHES WERE EXECUTED IN "GOOD FAITH"

While the government correctly notes that JTTF agents conducted a search of Mr. Iqbal's

Staten Island home and a search of his HDTV business office in Brooklyn pursuant to a search

warrant, *see* G. Mem. at 33, D. Mem. at 40, the government conveniently overlooks the glaring

lack of probable cause underlying that search warrant.  The government unpersuasively and

impermissibly stretches the contours of the "good faith" doctrine, *see United States v. Leon*, 468

U.S. 897 (1984), arguing that Mr. Iqbal's engagement in First Amendment protected activity

provided sufficient probable cause to issue and execute a search warrant.  *See* G. Mem. at 34.

The government's misguided contention – for which it cites not one case – must fail.

Not only must a search warrant be predicated upon a showing of probable cause to

believe that the items described in the warrant are presently in the place authorized to be

searched, *see Michigan v. Tyler*, 436 U.S. 499, 512 (1978); *Franks v. Delaware*, 438 U.S. 154

165 (1978);  *Steagald v. United States*, 451 U.S. 204, 217 (1981), but there also must exist

reasonable grounds to believe that the specified items are connected to criminal activity.  *See*

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556-7 (1978);  *Steagald,* 451 U.S. at 213.  *See also*

*Stanford v. State of Texas*, 379 U.S. 476, 485 (1965) (requiring "scrupulous exactitude" in

particularity of warrant where things to be seized are protected by the First Amendment).

---

[9]  For ease of reference, he numerical order of the "Points,"though not sequential in this
document, correspond to the original point headings in Defendants' Initial Memo of Law.

Moreover, although the government attempts to shield the law enforcement officers in question by invoking the "good faith" doctrine, the government itself recognizes that its agents cannot reasonably rely on the "good faith" exception in executing a potentially defective warrant if "the supporting affidavit lacked any indicia of probable cause." *See* G. Mem. at 34.

The Search Warrant Affidavit, as attested to by FBI Agent Charles Villani, unmistakably establishes that the *sole* basis giving rise to the search warrant was Mr. Iqbal's involvement in First Amendment protected activity, namely the possession of satellite dishes, broadcast equipment, and/or the posting of advertisements offering Al-Manar and other programming, and the alleged use of such equipment to provide such programming – all of which amount to the modern day equivalent of possessing and operating a printing press. *See* Search Warrant Affidavit dated August 22, 2006, attached as Exhibit 8 to the Dratel Declaration dated April 6, 2006, submitted with Defendants' Initial Memo of Law, at ¶¶ 15-18, 20-23.

Clearly, possession of such items – all directly connected to First Amendment activity, and known to be such by law enforcement – cannot provide "reasonable grounds to believe that the specified items are connected to criminal activity," *Zurcher*, 436 U.S. at 556-7, such that sufficient probable cause would have existed to execute the search.[10]

Furthermore, the government agents, based on their training, experience and familiarity with the statutes at issue, specifically 18 U.S.C. §2339B and 50 U.S.C. §1701, *see* Search Warrant Affidavit, at ¶¶ 7 & 9, could not reasonably believe that the possession of the aforementioned equipment and the broadcast of Al-Manar programming could have constituted

_____

[10] In addition, the government cannot use possession of satellite broadcasting equipment to show a defendant's knowledge or intent without specific proof that the defendant shared the point of view expressed therein, particularly with respect to the charged conduct in Counts 1, 2, 7 & 8.

15

criminal activity.  As discussed **ante**, the statutory language of 18 U.S.C. §2339B carries an explicit exception for First Amendment activity, and the Berman Amendment likewise limits prosecution under 50 U.S.C. §1701 for protected speech activity – both of which would have been known (based on their training and experience) to the government agents executing the searches of Mr. Iqbal's home and office.[11]  As such, in the absence of probable cause, these government agents cannot avail themselves of *Leon*'s good faith doctrine.

As such, all property seized from Mr. Iqbal's home and office, and any fruits thereof, *see Wong Sun v. United States*, 371 U.S. 471 (1963), must be suppressed.  In the alternative, the Court should conduct an evidentiary hearing under *Leon* to determine whether sufficient probable cause existed such that the officers executing the search could have acted in good faith.

### POINT VI
### THE INDICTMENT SHOULD BE DISMISSED BECAUSE MR. IQBAL AND DR. ELAWAL HAVE BEEN SUBJECT TO SELECTIVE PROSECUTION, OR, IN THE ALTERNATIVE THE COURT SHOULD CONDUCT A HEARING

As the government correctly acknowledges, Defendants' selective prosecution claim requires a *prima facie* showing that (1)  similarly situated others have not been prosecuted for engaging in conduct of the type forming the basis of the charges against the Defendants, such that the Defendants have been singled out (the discriminatory effect prong); and (2)  the government's discriminatory selection of the Defendants for prosecution is in bad faith, *i.e.*, based on impermissible considerations such as race, religion, or the desire to prevent Defendants'

---

[11]  Indeed, the government quickly dispensed with any prosecution under 50 U.S.C. §1701 (IEEPA) because it recognized that the Berman Amendment expressly precluded such prosecution, and substituted (unavailingly, as discussed **ante**, in POINT II) the United Nations Participation Act instead.

16

exercise of their constitutional rights (the discriminatory intent prong).  *See* G. Mem. at 36; D.

Mem. at 44-45 (citing *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992)).  *See United States*

*v. Wayte*, 470 U.S. 598 (1985); *Awan*, 459 F. Supp.2d 167.

The discriminatory effect and intent driving the government's selective prosecution in

this case is evidenced irrefutably in its failure to prosecute other similarly situated entities, which,

like the Defendants, were exercising their First Amendment rights to freely disseminate news and

information, even satire, within the U.S.[12]  Consider the following (non-exhaustive)[13] catalog of

similarly situated "offending" entities that have escaped prosecution altogether:[14]

- Al-Hurra, the United States government's own Arabic TV network, recently broadcast a 68-minute speech from a senior Hizballah officer (most likely filmed originally by Al-Manar, *see* **ante**, at n.2), and has aired other anti-Israel, anti-Semitic, anti-United States footage.  *See* "U.S. Government Gave Airtime to Terrorists, Official Admits," dated May 22, 2007; "Mad TV," dated May 1, 2007; "Outside Panel to Scrutinize U.S. Arabic TV Network," dated June 6, 2007, attached to the Dratel Reply Declaration as Exhibits 3,4 & 5, respectively.

- Fox News, on at least three different instances, has aired Al-Manar programming; *see* Exhibits 2a, 2b, 2c.

- CNN, through its domestic (CNN News and Larry King Live) and international

---

[12]  Each of the programs described was made available in the United States by the referenced broadcast agency on the date indicated.  *See* Javed Iqbal Declaration dated June 11, 2007 (hereinafter, "Iqbal Declaration"), attached to the Dratel Reply Declaration dated June 11, 2007, as Exhibit 1, at ¶ 2.

[13]  Counsel currently is investigating the existence of exclusivity agreements that may apply to all filming and broadcast of Hizballah-related activity in Lebanon, such that Al-Manar would be the only entity permitted to film such activity – thereby requiring all other broadcast entities (including, but not limited, to those already described) to enter into contracts with Al-Manar to show such footage.

[14]  A description of the "offending programming" offered by these broadcasting agencies is provided in the Dratel Reply Declaration.  *See* Dratel Reply Declaration at ¶ 4.  Furthermore, a DVD containing all the referenced clips has been submitted for the Court's review as Exhibit 2 to the Dratel Reply Declaration.  As these various clips evidence, the Al-Manar programming made available through these different broadcast agencies include news (Exhibits 2a-2c, 2e, 2g, 2h), commentary (Exhibits 2d, 2f), political speech (Exhibit 2i), and entertainment (Exhibit 2j).

(CNN International) programming, has aired Al-Manar footage on at least three different occasions; *see* Exhibits 2d, 2e, 2f.

- Israeli Channel 10, available in the United States through DishNetwork, *see* Iqbal Declaration, at ¶ 2, has aired Al-Manar on at least one occasion; *see* Exhibit 2g.

- Al-Jazeera, available in the United States through satellite broadcast, such as (but not limited to) Globecast, *see* Iqbal Declaration, at ¶ 2, has aired Al-Manar programming on at least two different instances, including a full-length "dramatization" (which Al-Jazeera describes in an introductory scroll as produced in Syria but aired on Al-Manar) depicting a worldwide, long-standing Jewish conspiracy to rule the world; *see* Exhibits 2h, 2i.

- Live web-casts of Al-Manar programming could be viewed during the period of Defendants' charged conduct, and still can be viewed today online at Al-Manar's website, and via other websites, including, but not limited to, Al-Jazeera's and Israel Channel 10's site; *see* Dratel Reply Declaration at ¶¶ 5-7.

- Coca-Cola and Procter & Gamble, both with advertising contracts with Al-Manar, conducted business with Al-Manar until the summer of 2006.  *See* Exhibit 2a.

The government unconvincingly attempts to separate the conduct of these offending entities from the charges against the Defendants by offering unsubstantiated disclaimers that: other broadcast agencies "did not enter into contracts with Hizballah to broadcast Al-Manar;" "it is highly unlikely that these networks would have accepted thousands of dollars in payments from Al-Manar in exchange for their assistance;" and, likewise, "it is further unlikely that these networks would have shipped electronic equipment to Al-Manar." G. Mem. at 37-38.

However, such conjecture by the government represents nothing more than *its* mere speculation about the business dealings of the above-referenced corporations – and proves Defendants' point:  while this open and notorious broadcasting of Al-Manar programming has existed in numerous permutations via numerous channels and means of delivery, the government has not bothered to investigate a single instance other than Defendants' alleged conduct.  The

conclusion is obvious and inescapable: the government could care less about prosecuting other offenders similarly situated; it is interested only in Defendants.

In the absence of additional discovery, the government lacks *any* evidentiary foundation for its (largely hypothetical) conclusion that the Defendants' are not "similarly situated to other offenders who were not indicted by a United States grand jury." G. Mem. at 38. *See Awan*, 459 F.Supp.2d at 185, *citing United States v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003).

Mr. Iqbal and Dr. Elahwal's selective prosecution motion is neither "speculative nor unduly myopic." *Fares*, 978 F.2d at 60. Instead, it is based on incontrovertible facts: they, among the many who performed the same conduct (but are not of the same race, ethnicity or religion as Defendants), are the only persons to face prosecution. Therefore, Mr. Iqbal and Dr. Elahwal meet the *Wayte* standard: they were "selected . . . on the basis of [their] speech" as well on their race, place of origin and/or religion. 470 U.S. at 608-09.

In the alternative, if the showing made above is insufficient to demonstrate selective prosecution, certainly the evidence is adequate to warrant further discovery[15] and an evidentiary hearing. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996). *See United States v. Correa-Gomez*, 160 F. Supp. 2d 748 (2001).

Accordingly, it is respectfully submitted the charges in the Indictment are the product of selective prosecution, and should be dismissed. In the alternative, it is respectfully submitted that the Court should order discovery and an evidentiary hearing on the matter.

---

[15]  It is respectfully submitted that the Court should issue an Order directing the government to produce all memoranda prepared by government agents and officials regarding the reasons for (a) commencing the investigation in this case; (b) sending an informant to visit Mr. Iqbal; (c) arresting Mr. Iqbal; and (d) seeking the instant Indictment against Mr. Iqbal and Dr. Elahwal.

19

## POINT VII
### THE COURT SHOULD SEVER DEFENDANTS' TRIALS

The Court should sever Defendants' trials because an abundance of the government's evidence relates only to Mr. Iqbal, and will prejudicially "spill over" to Dr. Elahwal.

If it appears that a defendant is prejudiced by a joint trial, the Court may grant severance. *See United States v. Kelley*, 349 F.2d 720, 756-57 (2d Cir. 1965). The government cannot proffer more than a couple of examples of an alleged joint effort by the two defendants, while almost all of the government's evidence relates only to Mr. Iqbal and will serve to deny Dr. Elahwal a fair trial under the Sixth Amendment. To support its request for a joint trial, the government cites judicial economy, public policy, and Rule 8, Fed.R.Crim.P. However, Dr. Elahwal's right to a fair trial is paramount to such interests.

Despite the government's perfunctory offer to alter each defendant's statements – replacing with the words "another person" those incriminating references each defendant made about the other – the previously detailed *Bruton* problem remains. *See* D. Mem. at 46-48. *See Bruton v. United States*, 391 U.S. 123 (1968); *United States v. Danzey*, 594 F.2d 905, 917-18 (2d Cir. 1979). Accordingly, the Court should grant Defendants' motion to sever.

### Conclusion

As such, it is respectfully submitted that defendants' pretrial motions should be granted.

Dated: 11 June 2007
      New York, New York

Respectfully submitted,
    / s /
Joshua L. Dratel, Esq.                Edward V. Sapone, Esq.
Renita K. Thukral, Esq.
*Attorneys for Defendant Javed Iqbal*      *Attorney for Defendant Saleh Elahwal*