LAW OFFICES OF
JOSHUA L. DRATEL, P.C.
2 WALL STREET, 3RD FLOOR
NEW YORK, NEW YORK 10005
TEL (212) 732-0707
FAX (212) 571-3792
E-MAIL JDratel@joshuadratel.com

JOSHUA L. DRATEL
—
AARON MYSLIWIEC
ALICE L. FONTIER
STUART A. WHITE
LINDSAY A. LEWIS

STEVEN WRIGHT
*Office Manager*
RYAN DUFFEY
*Paralegal*

April 7, 2009

**BY HAND**

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. Javed Iqbal*,
    06 Cr. 1054 (RMB)

Dear Judge Berman:

    This letter is submitted on behalf of Javed Iqbal with respect to his sentencing, scheduled for Thursday, April 23, 2009, at 3:30 p.m. For the reasons set forth below, it is respectfully submitted that the Court should impose upon Mr. Iqbal a sentence of 63 months' imprisonment, which is at the bottom of the applicable Sentencing Guidelines range prescribed by both the Plea Agreement (hereinafter "Agreement")[1] and the draft Pre-Sentence Report (hereinafter "PSR").[2] The Agreement stipulates a Guidelines range of 63 to 78 months and does not permit Mr. Iqbal to seek a sentence below that range. *See* the Agreement, at 3. In that context, a sentence of 63 months' imprisonment would be "sufficient but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. §3553(a)(2). *See* 18 U.S.C. §3553(a)(2). It is also requested that the Court recommend that Mr. Iqbal be designated to a facility in the northeastern region of the United States, as near as possible to his pregnant wife and five children.

    As detailed below, Mr. Iqbal's sentence should be at the low end of the applicable Guidelines range (63 months) because:

(1)    as evidenced by the Agreement and Mr. Iqbal's allocution, Mr. Iqbal has fully accepted responsibility for his conduct, deeply regrets his involvement in these activities, and has exhibited remorse;

---

[1] A copy of the Agreement is attached hereto as Exhibit 1.

[2] The draft version of the PSR is referred to herein throughout because the final PSR has not yet been circulated.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 2 of 18

(2) Mr. Iqbal's background and personal history clearly demonstrate that he is a dedicated family man who has spent the overwhelming majority of the last twenty years leading a law-abiding life and striving through consistent hard and legitimate work to provide for his family;

(3) in addition to the punishment that imprisonment imposes under ordinary circumstances, each day of Mr. Iqbal's sentence will be far more onerous due to his medical conditions and significant anxiety disorder, which require frequent care; and,

(4) Mr. Iqbal's conduct was atypical for "material support for terrorism," in that (a) it was not motivated by any violent or terrorist intent or agenda;[3] (b) it occurred in the context of an otherwise legitimate business that offered a wide variety of broadcast programs and services not connected with, and in some respects, inconsistent with or even antithetical to terrorism; and (c) Mr. Iqbal does not possess – and has not manifested in any of his other conduct or history – any ideology sympathetic to terrorism or other political doctrine.

A.  *The Plea Agreement*

Mr. Iqbal pleaded guilty December 23, 2008, to one count of providing material support and resources to Hizballah, a designated Foreign Terrorist Organization (hereinafter "FTO"), in violation of 18 U.S.C. §2339B. The Agreement stipulates the following Guidelines calculation:

- pursuant to §2M5.3(a), the base offense level is 26;

- the Guidelines terrorism enhancement, §3A1.4, does not apply to the particular facts of this case. *See* Agreement, at 2 [quoting 18 U.S.C. §2332b(g)(5)], and **ante**, at n. 3;

- pursuant to §3B1.3, a two-level increase is warranted because Mr. Iqbal used a special skill in a manner that significantly facilitated the commission of the offense; and,

- pursuant to §3E1.1(a), a two-level reduction is warranted assuming Mr. Iqbal has clearly demonstrated acceptance of responsibility, to the

---

[3] For example, the Agreement states, "[t]he parties agree that the Guidelines terrorism enhancement, U.S.S.G. §3A1.4, does not apply to the particular facts of this case because, at the present time, the Government would not be able to show that the defendant's offense was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *See* Agreement, at 2 [*quoting* 18 U.S.C. §2332b(g)(5)].

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

> satisfaction of the government, through his allocution and subsequent conduct prior to the imposition of sentence.[4]

Agreement, at 2.

Accordingly, the applicable Guidelines offense level, as stated in the Agreement, is 26, which, coupled with Mr. Iqbal's Criminal History Category of I (based on zero criminal history points), corresponds to a Guidelines range of 63 to 78 months. *Id.*, at 3. The Agreement further provides that neither an upward nor downward departure is warranted, and that neither party will seek a downward or upward departure from the stipulated Guidelines range. *Id.* In addition, both parties agreed not to "suggest that the Probation Department consider such a departure or adjustment, or suggest that the Court *sua sponte* consider such a departure or adjustment." *Id.*

The Agreement also provides that "a sentence within the Stipulated Guidelines Range would constitute a reasonable sentence in light of all the factors set forth in" 18 U.S.C. §3553(a). *Id.* As a result, the parties agreed not to seek a sentence outside of the stipulated range, suggest that the Probation Department consider a sentence outside of the range, or suggest that the Court *sua sponte* consider a sentence outside of the range. *Id.*

The draft PSR's Guidelines calculations conform to those in the Agreement in all respects.[5] *See* PSR, at ¶¶ 30-45, 81, 84.

**B.**   ***18 U.S.C. §3553(a) Requires a Sentence "Sufficient But Not Greater Than Necessary" to Accomplish the Stated Purposes of Sentencing***

Section 3553(a) sets forth the factors that guide the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the objectives of sentencing enumerated in §3553(a)(2). Those factors, with the exception of §3553(a)(2), which is set forth **post**, at 4, and the reference to the Guidelines, at §3553(a)(4), and the Sentencing Commission's policy statements, at §3553(a)(5), are:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

---

[4] Mr. Iqbal's guilty plea allocution and subsequent conduct, including his compliance with bail conditions and his appearing for remand following his guilty plea, clearly demonstrates his "acceptance of responsibility" for his offense conduct. As a result, as the draft PSR provides, at ¶ 37, the two-level reduction for acceptance of responsibility is warranted in this case.

[5] However, as detailed **post**, at 18, while ¶ 45 of the PSR correctly designates a Criminal History Category of I, the PSR at ¶ 45 incorrectly asserts that Mr. Iqbal "has one criminal history point."

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 4 of 18

     *     *     *

  (3)  the kinds of sentences available;

     *     *     *

  (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7)  the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a)(1), (3), (6), and (7).

Subsection 3553(a)(2), in turn, enumerates the following purposes of sentencing:

  (2)  the need for the sentence imposed –

    (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)  to afford adequate deterrence to criminal conduct;

    (C)  to protect the public from further crimes of the defendant; and

    (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).[6]

---

[6] As the Second Circuit stated last year, "the purposes [of sentencing] to be considered include punishment, deterrence, incapacitation, and the provision of necessary medical care or other correctional treatment." *United States v. Siegel*, 271 Fed. Appx. 115, 118 (2d Cir. 2008) (stating) (internal quotations omitted). *See also United States v. Denardi*, 892 F.2d 269, 276 (3d Cir. 1989) (Becker, J., concurring in part and dissenting in part) ("the four purposes of sentencing set forth in subsection 3553(a)(2)"are "retribution, deterrence, incapacitation, and rehabilitation").

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

As discussed below, in this case each of the relevant criteria weigh considerably in Mr. Iqbal's favor, thereby rendering any sentence that exceeds the lowest end of the stipulated Guidelines range, "greater than necessary" to accomplish the stated purposes of sentencing.

**B.   The §3553(a) Factors Weigh Overwhelmingly In Favor of a (63-Month) Sentence at the Bottom of the Guidelines Range**

**1.   *The Nature and Circumstances of Mr. Iqbal's Offense Conduct [§3553(a)(1)]***

As demonstrated by his guilty plea, Mr. Iqbal fully acknowledges his offense conduct. However, while Mr. Iqbal pleaded guilty to providing material support to Hizballah, his conduct was decidedly atypical for a "material support" case. For example, Mr. Iqbal's conduct was not motivated by any violent or terrorist intent or agenda. That is why the government agreed that the terrorism enhancement does not apply to Mr. Iqbal. Rather, Mr. Iqbal made the unfortunate choice to broadcast *Al Manar* in the context of an otherwise legitimate satellite television services business, HDTV, that carried a wide variety of programming.

Indeed, some of that programming was completely contrary to any terrorist or Islamic sentiment. For instance, HDTV carried Christian broadcasting, adult channels, a Jamaican channel, and a gay and lesbian channel. In addition, one of the partners in one of HDTV's ventures was a New York City police officer. That broad range of programming is consistent with Mr. Iqbal's lack of any particular political or religious ideology: he is a businessman, and sought to provide services he thought would generate profits. In fact, as the communications produced in discovery establish, one of the reasons Mr. Iqbal stated for not terminating *Al Manar* was that due to the terms of HDTV's contract with the Lebanese Communication Group (hereinafter "LCG"), Access Media Freedom Inc. (hereinafter "AMF"), the corporate vehicle for the contract represented by Mr. Iqbal's colleague Saleh Elahwal, would owe a substantial indemnity payment to LCG if the transmission of *Al Manar*'s signal was interrupted. *See* Agreement between Saleh Elahwal, on behalf of AMF, and Abdallah Cassir, on behalf of LCG, batestamped in discovery at Elahwal 1.

Nor did Mr. Iqbal's conduct involve participation, knowledge, or intent with respect to any specific violent activities. Nor is there any evidence suggesting Mr. Iqbal supports violence or any terrorist agenda. Thus, while Mr. Iqbal's conduct constituted an offense, it was not the product of any sympathy or support for Hizballah's ideology or activities. In fact, Mr. Iqbal (as other discovery material corroborated), a native of Pakistan, does not even speak Arabic. In that context, this case is unique among material support prosecutions. It is respectfully submitted that Mr. Iqbal's sentence should reflect that uncharacteristic situation.

**2.   *Mr. Iqbal's Personal History and Characteristics [§3553(a)(1)]***

The unprecedented type of motivation in this material support prosecution is not

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 6 of 18

surprising in light Mr. Iqbal's personal history and character. Indeed, in that context, Mr. Iqbal's offense conduct is simply aberrational. As the letters from his family, friends, and business associates quoted herein demonstrate, Mr. Iqbal has a long and impressive record of personal achievement and hard work, and is known for his helpfulness, generosity, and unselfish devotion to his family.

      a.     *Mr. Iqbal's Personal Background*

Mr. Iqbal, now 47 years old, emigrated from Pakistan to the United States as a teenager, and he has spent his entire adult life residing in the New York City area. Mr. Iqbal has married twice (and divorced once), fathered and parented five children, grown two businesses from the ground up, and been a productive member of society. As someone with a limited formal education and limited literacy skills, Mr. Iqbal's success is attributable to his decades of hard work.

Mr. Iqbal married his first wife, ███████, an Italian-American woman born in Staten Island, in 1993. She and Javed were married for approximately ten years, and have a son, ███, now eight years old. During their marriage, Mr. Iqbal gained resident alien status, but his inability to pass the writing portion of the English language literacy exam required for citizenship has prevented him from attaining citizenship. *See* U.S. Department of Justice, Immigration and Naturalization Service (hereinafter "INS") documents, at OCT000000048-49; OCT000000057-58; OCT000000061-6; OCT0000000236; OCT0000000238 (copies of which are attached hereto as Exhibit 2). During that time, Mr. Iqbal also advanced from being a motorcycle shop employee, to an auto mechanic shop employee, to an auto mechanic shop owner. Once Mr. Iqbal established his own business, he expanded it to include satellite dish installation, a skill he learned as a mechanic. Eventually, Mr. Iqbal launched a business that included satellite television broadcasting.

HDTV was the culmination of Mr. Iqbal's years of hard work and perseverance. The company maintained its main office in Brooklyn, New York, and provided satellite installation and satellite television services to customers throughout the New York City area. Mr. Iqbal raised capital for HDTV ventures and expansion by obtaining partners and recurring loans. Mr. Iqbal also applied for and obtained a license from the Federal Communications Commission, which authorized HDTV to transmit communications and facilitate broadcasts.

While Mr. Iqbal and ███████ divorced in 2000, Mr. Iqbal has maintained an extremely close relationship with both her and their son ███. *See* Letter of ███████ (attached hereto as Exhibit 3). In 2001, Mr. Iqbal met his current wife, ███████. Together they have four children: ███ (age 7), ███ (age 6), ███ (age 4), and ███ (age 1). *See* Letter of ███████ (attached hereto as Exhibit 4). Ms. Haimoud is currently pregnant with their fifth child, due in July of this year.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 7 of 18

Before his incarceration in January 2009, Mr. Iqbal provided both financial and emotional support to his wife and his children. In fact, the income Mr. Iqbal generated from his business was dedicated to that purpose. Mr. Iqbal's business ventures have not made him financially wealthy, and certainly the poor judgment he exercised in committing the offense conduct in this case has ruined him professionally and financially. As a result of Mr. Iqbal's arrest and prosecution in this case, his business failed and he has incurred a personal debt of approximately $164,000. Consequently, his family, without its sole provider, has been left impoverished. He is also personally liable for HDTV's debts, which he estimates at more than $1 million.

  **b.**  *Mr. Iqbal's Devotion to His Family*

Family ties are a relevant and important factor in determining an appropriate sentence under section 3553(a). *See, e.g., United States v. Nellum,* ___ F. Supp.2d ___, 2005 WL 300073, at *4 (N.D. Ind. 2005) (stating that "under §3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence"). Many of the letters written on Mr. Iqbal's behalf describe his devotion and loyalty to his family.

For example, Mr. Iqbal's sister-in-law, ███████████, writes that:

> Javed is a dedicated husband and father to my sister and my four nieces. . . . Javed has sacrificed so much for his family, including mine as well.

*See* Letter of ███████████ (attached hereto as Exhibit 5).

In another letter, ███████████ the mother of Mr. Iqbal's ex-wife ███████, writes:

> [Javed] has always been there for me and my family, if I needed some place to live he would open his house to me.

*See* Letter of ███████████ (attached hereto as Exhibit 6).

Still other family members, such as Javed's brother-in law and close friend, ███████████, state that Mr. Iqbal's devotion to his family is inspirational. In his letter, Mr. ███████ writes that he considers Mr. Iqbal to be an "amazing father to his children" and that he thinks of "Javed as an example of what I aspire to be like as a father." *See* Letter of ███████████ (attached hereto as Exhibit 7).

Those outside Mr. Iqbal's family are also aware of his unwavering devotion to his family. Mr. Iqbal's friend and attorney, ███████████, states that "there is nothing more important to Mr. Iqbal than taking care of his family." *See* Letter of ███████████, Esq. (attached hereto as Exhibit 8). Similarly, ███████████, a friend and former client of Mr. Iqbal's,

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

>Hon. Richard M. Berman
>United States District Judge
>Southern District of New York
>April 7, 2009
>Page 8 of 18

points out that Mr. Iqbal is "extremely dedicated to his family[,]" and that his "awareness of the need to balance his multiple responsibilities and prioritize his schedule to his 5 beautiful children . . . earned [her] respect." *See* Letter of ███████████ (attached hereto as Exhibit 9). ███████████ a close friend of Mr. Iqbal's wife, writes, "[a]bove all both Javed and ███ love their kids very much . . ." *See* Letter of ███████████ (attached hereto as Exhibit 10).

Mr. Iqbal's ex-wife, ███████, and his wife, ███████████ also wrote letters to the Court that describe Mr. Iqbal's nature. ███████████ writes:

> [i]n spite of our divorce, Javed remains my best friend and a part of my family. He still calls my mother "mom" and my niece and nephew still refer to him as "uncle." When my son and I lived in Pennsylvania after the divorce, Javed would come up every weekend to visit us. . . . Javed always made time for his family. . . . In 2003-2004 when my son and I returned to New York, and we had nowhere to go, Javed opened his home to us. We stayed with Javed, his wife ███ and their baby, for about six months while I got back on my feet.

*See* Letter of ███████████ (Exhibit 3).

Mr. Iqbal's wife, ███████████ writes:

> Javed is a great husband, father and generally a great person. His children miss him terribly and have had difficulty sleeping since he was recently detained. They ask for their father nearly every day. He is an integral part of their life and is the sole provider for the family. With the new child on the way, I fear that the difficulty of not having Javed around might become too much to bear. . . . Javed has been working long hours, prior to his arrest, just so he can put food on the table for his family. When Javed was not at work, he was at home and spent very little time, if any, doing anything else.

*See* Letter of ███████████ (Exhibit 4).

These letters attest to Mr. Iqbal's character beyond the very limited context of his offense conduct, demonstrating that such conduct was a departure for Mr. Iqbal from his otherwise fastidious dedication to his family and avid pursuit of legitimate business opportunities to provide support therefor.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 9 of 18

### c. *Mr. Iqbal's Strong Work Ethic and Professional Integrity*

Those who have written the Court on Mr. Iqbal's behalf have found his work ethic and professional integrity to be as remarkable as his devotion to his family. For instance, ▓▓▓▓ ▓▓▓▓ who befriended Mr. Iqbal in the 1980s while they worked at neighboring mechanic shops, writes of Mr. Iqbal's commitment to his business ventures:

> Mr. Iqbal is a person I would describe as a hard working family man. I watched him develop his professional skills from being a regular mechanic guy to a satellite service carrier with his own satellite receivers company. From what I know of Javed, he works almost entirely too much, spending his times either with his family ot at the office and is rarely found relaxing or idling . . .

*See* Letter of ▓▓▓▓ (attached hereto as Exhibit 11).

In another letter, Mr. Iqbal's first wife ▓▓▓▓ recalls both his hard work and rigorous schedule during their marriage:

> [d]uring our marriage, Javed proved to be an extremely hard worker and a good provider for our family. When we were first married, Javed owned and operated a mechanic shop. He would get up early in the morning, leave the house around 7:30 a.m., and would come home at 6 p.m.. When he was trying to launch his television business, he worked all hours of the day and night – waking at 6 a.m., coming home after 10 p.m., and then working at home to get his business off the ground.

*See* Letter of ▓▓▓▓ (Exhibit 3).

Other letters focus on Mr. Iqbal's professional integrity. ▓▓▓▓ President of ▓▓▓▓ and Mr. Iqbal's long-time friend and business contact, confirms in his letter that Mr. Iqbal is "a man of great integrity" and that Mr. ▓▓▓▓ has "been impressed with [Mr. Iqbal's] dedication to any endeavor that he has been involved with." *See* Letter of ▓▓▓▓ (attached hereto as Exhibit 12). Mr. ▓▓▓▓ writes that Mr. Iqbal was at one time his company's satellite service provider and that:

> [Mr. Iqbal] always fulfilled his obligations under our service contract. In fact, some times, he went an extra mile to solve problems on our end without complaining or charging any cost. . . . At all times, I have found Javed to be dependable, reliable, hard-working, conscientous, honest, peace-loving, and courteous.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

> Hon. Richard M. Berman
> United States District Judge
> Southern District of New York
> April 7, 2009
> Page 10 of 18

*Id.*

Likewise, ▆▆▆▆▆▆▆▆, at one time Mr. Iqbal's colleague on "some electrical projects for Javed's satellite service company," and a friend for 22 years, writes:

> Javed is hard-working and highly committed to his profession. He is highly respected, as both a person and a professional, by colleagues, suppliers, and customers alike. . . . Therefore I am deeply saddened by the events and personal tragedy which have led to Javed's decision to have pleaded guilty. . . . The behavior is so perplexing because it is so unlike Javed's character.

*See* Letter of ▆▆▆▆▆▆▆▆ (attached hereto as Exhibit 13).

### d.  *Mr. Iqbal's Extraordinary Generosity*

Numerous individuals have submitted letters describing Mr. Iqbal's selflessness and extraordinary generosity towards both his family and even complete strangers. For instance, Mr. Iqbal's sister-in-law, ▆▆▆▆▆▆▆▆, recalls:

> I lived with [Mr. Iqbal] and my sister for two years without paying rent or any expenses due to his generosity. Additionally, when I fell ill and was in need of surgery, Javed drove me to and from the hospital on two separate occasions. Not only out of duty to my sister but from the kindness of his heart, he took off work and waited with me to make sure the surgery went well. Throughout the time he has been a member of my family, including these two trips to the hospital, Javed has been supportive and comforting and most of all sincerely caring for those in need.

*See* Exhibit 5.

In another instance, Mr. Iqbal's former sister-in-law, ▆▆▆▆▆▆▆▆, explains:

> [t]here was a time in my life when I was going through personal problems. [Javed] opened his door to me and my two children, making sure all of our needs were met. Like having a place to sleep, food to eat, and money in my pocket. When I would thank him, he would reply, "You're my sister."

*See* Letter of ▆▆▆▆▆▆▆▆ (attached hereto as Exhibit 14).

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 11 of 18

Mr. Iqbal's generosity extends beyond his family. ▉▉▉▉▉▉▉▉▉▉, who befriended Mr. Iqbal in 2005 when he opened a medical office near Mr. Iqbal's office states, "[Javed] is a very kind and helpful person." *See* Letter of ▉▉▉▉▉▉▉▉▉▉ MD (attached hereto as Exhibit 15). Dr. ▉▉▉▉ wife, ▉▉▉▉▉▉, recalls "[Javed] helped my husband in getting the office started. He was always there when ever(sic) we needed him." *See* Letter of ▉▉▉▉▉▉▉ (attached hereto as Exhibit 16). Mr. Iqbal also housed one of Mr. ▉▉▉▉▉ clients and the client's family. These people were complete strangers to Mr. Iqbal. As Mr. ▉▉▉▉▉ writes:

> [s]ometime in 2003 or thereabouts, my wife and I had to take in a Russian client of mine – along with her two sons – who was escaping from an abusive husband and with nowhere to turn. After sometime at my home (a 1½ bedroom apartment housing six people), I had to find a new place for my Russian client. When my search for a place bore no fruit, I turned to Mr. Iqbal for help. Mr. Iqbal was immediately receptive and allowed the mother of two to live at his home until she found an affordable place to live. The preceding example is what I will always remember about Mr. Iqbal– an unselfish and dedicated family man who looked for every opportunity to help out those whom he knew well and those with whom he had no relationship.

*See* Exhibit 8.

Thus, Mr. Iqbal's personal history justifies a sentence at the bottom of the Guidelines range (namely, 63 months).

### 3. Mr. Iqbal's Medical History

Mr. Iqbal suffers from several chronic medical conditions, and continues to require frequent care and medication to manage these conditions. The particulars of these conditions, along with Mr. Iqbal's treatment histories, are described in records provided by (a) Saint Vincent's Catholic Medical Center (now Richmond University Medical Center); (b) New York Downtown Hospital; (c) Maimonides Medical Center; (d) Lutheran Medical Center; (e) the Nursing Office at the Federal Bureau of Investigation; (f) Victory Memorial Hospital; (g) the Federation Employment and Guidance Service, Inc. (hereinafter "FEGS"); and (h) the Metropolitan Detention Center in Brooklyn (hereinafter "MDC") (attached hereto as Exhibits 17, 18, 19, 20, 21, 22, 23 and 24, respectively).[7]

---

[7] Relevant portions of the records are provided in the Exhibits. However, should the Court wish to review the (in some instances) voluminous records in their entirety, they can be provided.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman<br>
United States District Judge<br>
Southern District of New York<br>
April 7, 2009<br>
Page 12 of 18

Mr. Iqbal's medical records from over a decade of treatment, reveal a long history of depression and panic/anxiety disorder.[8] When Mr. Iqbal was treated for chest pain at Maimonides Medical Center in March 2001, records indicate he was "very anxious." *See* Records from Maimonides Medical Center, dated 3/16/01 (Exhibit 19). In June and July 2001, doctors treating Mr. Iqbal at Lutheran Medical Center diagnosed him during each visit with both atypical chest pain and anxiety attacks. *See* Records from Lutheran Medical Center, dated 6/01 and 7/01 (Exhibit 20). In July 2006, when Mr. Iqbal went to Saint Vincent's Catholic Medical Center complaining of chest pain, his illness was described as "an anxiety disorder," and his Interdisciplinary Admission Assessment referenced a past history of anxiety. *See* Records from Saint Vincent's Catholic Medical Center, dated 7/24/06 (Exhibit 17). Moreover, the treating physician noted that "this [7/24/06] episode of CP [chest pain] is 2nd time within 1 wk." *Id.* September 2006 records from Saint Vincent's Catholic Medical Center attributed to Mr. Iqbal a medical history of "panic/anxiety disorder" and angina. *Id.*

When Mr. Iqbal was arrested August 23, 2006, federal agents were sufficiently concerned with his medical condition to send him to the Nursing Office at the Federal Bureau of Investigation (hereinafter "FBI"), and then to New York Downtown Hospital. At the FBI's Nursing Office, ███████, RN, examined Mr. Iqbal and reported "a history of emotional problems for which he is rx medication." *See* Mednote from the Nursing Office at the FBI, dated 8/23/06 (Exhibit 21). That same day, when Mr. Iqbal was taken to New York Downtown Hospital, his medical history, as recorded in his nursing history and assessment record, included history of "cardiac," "psych," and "anxiety" problems. *See* Records from New York Downtown Hospital, dated 8/23/06 (Exhibit 18).

In June 2008, when Mr. Iqbal went to the emergency room at Richmond University Medical Center complaining of chest pain, his discharge summary also addressed his "past medical history of depression." *See* Records from Richmond University Medical Center (formerly Saint Vincent's Catholic Medical Center), dated 6/25/05 (Exhibit 17). Mr. Iqbal's documented history of such pain can be traced back as early as July 2000, when his chief complaint upon treatment at Victory Memorial Hospital was chest pain and numbness in his left arm. *See* Records of Victory Memorial Hospital, dated 7/17/00 (Exhibit 22).

---

[8] Anxiety disorder is defined as "a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress." *See* definition of "anxiety disorder," Medical Dictionary of MedicineNet.com, at <http://www.medterms.com/script/main/art.asp?articlekey=9948>. Panic disorder is defined as a "disorder characterized by sudden attacks or fear and panic. The episodes may resemble a heart attack. . . . Symptoms of panic attacks may include tachycardia (rapid heartbeat), chest pressure or pain, shortness of breath, dizziness, tingling, and anxiety. Hyperventilation, agitation, and withdrawal are common results. . . . Treatment of panic disorder may include medications and/or cognitive behavioral therapy . . ." *See* definition of "panic disorder," Medical Dictionary of MedicineNet.com, at <http://www.medterms.com/script/main/art.asp?articlekey=4753>.

LAW OFFICES OF

JOSHUA L. DRATEL, P.C.

> Hon. Richard M. Berman
> United States District Judge
> Southern District of New York
> April 7, 2009
> Page 13 of 18

     While treatment from the various hospitals, discussed **ante**, focused primarily on Mr. Iqbal's physical health, Pre-Trial Services referred Mr. Iqbal to FEGS, a mental health facility that provided Mr. Iqbal with "individual psychotherapy and medication management" on a regular basis from November 2006 until his incarceration in January 2009. *See* Records from FEGS (Exhibit 23). At FEGS Mr. Iqbal's treatment team consisted of therapist ▇▇▇ LCSW-R, and psychiatrists ▇▇▇, M.D., and ▇▇▇, M.D. An additional psychiatrist, ▇▇▇, M.D., also reviewed Mr. Iqbal's case periodically. *Id.* At the time of admission, Mr. ▇▇▇ described Mr. Iqbal's problems as "depression, anxiety, panic attacks, somatic complaints, extreme legal stressors with compounding financial problems, post-traumatic stress symptoms related to past abuse, 9/11 and current legal problems." *Id.* When Mr. Iqbal was remanded to MDC in January 2009, Mr.▇▇▇ prepared a discharge summary indicating the goals of Mr. Iqbal's treatment were to "[i]mprove management of symptoms and stressors" and the goal remained "active," rather than achieved, at the time of discharge. *Id.* Mr. Iqbal's discharge diagnoses' were: (1) Axis I: panic disorder with agoraphobia, depressive disorder not otherwise specified (hereinafter "NOS"), post traumatic stress disorder (hereinafter "PTSD") (chronic); (2) Axis III: hypertension, post concussion headache syndrome;[9] and (4) Axis IV: severe legal and financial stressors. *Id.*

     Treating Mr. Iqbal's anxiety disorder, depression, chest pain, and stomach conditions has required a large number of both prescription and over-the-counter medications. At the time of his incarceration, Mr. Iqbal's daily medication included eight prescription and over-the-counter medications. For his anxiety and panic disorder, Mr. Iqbal was taking Xanax, which he brought with him upon his incarceration. Xanax, like Alprozolam which he previously took, creates a

---

[9] WebMD explains that postconcussive syndrome "occurs after a severe head blow. Common symptoms are changes in the ability to concentrate, think, remember, or solve problems." *See* medical reference for "postconcussive syndrome," at <http://www.webmd.com/hw-popup/postconcussive-syndrome>. Mr. Iqbal attributes his limited literacy skills and cognitive difficulties to a head injury he sustained during a motorcycle accident in the late 1980's or 1990's. As indicated in MDC medical records from February 26, 2009, during a "follow-up [visit to MDC unit psychologist▇▇▇, Psy.D] to check on adjustment and response to psychotropic medication" Mr. Iqbal "reported memory problems following a head injury in a motorcycle accident in the 1980s." While ▇▇▇ noted "no gross memory problems .. within the context of the interview or in his description of his pre-arrest functioning as a tv station owner," FEGS records, as well as Mr. Iqbal's repeated inability to pass the writing portion of the English language literacy exam required for citizenship, discussed **ante**, at 6, suggest that the accident and resultant condition had significant impact on Mr. Iqbal's pre-arrest functioning. *See* Records from MDC (Exhibit 24); Records from FEGS (Exhibit 23); U.S. Department of Justice, Immigration and Naturalization Service (hereinafter "INS") documents, at OCT000000048-49; OCT000000057-58; OCT000000061-6; OCT0000000236; OCT0000000238 (Exhibit 2).

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 14 of 18

calming effect, and Mr. Iqbal requires a daily dose to control his panic disorder. For his stomach and bowel conditions, Mr. Iqbal was using Nexium, Diphenhydramine, and Nitroglycerine, which appear to have replaced the drug Prevacid, which was prescribed to prevent ulcers caused by long-term use of drugs for pain or swelling. Thus, Nexium, Diphenhydramine, and Nitroglycerine may in part counteract the effects of Naproxen, a non-steroidal anti-inflammatory drug (NSAID) that Mr. Iqbal took every day before he was incarcerated. In addition to the aforementioned drugs, Mr. Iqbal also was prescribed Lipitor to control his cholesterol, and Amlodipine Besylate to treat chest pain and increase oxygen supply to his heart. These drugs replaced Lopressor, which Mr. Iqbal used in prior years for chest pain, and Zocor, which he previously used for cholesterol control. FEGS records also indicate that Mr. Iqbal was taking Benadryl throughout the course of his treatment at FEGS, and at the time of discharge when he was remanded to MDC. *Id.*

Medical records from MDC, which cover Mr. Iqbal's treatment history since his post-guilty plea remand in January 2009, confirm the presence of his several chronic medical conditions, and continued need for frequent care and medication to manage these conditions. Medical staff at MDC have classified Mr. Iqbal as "care level 2." *See* Records from MDC (Exhibit 24). From the time of his incarceration through March 19, 2009, Mr. Iqbal has been seen by members of MDC's medical and psychiatric staff on eight or nine occasions. *Id.* Most recently, on March 19, 2009, Mr. Iqbal was seen by Dr. ███████████ in response to complaints of chest pain. *Id.* After Dr. ███████'s adjustments to Mr. Iqbal's medication, Mr. Iqbal is presently taking the following medications prescribed by MDC medical staff: Amlodipine (for unspecified essential hypertension), Aspirin (for unspecified hyperlipidemia), Citalopram (for unspecified anxiety state), Hydrocortisone ointment (for a rash), Nitroglycerin sl (for chest pain), Omeprazole (for stomach conditions/ esophageal reflux), and Simvastatin (for cholesterol). Over the course of his approximately three months at MDC, Mr. Iqbal has been prescribed 14 different medications, and his medication regiment has required readjustment at least five times. *Id.*

4. *Consideration of the Sentencing Objectives Set Forth in 18 U.S.C. §3553(a)(2) Compels a Sentence for Mr. Iqbal At the Bottom of the Guidelines Range*

In addition to evaluating the §3553(a) factors previously discussed, the sentence must also comport with the stated purposes of sentencing enumerated in §3553(a)(2) and applied below to Mr. Iqbal's specific circumstances.

a. *The Sentence Should Reflect the Seriousness of the Offense, Promote Respect For the Law, and Provide Just Punishment*

While Mr. Iqbal has acknowledged providing material support to Hizbollah, the mitigating factors set forth **ante**, at 5, apply to §§3553(a)(2)(A) & (B). As noted earlier, the government acknowledges the unique nature of Mr. Iqbal's conduct, as the Agreement provides that "the Government would not be able to show that the defendant's offense was 'calculated to

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

                                  Hon. Richard M. Berman
                                  United States District Judge
                                  Southern District of New York
                                  April 7, 2009
                                  Page 15 of 18

influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *See* Agreement, at 2, [*quoting* 18 U.S.C. § 2332b(g)(5)].

      Thus, a sentence at the bottom of the Guidelines range (63 months) would adequately reflect the seriousness of the offense, while promoting respect for the law and providing just punishment for Mr. Iqbal's particular offense conduct.

                **b.**     ***The Sentence Imposed Should Adequately Deter Criminal Conduct***
                          ***and Protect the Public from Any Further Crimes of the Defendant***

      Regarding deterrence, both general and specific, Mr. Iqbal's wife, Ms████████, and his ex-wife, ██████, describe the severe consequences that Mr. Iqbal has suffered as a result of his offense, and the painful lessons he has learned. *See* Exhibits 4 and 3, respectively). Also, since the circumstances of this case are so distinct from the typical material support case, general deterrence is less relevant than it would be ordinarily. In any event, the punishment Mr. Iqbal has already suffered – loss of his business, destitution, leaving his family without economic support, and aggravation of his depression and anxiety disorders – in addition to the sentence the Court will impose, is more than sufficient to deter others who might contemplate similar conduct.

      For example, ██████ describes the hardship that Mr. Iqbal has endured:

> [a]s a result of this incident, I truly feel that everything Javed has worked to achieve in this country is now gone. He will never be able to regain the trust of his customers, and his family has been left to struggle.

*See* Exhibit 3.

      Ms. ██████ further reports that Mr. Iqbal has learned from this arduous experience:

> [Javed] is not the type of person to . . . repeat the type of conduct with which he has been charged. He has pled guilty and taken responsibility for his actions so that he can move forward with his life. The children need their father and the child on the way will definitely be in need as well.

*See* Letter of ██████ (Exhibit 4).

      ██████, a retired New York city police officer and long time friend of Mr. Iqbal's, addresses Mr. Iqbal's nature and offense conduct in his letter, as well:

> I am a retired police officer and have known [Javed] for over 20 years
> . . . . I have known him not to be criminally minded . . . He has not

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 16 of 18

>   engaged in criminal activity before and certainly will never return
>   to doing this again. At the moment, he has five children and another
>   on the way. His family has always been law abiding and respectful,
>   and it is hoped this letter will help you to see him in a better light.

See Letter of ▓▓▓▓▓▓▓▓ (attached hereto as Exhibit 25).

In addition, defendants over 40 years of age present a dramatically reduced danger of recidivism. That fact, considered together with Mr. Iqbal's long history as a productive member of society, effectively minimizes the need to protect the public from any further crimes by Mr. Iqbal. See United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at <http://www.ussc.gov/publicat/Recidivism_General.pdf>. *See also United States v. Eberhard*, 2005 WL 1384038 (S.D.N.Y. June 9, 2005); *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. April 11, 2005); *United States v. Simon*, 361 F. Supp.2d 35, 41 (E.D.N.Y. 2005); *United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. 2005); *Nellum*, 2005 WL 300073, at *3 (N.D. Ind. 2005); Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964); P.B. Hoffman & J.L. Beck, *Burnout – age at release from prison and recidivism*," 12 J. Crim.Just. 617 (1984).

    c.    *The Sentence Should Provide Mr. Iqbal With Needed Medical Care In the Most Effective Manner Possible*

The fourth purpose of sentencing listed in §3553(a)(2) is "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner". §3553(a)(2)(D). As discussed *ante* at 11-14, Mr. Iqbal requires frequent care to manage several chronic medical and mental health conditions, including anxiety and panic disorder with agoraphobia, depressive disorder, PTSD, postconcussion headache disorder, hypertension, chest pain, and an array of stomach ailments. Since his remand to MDC, Mr. Iqbal has required medical care from the hypertension clinic and the behavioral health clinic, and he has received clinical assistance for chest pain upon notice of a medical emergency by his unit officer. *See* Records from MDC (Exhibit 24). He has also been referred for psychiatric evaluations, including an intake screening, a suicide risk assessment, and a medication review. *Id.*

Mr. Iqbal received frequent, and sometimes daily, treatment for his anxiety disorder and attendant conditions before being remanded to MDC. Experience teaches that he will not receive the same level of medical care while in BOP custody. *See* U.S. Department of Justice, Office of the Inspector General- Audit Division, Audit of the Federal Bureau of Prisons Pharmacy Services (November 2005) (stating that "[t]he Federal Bureau of Prisons (BOP) is faced with a significant challenge in providing adequate and cost-effective medical care to inmates because of the rising federal inmate population and the increasing cost of prescription medications"); *see also*

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 17 of 18

*Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. April 11, 2005) (concluding that defendant's need for ongoing treatment and monitoring of high blood pressure, diabetes, anxiety and depression was significant and required due consideration under 3553(a)(2) in determining sentence).

In a federal facility, Mr. Iqbal would receive medically mandatory care as determined appropriate by a BoP physician, but would likely not receive other medically appropriate but not always necessary care that would be available to him in the community. *See* U.S. Department of Justice, BoP Program Statement P6010.02, Health Services Administration, at 3 (January 15, 2005) (stating the BoP's "Health Services Division's goal is to provide medically necessary health care services"). According to a BoP Program Statement on patient care, "medically acceptable – not always necessary" conditions are those for which "treatment may improve the inmate's quality of life," but the conditions are "without significant risk of: serious deterioration leading to premature death; significant reduction in the possibility of repair later without present treatment; or significant pain or discomfort which impairs the inmate's participation in activities of daily living" or are "not immediately life threatening." *See* U.S. Department of Justice, BoP Program Statement P6031.01, Patient Care, at 5 (January 15, 2005).

Moreover, for inmates with pre-existing health problems, such as pre-existing stress-related conditions, the impacts of confinement can be far greater. Explaining the "heavy toll" prison life can take, Craig Haney, in his article, "The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," states, "particular vulnerabilities and inabilities to cope and adapt can come to the fore in a prison setting, [and] the behavior patterns and attitudes that emerge can take many forms . . . [including] deepening social and emotional withdrawal . . ." Craig Haney, "The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in David V. Canter and Rita Zukayskienée, *Psychology and the Law: Bridging the Gap*, Ashgate Publishing (2008), at 144. Therefore, in addition to the punishment that imprisonment imposes under ordinary circumstances, each day of Mr. Iqbal's sentence will be more onerous due to his medical conditions, and the limited medical resources available to manage them.

5. *The Court Should Not Impose Any Fine, Since Mr. Iqbal Is Financially Unable to Pay Any Further Financial Penalty*

Mr. Iqbal's financial situation demonstrates his inability to pay a fine in this case. As Mr. Iqbal's financial statements indicate, Mr. Iqbal's personal debt is approximately $164,000. Of that debt, $143,000 is mortgage debt to HSBC Mortgage Company on the house in which his pregnant wife and five children reside. *See* PSR at ¶ 76. Mr. Iqbal is also personally liable for the debts of HDTV, which total more than $1 million. Additionally, since his incarceration, Mr. Iqbal is no longer working and has no source of income. Based on 2009 figures, well documented in Mr. Iqbal's monthly cash flow statement, the Iqbal family's monthly cash inflow is *negative* $3,409. As such, it is respectfully requested that the Court not impose any fine in this case. Nor was there any financial loss to others as a result of his offense.

LAW OFFICES OF
JOSHUA L. DRATEL, P.C.

Hon. Richard M. Berman
United States District Judge
Southern District of New York
April 7, 2009
Page 18 of 18

### C. Mr. Iqbal's Objections to the Pre-Sentence Report

Mr. Iqbal submits the following objections, corrections, and additions to the draft PSR:

(1) at ¶ 45 the draft PSR contends that "defendant has one criminal conviction which results in the application of one criminal history point." However, §4A1.2 (e)(1) and (2), when read together, explain that a prior conviction of less than one year and one month is only counted if the prior sentence "was imposed within ten years of the defendant's commencement of the instance offense." Pursuant to §4A1.2(e)(3), "any prior sentence not within the time periods specified above [in §4A1.2 (e)(2) and (3)] is not counted." Since Mr. Iqbal's prior offense was committed in 1989 and resulted in an eight-day sentence, the prior sentence does not exceed one year and one month, was not imposed within ten years of the defendant's commencement of the instant offense, and, therefore, cannot be counted. Consequently, Mr. Iqbal should have zero criminal history points.

### Conclusion

For the foregoing reasons, it is respectfully submitted that Mr. Iqbal should be sentenced to a prison term of 63 months, which represents the bottom of the applicable Guidelines range as prescribed in the Plea Agreement. It is further requested that the Court recommend that Mr. Iqbal be designated to a facility in the northeastern region of the United States, as near as possible to his pregnant wife and five children.

Respectfully submitted,

Joshua L. Dratel

JLD/lal

cc: Eric Snyder
David S. Leibowitz
Assistant United States Attorneys

Susan D. Krol
United States Probation Officer